Anita Y. Milanovich (Mt. No. 12176)
THE BOPP LAW FIRM, PC
1627 West Main Street, Suite 294
Bozeman, MT 59715
Phone: (406) 589-6856
Email: aymilanovich@bopplaw.com
*Attorney for Plaintiff*

James Bopp, Jr. (Ind. No. 2838-84)*
Justin McAdam (Ind. No. 30016-49)*
THE JAMES MADISON CENTER FOR
FREE SPEECH
The National Building
1 South Sixth Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com
jmcadam@bopplaw.com
*Attorneys for Plaintiff*

*Pro hac vice application granted
September 4, 2015.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| **Montanans for Community Development**, <br><br> *Plaintiff*, <br><br> v. <br><br> **Jonathan Motl**, in his official capacity as Commissioner of Political Practices, **Timothy Fox**, in his official capacity as Attorney General of the State of Montana, and **Leo Gallagher,** in his official capacity as Lewis and Clark County Attorney, <br><br> *Defendants*. | Case No. 6:14-cv-00055 <br><br><br> **First Amended Verified Complaint For Declaratory and Injunctive Relief** |

Plaintiff Montanans for Community Development ("MCD") amends its

complaints against Defendants as follows[1]:

## Introduction

1.      This is a civil action for declaratory and injunctive relief arising under the First and Fourteenth Amendments to the Constitution of the United States. It concerns the constitutionality of Montana election statutes and administrative regulations that **1)** define political committees, MCA § 13-1-101(22), ARM 44.10.327 (revised and recodified by SB 289 as MCA § 13-1-101(30), effective October 1, 2015); **2)** define expenditures, MCA § 13-1-101(11)(a), ARM 44.10.323 (revised and recodified by SB 289 as MCA § 13-1-101(17)(a), effective October 1, 2015); **3)** define contributions, MCA § 13-1-101(7)(a)(i), ARM 44.10.321 (revised and recodified by SB 289 as MCA § 13-1-101(9)(a)(i), effective October 1, 2015); **4)** define electioneering communication and its reporting, adopted by SB 289 as MCA § 13-1-101(15) and MCA § 13-37-225(4), effective October 1, 2015; **5)**  proscribe anonymous speech, MCA § 13-35-225(1) (revised and recodified by SB 289 as MCA § 13-1-101(22), effective October 1, 2015); **6)** establish investigatory procedures for the Commissioner of Political Practices, MCA § 13-37-111; and **7)** authorize publication of complaints filed with

---

[1]This Court established March 13, 2015, as Plaintiff's deadline to amend its Complaint, but also permitted the parties to stipulate to extensions of this deadline. (Doc. 52 at 1,3.) Throughout discovery, the amended pleading deadline has been extended by the parties, with a final stipulated agreed deadline of June 23, 2015, reached on June 15, 2015. This Amended Complaint is therefore timely.

and sufficiency decisions prepared by the Commissioner of Political Practices, ARM 44.10.307(4).

2.      Political committees are required to report certain contributions in excess of $35 (both received and made, along with contributor information) and certain expenditures they make. MCA §§ 13-37-225, 13-37-229, 13-37-230, and SB 289, Section 14.  Political committees who fail to comply with these reporting requirements are subject to investigation, MCA § 13-37-111(1) and (2), MCA §13-37-125; civil prosecution, MCA § 13-37-124; and, if convicted, are subject to potentially substantial fines, MCA §13-37-128. *See, e.g., American Tradition Partnership v. Motl,* No. BDV-2010-1120, slip op. (Mont. 1st Jud. Dist. 2013) (attached as Ex. 1) (fining a 501(c)(4) organization over $260,000 for failing to report expenditures).

3.      Plaintiff MCD, a 501(c)(4) organization, complains that these definitional, reporting, anonymity, investigatory and publication provisions burden and chill its speech and association.  They are unconstitutional under the First and Fourteenth Amendments to the United States Constitution because **1)** they are unconstitutionally vague, **2)** they are unconstitutionally overbroad, or **3)** they fail scrutiny review.

## Jurisdiction and Venue

4.      Because this case arises under 42 U.S.C. § 1983 and the First and

**Plaintiff's First Amended
Verified Complaint**                     -3-

Fourteenth Amendments to the Constitution of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). It also has jurisdiction pursuant to the Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201 and 2202.

5.     Venue is proper under 28 U.S.C. § 1391(b) because events giving rise to the claim occurred, and Defendants reside, in this Division.

**Parties**

6.     Montanans for Community Development ("MCD") is a non-profit corporation organized under Montana law that is exempt from federal income taxes under 26 U.S.C. 501(c)(4). MCD is located in Helena, Montana, which is in Lewis and Clark County.

7.     As Commissioner of Political Practices, Defendant Jonathan Motl has the authority to investigate violations of, enforce the provisions of, and hire attorneys to prosecute violations of, Montana Code Chapters 35 and 37 and the regulations adopted to carry out these provisions. MCA §§ 13-37-111, 13-37-113, 13-37-114, and 13-37-124. The Commissioner acts under color of law and is sued in his official capacity.

8.     As Montana Attorney General, Defendant Timothy Fox has the power to investigate and prosecute violations of Montana Code Chapters 35 and 37 by and through the county attorneys under his supervision. MCA §§ 2-15-501(5), 13-

37-124, 13-37-125, and 13-37-128. The Attorney General acts under color of law and is sued in his official capacity.

**9.** As Lewis and Clark County Attorney, Defendant Leo Gallagher has the power to investigate and prosecute violations of Montana Code Chapters 35 and 37. *See* MCA §§ 7-4-2716, 13-37-124, 13-37-125, 13-37-128 (granting investigative and prosecutorial power to Montana's county attorneys). The county attorney acts under color of law and is sued in his official capacity.

## Facts

**10.** Chapters 35 and 37 of Title 13 the Montana Code impose campaign finance restrictions and bans on political speakers, including corporations and organizations, that fall within the scope of these chapters.

**11.** MCA § 13-1-101(22) (hereinafter "the Political-Committee Statutory Definition") states that:

> "Political committee" means a combination of two or more individuals or a person other than an individual who makes a contribution or expenditure:
>    (a) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
>    (b) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue; or
>    (c) as an earmarked contribution.

"Person" is defined as "an individual, corporation, association, firm, partnership, cooperative, committee, club, union, or other organization or group of individuals

or a candidate as defined in subsection (6)." *Id.* 13-1-101(20).

    **12.**    Revisions to Montana's campaign finance laws were adopted in SB

289, which goes into effect October 1, 2015.  *See* SB 289, *available at*

http://leg.mt.gov/bills/2015/billpdf/SB0289.pdf.[2] Under these revisions, "political

committee" means:

> (a) . . .a combination of two or more individuals or a person other than
> an individual who makes receives a contribution or makes an
> expenditure:
>     (i) to support or oppose a candidate or a committee organized to
> support or oppose a candidate or a petition for nomination; or
>     (ii) to support or oppose a ballot issue or a committee organized to
> support or oppose a ballot issue;
>     (iii) to prepare or disseminate an election communication, an
> electioneering communication, or an independent expenditure.
> (b) Political committees include ballot issue committees, incidental
> committees, independent committees, and political party committees.
> (c) A candidate and the candidate's treasurer do not constitute a political
> committee.
> (d) A political committee is not formed when a combination of two or
> more individuals or a person other than an individual makes an election
> communication, an electioneering communication, or an independent
> expenditure of $250 or less.

Rev. MCA § 13-1-101(30).

    **12.**    Rev. MCA § 13-1-101(15)(a) defines "Electioneering

Communication" as:

> a paid communication that is publicly distributed by radio, television,

---

[2]All references to the new law will hereinafter be referred to as "Rev.
MCA."  No new administrative rules have yet been adopted.

**Plaintiff's First Amended
Verified Complaint**      -6-

cable, satellite, internet website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:

(i) refers to one or more clearly identified candidates in that election;

(ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or

(iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.

"A person who makes an election communication, electioneering communication, or independent expenditure is subject to reporting and disclosure requirements as provided in chapters 35 and 37 of this title." Rev. MCA § 13-37-225(4).

13.     ARM 44.10.327 (hereinafter "the Political-Committee Regulatory Definition") establishes three types of political committees: "(a) principal campaign committee; (b) independent committee; and (c) incidental committee." ARM 44.10.327(1). These categories were added to the revised statutory scheme. *See* Rev. MCA § 13-1-101(30)(b).

14.     A "principal campaign committee" is defined as "a political committee that is specifically organized to support or oppose a particular candidate or issue." ARM 44.10.327(2)(a);

15.     An "independent committee" is defined as "a political committee that is not specifically organized to support or oppose any particular candidate or issue but one that is organized for the primary purpose of supporting or opposing

**Plaintiff's First Amended
Verified Complaint**          -7-

various candidates and/or issues." ARM 44.10.327(2)(b).  Rev. MCA § 13-1-101(23) replaces this definition to instead be "a political committee organized for the primary purpose of receiving contributions and making expenditures that is not controlled either directly or indirectly by a candidate and that does not coordinate with a candidate in conjunction with the making of expenditures except pursuant to the limits set forth in 13-37-216(1)."

16.     An "incidental committee" is defined as "a political committee that is not specifically organized or maintained for the primary purpose of influencing elections but that may incidentally become a political committee by making a contribution or expenditure to support or oppose a candidate and/or issue." ARM 44.10.327(2)(c). Rev. MCA § 13-1-101(22) replaces this definition to instead be "a political committee that is not specifically organized or operating for the primary purpose of supporting or opposing candidates or ballot issues but that may incidentally become a political committee by receiving a contribution or making an expenditure."

17.     Rev. MCA § 13-1-101(30) identifies two other possible political committees: a ballot issue committee and a political party committee. A "ballot issue committee" is defined as "a political committee specifically organized to support or oppose a ballot issue."  Rev. MCA § 13-1-101(7). A "political party committee" is defined as "a political committee formed by a political party

organization[3] and includes all county and city central committees." Rev. MCA § 13-1-101(31).

18.    MCA § 13-1-101(11)(a) (hereinafter "the Expenditure Statutory Definition") states that an "'[e]xpenditure' means a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value made for the purpose of influencing the results of an election." Rev. MCA § 13-1-10117(a) replaces this definition with:

> a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value:
>     (i) made by a candidate or political committee to support or oppose a candidate or a ballot issue; or
>     (ii) used or intended for use in making independent expenditures or in producing electioneering communications.

19.    ARM 44.10.323 (hereinafter "the Expenditure Regulatory Definition") states that "the term 'expenditure' as defined in 13-1-101, MCA, includes, but is not limited to" a list of various expenses, payments, and types of expenditures.

20.    MCA § 13-1-101(7)(a)(i) (hereinafter "the Contribution Statutory Definition") states that a "contribution" means "an advance, gift, loan,

---

[3]"Political party organization" means "a political organization that: (a) was represented on the official ballot in either of the two most recent statewide general elections; or (b) has met the petition requirements, as provided in Title 13, chapter 10, part 5." Rev. MCA § 13-1-101(32). "Political organization" is undefined.

conveyance, deposit, payment, or distribution of money or anything of value to

influence an election; . . ." Rev. MCA § 13-1-101(9)(a) replaces this definition

with:

> (i) the receipt by a candidate or a political committee of an advance, gift, loan, conveyance, deposit, payment, or distribution of money or anything of value to support or oppose a candidate or a ballot issue;
> (ii) an expenditure, including an in-kind expenditure, that is made in coordination with a candidate or ballot issue committee and is reportable by the candidate or ballot issue committee as a contribution;
> (iii) the receipt by a political committee of funds transferred from another political committee;
> (iv) the payment by a person other than a candidate or political committee other than a candidate or political committee of compensation for the personal services of another person that are rendered to a candidate or political committee.

**21.**    ARM 44.10.321 (hereinafter "the Contribution Regulatory

Definition") states that "the term 'contribution' as defined in 13-1-101, MCA,

includes, but is not limited to" a list of various purchases, payments, candidate

self-funding, and in-kind contributions.

**22.**    Rev. MCA  § 13-35-225(1) (hereinafter the "Anonymous Speech

Ban") states:

> All election communications, electioneering communications, and independent expenditures must clearly and conspicuously include the attribution "paid for by" followed by the name and address of the person who made or financed the expenditure for the communication. The attribution must contain:
> . . .
> (b) for election communications, electioneering communications, or independent expenditures financed by a political committee, the name

of the committee, the name of the committee treasurer, and the address
of the committee or the committee treasurer; and

       (c) for election communications, electioneering communications,
or independent expenditures financed by a political committee that is a
corporation or a union, the name of the corporation or union, its chief
executive officer or equivalent, and the address of the principal place of
business.

23.     Those accused of violating or attempting to violate campaign finance

laws predicated on these definitions the ban are subject to investigation, MCA

§ 13-37-111(1), and potentially civil prosecution, MCA § 13-37-128.[4]

24.     MCA § 13-37-111 provides that "the commissioner is responsible for

investigating all of the alleged violations of the election laws," MCA § 13-37-

111(1), and authorizes the commissioner to:

       (a) investigate all statements filed pursuant to the provisions of chapter
35 of this title or this chapter and shall investigate alleged failures to file
any statement or the alleged falsification of any statement filed pursuant
to the provisions of chapter 35 of this title or this chapter. Upon the
submission of a written complaint by any individual, the commissioner
shall investigate any other alleged violation of the provisions of chapter

---

[4]MCA Section 13-37-128 provides that:

(1) A person who intentionally or negligently violates any of the
reporting provisions of this chapter, a provision of 13-35-225, or a
provision of Title 13, chapter 35, part 4, is liable in a civil action
brought by the commissioner or a county attorney pursuant to the
provisions outlined in 13-37-124 and 13-37-125 for an amount up to
$500 or three times the amount of the unlawful contributions or
expenditures, whichever is greater.

MCA § 13-37-128(1).

**Plaintiff's First Amended**
**Verified Complaint**          -11-

35 of this title, this chapter, or any rule adopted pursuant to chapter 35 of this title or this chapter.

(b) inspect any records, accounts, or books that must be kept pursuant to the provisions of chapter 35 of this title or this chapter that are held by any political committee or candidate, as long as the inspection is made during reasonable office hours; and

(c) administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, bank account statements of a political committee or candidate, or other records that are relevant or material for the purpose of conducting any investigation pursuant to the provisions of chapter 35 of this title or this chapter.

25.     Additionally, ARM 44.10.307(3) and (4) (the "Publication Provisions") state that "[t]he commissioner, upon completion of the investigation, shall prepare a written summary of facts and statement of findings, which shall be sent to the complainant and the alleged violator," ARM 44.10.307(3), and that "[a] filed complaint and the summary of facts and statement of findings shall be public record," ARM 44.10.307(4).

26.     Those convicted of violating or attempting to violate Montana's campaign finance laws through the procedures of the Investigatory Procedures Provision, the Publication Provisions, and subsequent civil action are subject to fines. MCA § 13-37-128(1).[5]

_____

[5]The Commissioner is seeking to increase penalties to also revoke corporate charters. *See Montana political practices commissioner seeks expansion of powers*, *available at* http://m.missoulian.com/news/state-and-regional/montana-

27.     MCD, a non-profit corporation exempt from federal income taxation

under I.R.C. 501(c)(4) (2006), is a non-sectarian and non-partisan organization.

(*See MCD Bylaws,* attached as Ex. 3, at 1, § 2.) It is not connected with any

political candidate or political party. Nor is it connected with any political

committee.

28.     MCD's mission is to "to promote and encourage policies that create

jobs and grow local economies throughout Montana." (*Id.*) It "engages in

grassroots advocacy and issues-oriented educational campaigns to further

[its] goals." (*Id.*)  In pursuit its mission, MCD engages in political speech.

29.     For example, in 2013, MCD prepared a variety of economic

development ads, including one that mentioned grassroots activist John Quandt, an

individual who also was at the time a Republican City Council candidate in

Billings.  (*See, e.g., 2013 Ads,* attached as Ex. 4.)  Such ads are issue advocacy.

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 470 (2007).

30.     Most recently, MCD intended to circulate issue ads that mention

individuals who also were candidates at the end of September 2014, which would

have been during the 2014 general election cycle. (*See 2014 Ads*, attached as Ex.

---

political-practices-commissioner-seeks-expansion-of-powers/article_49303056-ed
e1-11e3-b564-0019bb2963f4.html?mobile_touch=true (June 6, 2014) (attached as
Ex. 2).

**Plaintiff's First Amended**
**Verified Complaint**                    -13-

5.) One ad mentioned grassroots activist Joshua Sizemore, presently a candidate

for House District 47. (*Id.* at 2.) The other mentioned environmentalist and

legislative official  Mary McNally, presently up for re-election to House District

49. (*Id.* at 4.) Both ads supported 21st Century Energy's plan to promote job

growth in the energy sector and provide recipients with contact information to

further educate themselves regarding that Plan. (*Id.*)

**31.**     MCD intends to spend more than $250 to publish substantially

similar ads that will likely reach more than 100 recipients in the district voting of

the candidate mentioned within 60 days of the initiation of voting in future

elections.

**32.**     MCD's organizational documents show that MCD does not have the

major purpose or a priority of nominating or electing any candidate(s). (*See MCD*

*Bylaws,* attached as Ex. 3, at 1, § 2.)

**33.**     MCD has not and does not plan to spend either time or money

contributing to, coordinating spending with, or making independent expenditures

for or against the nomination or election of candidates or the passage of ballot

issues at the local, state, or federal level.

**34.**     MCD does not intend to follow Montana's political committee

requirements, including reporting to the Commissioner of Political Practices its

spending on its issue ads.

**Plaintiff's First Amended**
**Verified Complaint**                        -14-

35.     In 2013, a Montana trial court imposed substantial fines against the

501(c)(4) organization American Tradition Partnership ("ATP") for failing to

report its spending on issue ads regardless of its major purpose. *See Western*

*Tradition Partnership v. Gallik,* No. BDV-2010-1120, slip op. at 12, 16 (Mont. 1st

Jud. Dist. 2011)(attached as Ex. 6) (discussing how ATP's primary purpose is in

factual dispute); *American Tradition Partnership v. Motl,* No. BDV-2010-1120,

slip op. at 2-3, 9 (attached as Ex. 1) (imposing a $261,600 fine against ATP

without any factual resolution regarding ATP's major or primary purpose).

36.     Because of that investigation, MCD sought an advisory opinion from

the Commissioner to secure a predetermination that its 2013 ads, which it intended

to circulate prior to the November 3, 2013, election, did not need to be reported.

*See Montanans for Community Development v. Motl,* No. 13-cv-70, 2014 WL

977999 at *1 (Mar. 12, 2014). It was not able to secure such an opinion prior to

the 2013 election,[6] so it did not engage in its desired speech.

37.     Now, during the 2014 primary election cycle, the Commissioner has

been investigating and initiating civil actions against candidates associated with

ATP, in part asserting that ATP's issue ads are an in-kind expenditure and

[6]That advisory process has been closed. *See Notice of Refusal to Issue a Declaratory Ruling, available at* http://www.politicalpractices.mt.gov/content/5campaignfinance/MontananasforCommunityDevelopmentDeclaratoryRuling (Mar. 7, 2014) (attached as Ex. 7).

**Plaintiff's First Amended
Verified Complaint**               -15-

therefore an illegal and unreported contribution to the candidates who "benefit" from the ads. *See Comm'n of Political Practices v. Miller*, Cause. No. CDV-2014-62 (1st Jud. Dist. 2014) (attached as Ex. 8) (pursuing civil action against candidate Miller in part because ATP's issue ad mentioning his opponent was allegedly an illegal and unreported in-kind contribution); *Comm'n of Political Practices v. Murray,* BDV-2014-170 (1st Jud. Dist. 2014) (attached as Ex. 9) (same); *Comm'n of Political Practices v. Bannan,* CDV-2014-178 (1st Jud. Dist. 2014) (attached as Ex. 10) (same); *Comm'n of Political Practices v. Wittich,* ADV-2014-251 (1st Jud. Dist. 2014) (attached as Ex. 11) (same). (*See also Commissioner Letter to Candidates,* attached as Ex. 12) (encouraging candidates to "protest" flyers and letters that have undisclosed and unreported costs).)

38.     The Commission has also sent letters to conservative organizations advising them that it expects timely and full reporting of any expenditures on "oppositional" flyers and candidate surveys they make. (*See Commission Letter to Organizations,* attached as Ex. 13; *Commission Letter to Survey Groups*, attached as Ex. 14.)  The letters make no mention of major or primary purpose.

39.     MCD reasonably fears that if it engages in its desired issue advocacy, it, like ATP, will be presumed to be a political committee under Montana law and be subject to Montana's political committee burdens, which require: registration with the state, treasurer-designation, and bank account designation, MCA §§ 13-

37-201, 13-37-205; record-keeping requirements, MCA § 13-37-208; periodic reporting requirements, MCA § 13-37-228; source bans on contributions received, MCA § 13-35-227; and disclosure of contribution sources, MCA § 13-37-225.

40.    Also, under Rev. MCA § 13-1-101(15)(a), MCD's ads, if circulated as desired, would be electioneering communications that trigger political committee status and burdens. *See* Rev. MCA § 13-1-101(30)(a)(iii).

41.    Additionally, regardless of its political committee status, MCD reasonably fears that its issue ad spending will be construed not only as reportable spending, *see ATP*, No. BDV-2010-1120, slip op. at 5-7 (attached as Ex. 1), but also as an in-kind contribution and therefore an illegal and unreported contribution to a candidate, exposing it and the "benefitting" candidate to fines and the candidates to possible removal from the ballot or office. *See, e.g., Miller,* Cause No. CDV-2014-62, at 16-17 (attached as Ex. 8) (seeking as a penalty for alleged violations Rep. Miller's removal from office pursuant to MCA § 13-35-106(3)); *Wittich,* ADV-2014-251, at 16-17 (attached as Ex. 10) (same).

42.    Last, MCD reasonably fears that it, those candidates mentioned in its issue ads, or opponents to those mentioned could be the target of investigation in the next four years, *see* MCA § 13-37-130. The Commission has characterized lawful, unreported issue advocacy spending as "dark money," inherently warranting scrutiny and investigation. (*See Dark Money Article,* attached as Ex.

15; *see also Welch Complaint*, attached as Ex. 16 (renewing investigation into ATP and organizations associated with it).) MCD fears that such investigation could **1)** destroy MCD's reputation, (*see Dark Money Article,* attached as Ex. 15 (quoting the Commissioner as advising Montanans to treat 2014 ATP issue advocacy emails as suspect, asserting that ATP no longer has the public trust, and disparaging the group for being unable to properly defend and protect itself during investigation and civil prosecution even though ATP has only been adjudicated to have failed to report issue advocacy expenditures)); **2)** subject MCD to substantial fines, and **3)** cause the individuals it mentions or their opponents to be investigated and either removed from the ballot or from office, all because its ads were not reported and/or are construed as an illegal contribution made to a candidate.

**43.**    Should it be investigated because of its issue ads, MCD reasonably fears that confidential information and conclusions (whether correct or not) about its strategies and associations attached to a complaint filed with the Commission or secured during that investigation (whether by subpoena or voluntarily supplied) will be publicly disclosed. (*See, e.g., Bonogofsky v. Kennedy,* attached as Ex. 17, at 24-28.) Complaints and commissioner sufficiency decisions are sent to the complainant (who often is a political opponent) and are published on the Commissioner's website. *See Docket of Formal Complaints*, http://political

practices.mt.gov/2recentdecisions/ docket.mcpx (last visited June 23, 2015);

*Campaign Finance and Practices Decision Page,* http://politicalpractices.mt.gov/

2recentdecisions/campaignfinance.mcpx (last visited June 23, 2015).

     **44.**     Because it can be construed as a political committee with its ads

treated as both expenditures and contributions, or treated as one because its ads are

electioneering communications, and its associations and strategies made public

during an investigation before they are even adjudicated through due process as

relevant or even true, MCD will not run its desired ads.

     **45.**     Additionally, because its ads are now subject to the Anonymous

Speech Ban, which requires both MCD and its President to be identified on its ads,

*see* Rev. MCA § 13-37-225(1)(c), MCD will not run its desired ads.

     **46.**     MCD intended to circulate the ads attached as Exhibit 3 on October 3,

2014, and would run substantially similar ads in the future but for the statutes and

regulations here challenged. MCD's speech is therefore chilled.

     **47.**     MCD has no adequate remedy at law.

**Count I**
**The Political-Committee Statutory Definition Is Facially Overbroad.**

     **48.**     Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

     **49.**     The Political-Committee Statutory Definition states that:

"Political committee" means a combination of two or more individuals or a person other than an individual who makes a contribution or expenditure:
   (a) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
   (b) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue; or
   (c) as an earmarked contribution.

MCA § 13-1-101(22). "Person" is defined as "an individual, corporation, association, firm, partnership, cooperative, committee, club, union, or other organization or group of individuals or a candidate as defined in subsection (6)." *Id.* 13-1-101(20). Rev. MCA § 13-1-101(30) redefines "political committee" to mean:

   (a) . . .a combination of two or more individuals or a person other than an individual who makes receives a contribution or makes an expenditure:
      (i) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
      (ii) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue;
      (iii) to prepare or disseminate an election communication, an electioneering communication, or an independent expenditure.

It also establishes that "[a] political committee is not formed when a combination of two or more individuals or a person other than an individual makes an election communication, an electioneering communication, or an independent expenditure of $250 or less." Rev. MCA § 13-1-101(30)(d).

   **50.**   A law or regulation "is overbroad if it does not aim specifically at

evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech." *Klein v. San Diego County*, 463 F.3d 1029, 1038 (9th Cir. 2006) (internal citations omitted).

51.    To avoid overbreadth, the government may impose political-committee or political-committee-like burdens, *see Citizens United v. FEC,* 558 U.S. 310, 337-339 (2008), on an organization only if (1) it is "under the control of a candidate" or candidates, or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley v. FEC,* 424 U.S. 1, 79 (1976).

52.    In reviewing *Buckley*'s overbreadth concerns, the Ninth Circuit has held that such overbreadth can also be avoided when the political committee definition only applies to groups that have "a 'primary' purpose of political activity," *Human Life of Washington v. Brumsickle*, 624 F.3d 990, 1011 (2010). This "limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally

subject to political committee burdens. *Id.* at 1012;[7] *see also Yamada v. A-1 A-Lectrician, Inc.,* Nos. 12-15913, 12-17845, 2-15 WL 2384944 at *14 (9th Cir. May 20, 2015) ("because Hawaii's definition extends only to organizations having "the purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making epxneidutres, for express advocacy or its functional equivalent.").

53.    The Ninth Circuit has also held that overbreadth can be avoid when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[8] *Yamada,* 2015 WL 2384944, at *15.

54.    The Political-Committee Statutory Definition applies not only to express advocacy or its functional equivalent, but also to electioneering communications, which by definition can be neither types of speech. So it is not tailored to any cognizable state interest, but is instead overbroad. *Yamada*, 2015

---

[7]The resulting "priority-incidentally" test is unconstitutionally vague for two reasons: It is based on "political advocacy[,]" 624 F.3d at 1011, so it is vague under *Buckley,* 424 U.S. at 42-43, and the boundary between "priority" and "incidentally" is unclear. But until it is so declared, it remains mandatory law for this Court.

[8]Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. But until it is so declared, it remains mandatory law for this Court.

WL 2384944, at *14; *See Wisconsin Right to Life v. Barland,* 751 F.3d 804, 840

(7th Cir. 2014) ("*WRTL-III*"). It nowhere limits its applicability to organizations

having either the major purpose of nominating or electing candidates as required

by *Buckley*, having a priority of engaging in political advocacy as required by

*HLW*, or that are significant participants in the electoral process as required by

*Yamada.* Nor has it been construed within these constitutional parameters. It is

therefore facially overbroad in violation of the First and Fourteenth Amendments.

**Count II**
**The Political-Committee Statutory Definition**
**Is Unconstitutional As Applied To MCD.**

  **55.**  Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

  **56.**  The Political-Committee Statutory Definition states that:

> "Political committee" means a combination of two or more individuals
> or a person other than an individual who makes a contribution or
> expenditure:
>  (a) to support or oppose a candidate or a committee organized to
> support or oppose a candidate or a petition for nomination; or
>  (b) to support or oppose a ballot issue or a committee organized to
> support or oppose a ballot issue; or
>  (c) as an earmarked contribution.

MCA § 13-1-101(22). "Person" is defined as "an individual, corporation,

association, firm, partnership, cooperative, committee, club, union, or other

organization or group of individuals or a candidate as defined in subsection (6)."

*Id.* 13-1-101(20). Rev. MCA § 13-1-101(30) redefines "political committee" to mean:

> (a) . . .a combination of two or more individuals or a person other than an individual who makes receives a contribution or makes an expenditure:
>
>   (i) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
>   (ii) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue;
>   (iii) to prepare or disseminate an election communication, an electioneering communication, or an independent expenditure.

It also establishes that "A political committee is not formed when a combination of two or more individuals or a person other than an individual makes an election communication, an electioneering communication, or an independent expenditure of $250 or less." Rev. MCA § 13-1-101(30)(d).

57.     The government may impose political-committee or political-committee-like burdens, *see Citizens United,* 558 U.S. at 337-339, on an organization only if (1) it is "under the control of a candidate" or candidates or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley,* 424 U.S. at 79.

58.     In applying *Buckley*, the Ninth Circuit has held that overbreadth can also be avoided if the definition only applies to a group that has "a 'primary' purpose of political activity." *HLW*, 624 F.3d at 1011. This "limitation ensures that the electorate has information about groups that make political advocacy a

priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally subject to political committee burdens. *Id.* at 1012;[9] *see also Yamada*, 2015 WL 3884944, at *14 ("because Hawaii's definition extends only to organizations having "the purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making epxneidutres, for express advocacy or its functional equivalent.").

      59.    The Ninth Circuit has also held that overbreadth can be avoid when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[10] *Yamada,* 2015 WL 2384944, at *15.

      60.    MCD's sole purpose is "to promote the social welfare" by "engag[ing] in grassroots advocacy and issues-oriented educational campaigns" that "promote and encourage policies that create jobs and grow local economies

---

[9]The resulting "priority-incidentally" test is unconstitutionally vague. *See supra* n. 7.

[10]Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. *Supra* n. 8. But until it is so declared, it remains mandatory law for this Court.

throughout Montana." (*MCD Bylaws*, attached as Ex. 3, at 1 § 2.) It has not and does not intend to engage in political activities such as contributions, coordinated expenditures, independent expenditures, express advocacy, or appeals to vote for the nomination or defeat of a candidate or passage of a ballot issue. Its desired speech is an electioneering communication. So under *Buckley, HLW,* and *Yamada,* the Political-Committee Statutory Definition is not tailored to any cognizable interest as applied to MCD. Any political speech MCD engages in cannot constitutionally be subject to political-committee or political-committee like burdens. *See Buckley,* 424 U.S. at 79; *HLW,* 624 F.3d at 1011; *Yamada*, 2015 WL 2384994 at *15.[11]

61.    The Political-Committee Statutory Definition is unconstitutional as applied to MCD.

## Count III
## The Political-Committee Statutory Definition Is Unconstitutionally Vague.

62.    Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

63.    The Political-Committee Statutory Definition states that:

"Political committee" means a combination of two or more individuals

---

[11]Non-political committee, one-time, event-driven reporting can be constitutionally imposed. *See WRTL-III*, 751 F.3d at 841 (*citing Citizens United,* 558 U.S. at 366-69). Montana has no such reporting requirements.

or a person other than an individual who makes a contribution or
expenditure:
   (a) to support or oppose a candidate or a committee organized to
support or oppose a candidate or a petition for nomination; or
   (b) to support or oppose a ballot issue or a committee organized to
support or oppose a ballot issue; or
   (c) as an earmarked contribution.

MCA § 13-1-101(22). "Person" is defined as "an individual, corporation,

association, firm, partnership, cooperative, committee, club, union, or other

organization or group of individuals or a candidate as defined in subsection (6)."

*Id.* 13-1-101(20). Rev. MCA § 13-1-101(30) redefines "political committee" to

mean:

(a) . . .a combination of two or more individuals or a person other than
an individual who makes receives a contribution or makes an
expenditure:
   (i) to support or oppose a candidate or a committee organized to
support or oppose a candidate or a petition for nomination; or
   (ii) to support or oppose a ballot issue or a committee organized to
support or oppose a ballot issue;
   (iii) to prepare or disseminate an election communication, an
electioneering communication, or an independent expenditure.

It also establishes that "A political committee is not formed when a combination of

two or more individuals or a person other than an individual makes an election

communication, an electioneering communication, or an independent expenditure

of $250 or less." Rev. MCA § 13-1-101(30)(d).

**64.**    "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti v.*

*City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998); *WRTL-III,* 751 F.3d at 835.

"A statute is vague if men of common intelligence must necessarily guess at its

meaning and differ as to its application." *In re Doser*, 412 F.3d 1056, 1062 (9th

Cir. 2005). "Statutes that are insufficiently clear are void for three reasons: (1) to

avoid punishing people for behavior that they could not have known was illegal;

(2) to avoid subjective enforcement of the laws based on "arbitrary and

discriminatory enforcement" by government officers; and (3) to avoid any chilling

effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

      **65.**    The Political-Committee Statutory Definition uses the terms "expen-

diture," "contribution," and "electioneering communication" to establish the scope

of its application. Because these terms are unconstitutionally vague, *see infra*

Counts VIII, X, and XII, the Political-Committee Statutory Definition is also

unconstitutionally vague.

      **66.**    As revised, the term "political committee" uses "expenditure" and

"contribution" to define itself. Rev. MCA § 13-1-101(30). "Expenditure" and

"contribution" in turn use the term "political committee" to define themselves.

*See* Rev. MCA § 13-1-101(9)(a) (defining contribution as "the receipt by a

candidate or a political committee. . ."); *see id.* at 13-1-101(17)(a) (defining

expenditure to include spending "made by a candidate or a political committee . .

."). This makes the three definitions circular and therefore the Political-Committee

**Plaintiff's First Amended
Verified Complaint**        -28-

Statutory Definition unconstitutionally vague.

67.    The Political-Committee Statutory Definition uses the phrase "to support or oppose a candidate" to establish the scope of its application. This phrase is unconstitutionally vague. *See McConnell v. FEC,* 540 U.S. 93, 170 n.64 (2003); *WRTL III*, 751 F.3d at 837-38; *see Yamada*, 2015 2384944, at *8 (upholding against a vagueness challenge "support" and "opposition" language because it was tied to "*the nomination . . . or election* of the candidate.") (emphasis added).

68.    The Political-Committee Statutory Definition is unconstitutionally vague in violation of the First and Fourteenth Amendments.

## Count IV
## The Political-Committee Regulatory Definition Is Facially Overbroad.

69.    Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

70.    The Political-Committee Regulatory Definition establishes three types of political committees: "(a) principal campaign committee; (b) independent committee; and (c) incidental committee." ARM 44.10.327(1).

71.    A "principal campaign committee" is defined as "a political committee that is specifically organized to support or oppose a particular candidate or issue." ARM 44.10.327(2)(a).

**Plaintiff's First Amended**
**Verified Complaint**                    -29-

72.     An "independent committee" is defined as "a political committee that is not specifically organized to support or oppose any particular candidate or issue but one that is organized for the primary purpose of supporting or opposing various candidates and/or issues." ARM 44.10.327(2)(b).

73.     An "incidental committee" is defined as "a political committee that is not specifically organized or maintained for the primary purpose of influencing elections but that may incidentally become a political committee by making a contribution or expenditure to support or oppose a candidate and/or issue." ARM 44.10.327(2)(c).

74.     Rev. MCA § 13-1-101(30) identifies two other possible political committees: a ballot issue committee and a political party committee. A "ballot issue committee" is defined as "a political committee specifically organized to support or oppose a ballot issue."  Rev. MCA § 13-1-101(7). A "political party committee" is defined as "a political committee formed by a political party organization and includes all county and city central committees." Rev. MCA § 13-1-101(31).

75.     A law or regulation "is overboard if it does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech." *Klein*, 463 F.3d at 1038 (internal citations omitted).

76.     The government may impose political-committee or political-committee-like burdens, *see Citizens United,* 558 U.S. at 337-339, on an organization only if (1) it is "under the control of a candidate" or candidates or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley,* 424 U.S. at 79.

77.     In applying *Buckley*, the Ninth Circuit has held that the relevant inquiry is whether the political committee definition applies only to groups that have "a 'primary' purpose of political activity." *HLW*, 624 F.3d at 1011. This "limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally subject to political committee burdens. *Id.* at 1012;[12] *see also Yamada*, 2015 WL 3884944, at *14 ("because Hawaii's definition extends only to organizations having "the purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making epxneidutres, for express advocacy or its functional equivalent.").

---

[12]The resulting "priority-incidentally" test is unconstitutionally vague. *See supra* n. 7.

78.     The Ninth Circuit has also held that overbreadth can be avoid when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[13] *Yamada,* 2015 WL 2384944, at *15.

79.     The Political-Committee Regulatory Definition is not closely drawn to a cognizable state interest. *WRTL-III*, 751 F.3d at 841. It nowhere limits its applicability to organizations having the major purpose of nominating or electing candidates under *Buckley* or organizations that are a significant participant under *Yamada*, and only has two types of committees—the independent committee and the ballot issue committee—that requires a "primary purpose" or priority of engaging in political advocacy under *HLW*. And it goes beyond nominating or electing candidates under *Buckley* or engaging in political advocacy under *HLW* to include supporting or opposing issues. Moreover, it expressly includes those organizations that do not have a major purpose or priority of nominating or electing candidates but who incidentally do so as "incidental committees," contrary to *HLW*. ARM 44.10.327(2)(c).

80.     The Political-Committee Regulatory Definition is facially overbroad,

---

[13]Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. *Supra* n. 8. But until it is so declared, it remains mandatory law for this Court.

in violation of the First and Fourteenth Amendments.

## Count V
### The Political-Committee Regulatory Definition
### Is Unconstitutional As Applied to MCD.

81.     Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

82.     The Political-Committee Regulatory Definition establishes three types of political committees: "(a) principal campaign committee; (b) independent committee; and (c) incidental committee." ARM 44.10.327(1).

83.     An "incidental committee" is defined as "a political committee that is not specifically organized or maintained for the primary purpose of influencing elections but that may incidentally become a political committee by making a contribution or expenditure to support or oppose a candidate and/or issue." ARM 44.10.327(2)(c); *see also* Rev. MCA § 13-1-101(22)(a).

84.     Rev. MCA § 13-1-101(30) identifies two other possible political committees: a ballot issue committee and a political party committee. A "ballot issue committee" is defined as "a political committee specifically organized to support or oppose a ballot issue."  Rev. MCA § 13-1-101(7). A "political party committee" is defined as "a political committee formed by a political party organization and includes all county and city central committees." Rev. MCA § 13-1-101(31).

85.     The government may impose political-committee or political-committee-like burdens, *see Citizens United,* 558 U.S. at 337-339, on an organization only if (1) it is "under the control of a candidate" or candidates or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley,* 424 U.S. at 79.

86.     In applying *Buckley*, the Ninth Circuit has held that political committee definitions can avoid overbreadth by applying only to groups that have "a 'primary' purpose of political activity."*HLW*, 624 F.3d at 1011. This "limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally subject to political committee burdens. *Id.* at 1012;[14] *see also Yamada*, 2015 WL 3884944, at *14 ("because Hawaii's definition extends only to organizations having "the purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making epxneidutres, for express advocacy or its functional equivalent.").

---

[14]The resulting "priority-incidentally" test is unconstitutionally vague. *See supra* n. 7.

87.     The Ninth Circuit has also held that overbreadth can be avoid when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[15] *Yamada,* 2015 WL 2384944, at *15.

88.     MCD's exclusive purpose is "to promote the social welfare" by "engag[ing] in grassroots advocacy and issues-oriented educational campaigns" that "promote and encourage policies that create jobs and grow local economies throughout Montana." (*MCD Bylaws*, attached as Ex. 3, at 1 § 2.)  MCD has not and does not intend to engage in electoral activity, by making contributions, expenditures, independent expenditures, or engaging in express advocacy or appeals to vote for the nomination or election of a candidate, or for the passage of a ballot initiative. So under *Buckley, HLW,* and *Yamada*, any political speech MCD engages in cannot constitutionally be subject to political-committee or political-committee like burdens. *See Buckley,* 424 U.S. at 79; *HLW,* 624 F.3d at 1011; *Yamada*, 2015 WL 2384944, at *15. Yet the Political-Committee Regulatory Definition can apply to MCD because it expressly includes as political committees those organizations that are not significant participants who engage in

---

[15] Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. *Supra* n. 8. But until it is so declared, it remains mandatory law for this Court.

express advocacy or its functional equivalent under *Yamada*, who do not have a major purpose of nominating or electing candidates but who incidentally do so as "incidental committees," ARM 44.10.327(2)(c), in direct contravention of *HLW*.

89.     The Political-Committee Regulatory Definition is unconstitutional as applied to MCD.

**Count VI**
**The Political-Committee Regulatory Definition Is Unconstitutionally Vague.**

90.     Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

91.     The Political-Committee Regulatory Definition establishes three types of political committees: "(a) principal campaign committee; (b) independent committee; and (c) incidental committee." ARM 44.10.327(1).

92.     A "principal campaign committee" is defined as "a political committee that is specifically organized to support or oppose a particular candidate or issue." ARM 44.10.327(2)(a).

93.     An "independent committee" is defined as "a political committee that is not specifically organized to support or oppose any particular candidate or issue but one that is organized for the primary purpose of supporting or opposing various candidates and/or issues." ARM 44.10.327(2)(b).

94.     An "incidental committee" is defined as "a political committee that is

not specifically organized or maintained for the primary purpose of influencing

elections but that may incidentally become a political committee by making a

contribution or expenditure to support or oppose a candidate and/or issue." ARM

44.10.327(2)(c); *see also* Rev. MCA § 13-1-101(22)(a).

95.    "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*,

146 F.3d at 638. "A statute is vague if men of common intelligence must

necessarily guess at its meaning and differ as to its application." *In re Doser*, 412

F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1)

to avoid punishing people for behavior that they could not have known was

illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and

discriminatory enforcement" by government officers; and (3) to avoid any chilling

effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

96.    The Political-Committee Regulatory Definition uses the terms

"expenditure" and "contribution" to establish the scope of its application. Because

these terms are unconstitutionally vague, *see infra* Counts VIII, X, and XII, the

Political-Committee Regulatory Definition is also unconstitutionally vague.

97.    As revised, the terms "expenditure" and "contribution" use the term

"political committee" to define themselves. *See* Rev. MCA § 13-1-101(9)(a)

(defining contribution as "the receipt by a candidate or a political committee. . .");

*see id.* at 13-1-101(17)(a) (defining expenditure to include spending "made by a candidate or a political committee . . ."). This makes the three definitions circular and therefore the Political-Committee Regulatory Definition unconstitutionally vague.

98.    The Political-Committee Regulatory Definition uses the phrase "to support or oppose" to establish the scope of its application. This phrase is unconstitutionally vague. *See McConnell,* 540 U.S. at 170 n.64; *WRTL III*, 751 F.3d at 837-38; *see Yamada*, 2015 WL 3884944, at *8 (finding that "support" and "oppose" language withstood a vagueness challenge because they were tied to the nomination or election of a candidate).

99.    The Political-Committee Regulatory Definition is unconstitutionally vague in violation of the First and Fourteenth Amendments.

## Count VII
## The Political-Committee Regulatory Definition Is Unconstitutional.

100.    Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

101.    The Political-Committee Regulatory Definition establishes three types of political committees: "(a) principal campaign committee; (b) independent committee; and (c) incidental committee." ARM 44.10.327(1).

102.    The Commissioner of Political Practices does not have the

independent authority to make law but rather is authorized only to "adopt rules to carry out the provisions of chapter 35 of this title and this chapter in conformance with the Montana Administrative Procedure Act." MCA § 13-37-114.

103.   Because the Political-Committee Regulatory Definition helps carry out and enforce the unconstitutional Political-Committee Statutory Definition, the Political-Committee Regulatory Definition should be struck down in its entirety as unconstitutional. *See Davis v. FEC,* 554 U.S. 724, 744 (2008) (striking down as unconstitutional disclosure requirements "designed to implement [] asymmetrical contribution limits" because the limits were unconstitutional).

104.   Insofar as the Political-Committee Regulatory Definition applies to MCD in a manner consistent with the Political-Committee Statutory Definition, it should be struck down as unconstitutional as applied to MCD. *See id.*

**Count VIII**
**The Expenditure Statutory Definition Is Facially Vague.**

105.   Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

106.   The Expenditure Statutory Definition states that an "'[e]xpenditure' means a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value made for the purpose of influencing the results of an election." MCA § 13-1-101(11)(a).

**Plaintiff's First Amended**
**Verified Complaint**                            -39-

**107.**   Rev. MCA § 13-1-10117(a) replaces this definition with:

a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value:

(i) made by a candidate or political committee to support or oppose a candidate or a ballot issue; or

(ii) used or intended for use in making independent expenditures or in producing electioneering communications.

**108.**   "A statute must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*, 146 F.3d at 638. "A statute is vague if men of common intelligence must necessarily guess at its meaning and differ as to its application." *In re Doser*, 412 F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**109.**   As revised, the term "expenditure" uses "political committee" to define itself. Rev. MCA § 13-1-101(17)(a). "Political committee" in turn use the term "expenditure" to define itself.  *See* Rev. MCA § 13-1-101(30). This makes the two definitions circular and therefore the Expenditure Statutory Definition unconstitutionally vague.

**110.**   A Montana court has held that the Expenditure Statutory Definition

suffers vagueness problems because of the use of the word "influencing." *WTP,*

No. BDV-2010-1120, slip op. at 18 (attached as Ex. 6). To remedy that vagueness,

the court interpreted the vague phrase "influencing the results of an election" to:

> only include communications and activities that expressly advocate for
> or against a candidate or ballot issue or that clearly identify a candidate
> or ballot issue by apparent and unambiguous reference and are
> susceptible of no reasonable interpretation other than to promote or
> oppose the candidate or ballot issue.

*Id.* This definition is consistent with the revision to the Expenditure Statutory

Definition. *See* Rev. MCA § 13-1-101(17)(a) (replacing "influencing the results of

an election" with "support or oppose," which is defined as express advocacy or an

appeal to vote under Rev. MCA § 13-1-101(47)).

**111.**    The Expenditure Statutory Definition's inclusion of the appeal-to-

vote test renders it vague because the test:

> ultimately depend[s] . . . upon a judicial judgment (or is it—worse
> still—a jury judgment?) concerning "reasonable" or "plausible" import
> that is far from certain, that rests upon consideration of innumerable
> surrounding circumstances which the speaker may not even be aware of,
> and that lends itself to distortion by reason of the decisionmaker's
> subjective evaluation of the importance or unimportance of the
> challenged speech. In this critical area of political discourse, the
> speaker[s] cannot be compelled to risk felony [or other] prosecution
> with no more assurance of impunity than [their] prediction that what
> [t]he[y] say[] will be found susceptible of some "reasonable
> interpretation other than [to promote or oppose] a specific candidate."
> Under these circumstances, "many persons, rather than undertake the
> considerable burden (and sometimes risk) vindicating their rights
> through case-by-case litigation, will choose simply to abstain from
> protected speech—harming not only themselves but society as a whole,

which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

*FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 493-94 (2007) ("*WRTL-II*")

(Scalia, J., concurring in part and concurring in the judgment) (brackets in original

omitted); *but see Yamada*, 2015 WL 2384994, at *6-*7.  *See, e.g., WTP,* No.

BDV-2010-1120, slip op. at 19-20 (attached as Ex. 6) (applying the appeal-to-vote

test to conclude that "it could be . . . reasonable to interpret" the issue ad before it

as an "appeal to vote" and as "advocat[ing] for the defeat" of that candidate, *id.* at

19; *Magill v. Reintsma,* No. COPP 2014-CFP-037 at 8-10 (May 12, 2015)

(attached as Ex. 18) (reasoning that a state court complaint seeking to remove an

elected official from office filed during an election cycle both amounted to express

advocacy and satisfied the appeal-to-vote test).

112.   The Expenditure Statutory Definition is facially vague in violation of

the First and Fourteenth Amendments.

## Count IX
## The Expenditure Regulatory Definition Is Unconstitutional.

113.   Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

114.   The Expenditure Regulatory Definition interprets the Expenditure

Statutory Definition, stating that "the term 'expenditure' as defined in 13-1-101,

MCA, includes, but is not limited to" a list of various expenses, payments, and

types of expenditures. ARM 44.10.323.

115.    The Commissioner of Political Practices does not have the

independent authority to make law but rather is authorized only to "adopt rules to

carry out the provisions of chapter 35 of this title and this chapter in conformance

with the Montana Administrative Procedure Act." MCA § 13-37-114.

116.    Because the Expenditure Regulatory Definition is designed to help

carry out and enforce the facially vague Expenditure Statutory Definition, the

Expenditure Regulatory Definition should be struck down in its entirety as

unconstitutional. *See Davis v. FEC,* 554 U.S. 724, 744 (2008) (striking down as

unconstitutional disclosure requirements "designed to implement [] asymmetrical

contribution limits" because the limits were unconstitutional).

117.    Insofar as the Expenditure Regulatory Definition applies to issue ads

consistent with the Expenditure Statutory Definition, it should be struck down as

unconstitutional as applied to issue ads. *See id.*

## Count X
## The Contribution Statutory Definition Is Facially Vague.

118.    Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

119.    The Contribution Statutory Definition states that a "contribution"

means "an advance, gift, loan, conveyance, deposit, payment, or distribution of

money or anything of value to influence an election; . . ." MCA § 13-1-101(7)(a)(I).

**120.** Rev. MCA § 13-1-101(9)(a) replaces this definition with:

(i) the receipt by a candidate or a political committee of an advance, gift, loan, conveyance, deposit, payment, or distribution of money or anything of value to support or oppose a candidate or a ballot issue;
(ii) an expenditure, including an in-kind expenditure, that is made in coordination with a candidate or ballot issue committee and is reportable by the candidate or ballot issue committee as a contribution;
(iii) the receipt by a political committee of funds transferred from another political committee;
(iv) the payment by a person other than a candidate or political committee other than a candidate or political committee of compensation for the personal services of another person that are rendered to a candidate or political committee.

**121.** "A statute must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*, 146 F.3d at 638; *WRTL-III*, 751 F.3d at 835. "A statute is vague if men of common intelligence must necessarily guess at its meaning and differ as to its application." *In re Doser*, 412 F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**122.**   As revised, the term "contribution" uses "political committee" to define itself. Rev. MCA § 13-1-101(9)(a). "Political committee" in turn use the term "contribution" to define itself.  *See* Rev. MCA § 13-1-101(30). This makes the two definitions circular and therefore the Contribution Statutory Definition unconstitutionally vague.

**123.**   A Montana court has held that the Expenditure Statutory Definition is unconstitutionally vague on its face. *ATP,* No. BDV-2010-1120, slip op. at 18 (attached as Ex. 1).  The Contribution Statutory Definition contains nearly identical language but has not been similarly construed. It is therefore unconstitutionally vague. *See also Nat'l Org. For Marriage v. McKee,* 649 F.3d 34, 65 (1st Cir. 2011).

**124.**   However, effective October 1, 2015, the Contribution Statutory Definition will be revised to exclude "influence of election" and instead turn on "support or oppose a candidate," which is defined as express advocacy or an appeal to vote under Rev.MCA § 13-1-101(47). *See* Rev. MCA § 13-1-101(9)(a). As with the Expenditure Regulatory Definition, the Contribution Statutory Definition remains vague because:

> [it] ultimately depend[s] . . . upon a judicial judgment (or is it—worse still—a jury judgment?) concerning "reasonable" or "plausible" import that is far from certain, that rests upon consideration of innumerable surrounding circumstances which the speaker may not even be aware of, and that lends itself to distortion by reason of the decisionmaker's

subjective evaluation of the importance or unimportance of the challenged speech. In this critical area of political discourse, the speaker[s] cannot be compelled to risk felony [or other] prosecution with no more assurance of impunity than [their] prediction that what [t]he[y] say[] will be found susceptible of some "reasonable interpretation other than [to promote or oppose] a specific candidate." Under these circumstances, "many persons, rather than undertake the considerable burden (and sometimes risk) vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

*WRTL-II*, 551 U.S. at 493-94 (Scalia, J., concurring in part and concurring in the judgment) (brackets in original omitted); *but see Yamada*, 2015 WL 3884944, at *6-*7.  *See, e.g., WTP,* No. BDV-2010-1120, slip op. at 19-20 (attached as Ex. 6) (applying the appeal-to-vote test to conclude that "it could be . . . reasonable to interpret" the issue ad before it as an "appeal to vote" and as "advocat[ing] for the defeat" of that candidate); *Magill,* No. COPP 2014-CFP-037 at 8-10 (attached as Ex. 18) (reasoning that a state court complaint seeking to remove an elected official from office filed during an election cycle both amounted to express advocacy and satisfied the appeal-to-vote test).

125.   The Contribution Statutory Definition is facially vague in violation of the First and Fourteenth Amendments.

## Count XI
## The Contribution Regulatory Definition Is Unconstitutional.

126.   Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

127.    The Contribution Regulatory Definition interprets the Contribution Statutory Definition, stating that "the term 'contribution' as defined in MCA § 13-1-101, includes, but is not limited to" a list of various purchases, payments, candidate self-funding, and in-kind contributions. ARM 44.10.321.

128.    The Commissioner of Political Practices does not have the independent authority to make law but rather is authorized only to "adopt rules to carry out the provisions of chapter 35 of this title and this chapter in conformance with the Montana Administrative Procedure Act." MCA § 13-37-114.

129.    Because the Contribution Regulatory Definition is designed to help carry out and enforce the facially vague Contribution Statutory Definition, the Contribution Regulatory Definition should be struck down in its entirety as unconstitutional. *See Davis,* 554 U.S. at 744 (striking down as unconstitutional disclosure requirements "designed to implement [] asymmetrical contribution limits" because the limits were unconstitutional).

130.    Insofar as the Contribution Regulatory Definition applies to issue ads consistent with the Contribution Statutory Definition, it should be struck down as unconstitutional as applied to issue ads. *See id.*

**Plaintiff's First Amended**
**Verified Complaint**                           -47-

## Count XII
## The Electioneering Communication Definition And Reporting Requirement Are Facially Vague.

**131.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**132.** Rev. MCA § 13-1-101(15) (the "Electioneering Communication Definition") states:

(a) "Electioneering communication" means a paid communication that is publicly distributed by radio, television, cable, satellite, internet website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:

(i) refers to one or more clearly identified candidates in that election;

(ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or

(iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.

(b) The term does not mean:

(i) a bona fide news story, commentary, blog, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, internet website, or other periodical publication of general circulation unless the facilities are owned or controlled by a candidate or political committee;

(ii) a communication by any membership organization or corporation to its members, stockholders, or employees;

(iii) a commercial communication that depicts a candidate's name, image, likeness, or voice only in the candidate's capacity as owner, operator, or employee of a business that existed prior to the candidacy;

(iv) a communication that constitutes a candidate debate or forum or that solely promotes a candidate debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or

(v) a communication that the commissioner determines by rule is not an electioneering communication.

133.  Rev. MCA § 13-37-225(4)(the "Electioneering Reporting Requirement") states that "A person who makes an election communication, electioneering communication, or independent expenditure is subject to reporting and disclosure requirements as provided in chapters 35 and 37 of this title."

134.  "A statute must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*, 146 F.3d at 638; *WRTL-III*, 751 F.3d at 835. "A statute is vague if men of common intelligence must necessarily guess at its meaning and differ as to its application." *In re Doser*, 412 F.3d 1056, 1062 (9th Cir. 2005). "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

135.  Whether the communications regulated, particularly internet websites, billboards, or any other distribution of printed materials, "can be received by more than 100 recipients in the district voting on the candidate or ballot issue" is not ascertainable. *Cf. The Electioneering Communication Database*, FCC Media

Bureau, http://apps.fcc.gov/ecd/ (last visited June 23, 2015) (creating a searchable

database showing what radio and broadcast stations will satisfy FECA's EC

recipient requirement).

136.    Additionally, those that engage in electioneering communications,

whether as a political committee or otherwise, can only guess as to what reporting

requirement they are subject to because they, by definition, do not support or

oppose a candidate or issue and so are not one of the defined political committee

types with discreet reporting requirements. *See* Rev. MCA § 13-37-226(1)

(establishing times for reporting for those supporting or opposing a statewide

candidate or ballot); *id.* § 13-37-226(2) (establishing times for reporting for those

supporting or opposing a district candidate or ballot); *id.* § 13-37-226(3)

(establishing times for reporting for those supporting or opposing local issues); *id.*

§ 13-37-226(4) (establishing time for independent and political party committees

to report); *id.* § 13-37-225(5) (establishing times for incidental committees to

report); Rev. MCA § 13-37-229 (establishing disclosure content for ballot issue

committees, political party committees, and independent committees); SB 289,

Section 14 (establishing disclosure content for incidental committees).

137.    The Electioneering Communication Definition and Reporting

Requirement are unconstitutionally vague in violation of the First and Fourteenth

Amendments.

## Count XIII
## The Electioneering Communication Definition Fails Scrutiny Review.

**138.** Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**139.** Rev. MCA § 13-1-101(15) (the "Electioneering Communication

Definition") states:

(a) "Electioneering communication" means a paid communication that is publicly distributed by radio, television, cable, satellite, internet website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:
    (i) refers to one or more clearly identified candidates in that election;
    (ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or
    (iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.
(b) The term does not mean:
    (i) a bona fide news story, commentary, blog, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, internet website, or other periodical publication of general circulation unless the facilities are owned or controlled by a candidate or political committee;
    (ii) a communication by any membership organization or corporation to its members, stockholders, or employees;
(iii) a commercial communication that depicts a candidate's name, image, likeness, or voice only in the candidate's capacity as owner, operator, or employee of a business that existed prior to the candidacy;
    (iv) a communication that constitutes a candidate debate or forum or that solely promotes a candidate debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or
    (v) a communication that the commissioner determines by rule is

not an electioneering communication.

**140.**   Defendants cannot show that the Electioneering Communication

Definition satisfies scrutiny. *Center for Ind. Freedom, Inc. v. Tennant*, 706 F.3d

270, 283-84 (4th Cir. 2013). The Electioneering Communication Definition is

unconstitutional.

### Count XIV
### The Anonymous Speech Ban Is Unconstitutional.

**141.**   Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**142.**   Rev. MCA 13-35-225 states, in relevant part:

**Election materials not to be anonymous—statement of accuracy— notice—penalty.**   (1) All election communications, electioneering communications, and independent expenditures must clearly and conspicuously include the attribution "paid for by" followed by the name and address of the person who made or financed the expenditure for the communication. The attribution must contain:
. . .
        (b) for election material communications, electioneering communications, or independent expenditures financed by a political committee, the name of the committee, the name of the committee treasurer, and the address of the committee or the committee treasurer; and
        (c) for election communications, electioneering communications, or independent expenditures financed by a political committee that is a corporation or a union, the name of the corporation or union, its chief executive officer or equivalent, and the address of the principal place of business.

**143.**   The Anonymous Speech Ban is "a content-based limitation on core

political speech . . . [that] must receive the most "exacting scrutiny" under the First

Amendment," that is, the government must prove that it is narrowly tailored and

the least restrictive alternative to serve an overriding state interest. *Am. Civil

Liberties Union of Nevada v. Heller*, 378 F.3d 979, 992-93 (9th Cir. 2004) (*citing

McIntyre,* 514 U.S. at 346, 115 S.Ct. 1511); *see also Reed v. Town of Gilbert,* No.

13-502, slip. op. at 6 (June 19, 2015) ("Content-based laws—those that target

speech based on its communicative content—are presumptively unconstitutional

and may be justified only if the government proves that they are narrowly tailored

to serve compelling state interests.").

    **144.**   The Anonymous Speech Ban is not narrowly tailored to a compelling

state interest, *Heller,* 378 F.3d 992-93, so it is unconstitutional under the First and

Fourteenth Amendments.

### Count XV
### The Investigatory Procedures Provision and the Publication Provisions Unconstitutionally Burden And Chill Protected Speech and Association.

    **145.**   Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

    **146.**   Montana law states that "the commissioner is responsible for

investigating all of the alleged violations of the election laws," MCA § 13-37-

111(1), and authorizes the commissioner, during an investigation, to:

    (a) investigate all statements filed pursuant to the provisions of chapter

35 of this title or this chapter and shall investigate alleged failures to file any statement or the alleged falsification of any statement filed pursuant to the provisions of chapter 35 of this title or this chapter. Upon the submission of a written complaint by any individual, the commissioner shall investigate any other alleged violation of the provisions of chapter 35 of this title, this chapter, or any rule adopted pursuant to chapter 35 of this title or this chapter.

(b) inspect any records, accounts, or books that must be kept pursuant to the provisions of chapter 35 of this title or this chapter that are held by any political committee or candidate, as long as the inspection is made during reasonable office hours; and

(c) administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, bank account statements of a political committee or candidate, or other records that are relevant or material for the purpose of conducting any investigation pursuant to the provisions of chapter 35 of this title or this chapter.

MCA § 13-37-111(2) (collectively "the Investigatory Procedures Provision").

Then, "[t]he commissioner, upon completion of the investigation, shall prepare a written summary of facts and statement of findings, which shall be sent to the complainant and the alleged violator," ARM 44.10.307(3), and make "[a] filed complaint and the summary of facts and statement of findings . . . public record," ARM 44.10.307(4) (collectively "the Publication Provisions").

147.    Commissioners routinely post complaints, notices of complaints (often with supporting documentation), as well as sufficiency findings disclosing associations and strategies on the Commission's website. *See Docket of Formal Complaints*, http://political practices.mt.gov/2recentdecisions/ docket.mcpx (last

visited June 23, 2015); *Campaign Finance and Practices Decision Page,*
http://politicalpractices.mt.gov/ 2recentdecisions/campaignfinance.mcpx (last
visited June 23, 2015).

      **148.**    The First Amendment protects the right to associate with others.
*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("*NAACP*"). This
right is "fundamental." *San Francisco County Democratic Cent. Comm. v. Eu*, 826
F.2d 814, 827 (9th Cir. 1987).  Once disclosure occurs, it cannot be undone. *Perry
v. Schwarzenegger*, 591 F.3d 1147, 1158 (9th Cir. 2010). Consequently, disclosure
of an association's private, internal data, political affiliations, or activities imposes
a substantial burden on First Amendment rights, *Buckley v. Valeo*, 424 U.S. 1, 64-
68 (1976); *NAACP*, 357 U.S. at 462-63 (1958); *Perry*, 591 F.3d at 1159-60 (9th
Cir. 2010).

      **149.**    The "public disclosure of an association's confidential internal
materials . . . intrudes on the 'privacy of association and belief guaranteed by the
First Amendment,' *Buckley,* 424 U.S. at 64, 96 S.Ct. at 656, as well as seriously
interferes with internal group operations and effectiveness." *AFL-CIO v. FEC*, 333
F.3d 168, 177-78 (D.C. Cir. 2003). "Any interference with the freedom of a party
is simultaneously an interference with the freedom of its adherents." *Sweezy v.
New Hampshire*, 354 U.S. 234, 250-51 (1957). "Merely to summon a witness and
compel him, against his will, to disclose the nature of his past expressions and

associations is a measure of governmental interference in these matters." *Id.* at 250.

150.   Those haled before investigative bodies have a "strong confidentiality interest" analogous to those haled before a grand jury in a criminal proceeding. *In re Sealed Case*, 237 F.3d 657, 667 (D.C. Cir. 2001). Compelled disclosure is especially inappropriate in such contexts because "secrecy is needed to protect an innocent accused from damaging publicity." *Id*. at 177.

151.   The Investigatory Procedures Provision and the Publication Provisions  provide no safeguards preventing the public disclosure of **1)** confidential materials in and attached to complaints filed with the commissioner and the commissioner's complaint notices, or **2)** confidential materials discovered during an investigation discussed in the commissioner's sufficiency findings, whether acquired by subpoena or voluntarily furnished by the alleged violator or political opponents. The Investigatory Procedures Provision and the Publication Provisions thus fail to ensure "secrecy . . . to protect an innocent from damaging publicity." *Id.* at 177.

152.   Because of the Investigatory Procedures Provision and the Publication Provisions, MCD's speech is chilled. MCD will refrain from running its issue ads because any complaint filed against it will be publicly posted and could subject it to damaging publicity. And any confidential associations or

strategies it provides or are discovered during an investigation can become public knowledge in any sufficiency decisions issued by a commissioner. *See, e.g., Bognogofsky v. Kennedy,* slip op. at 24-27 (attached as Ex. 17) (discussing in a publicly-posted, unadjudicated document **1)** ATP's alleged strategies derived from materials furnished by political opponents and **2)** alleged associations between ATP and other individuals and organizations).

153.   MCD also bears the substantial burden of defending its constitutional rights throughout any investigation and risks liability if it is unable to adequately defend those rights.

154.   The Investigatory Procedures Provision and the Publication Provisions are not narrowly tailored to served a compelling state interest. *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 99 (1982); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

155.   The Investigatory Procedures Provision and the Publication Provisions are unconstitutional under the First and Fourteenth Amendment.

## Prayer for Relief

Wherefore, Plaintiff requests the following relief:

1.   Declare MCA Section 13-1-101(22) and Revised MCA Section 13-1-101(30) unconstitutionally overbroad and vague in violation of the First and Fourteenth Amendments;

**2.**     Declare ARM 44.10.327 unconstitutionally overbroad and vague in violation of the First and Fourteenth Amendments;

**3.**     Declare MCA Section 13-1-101(11)(a) and Revised MCA Section 13-1-101(17)(a) unconstitutionally vague in violation of the First and Fourteenth Amendments;

**4.**     Declare ARM 44.10.323 unconstitutional and in violation of the First and Fourteenth Amendments;

**5.**     Declare MCA Section 13-1-101(7)(a)(i) and Revised Section 13-1-101(9)(a)(i) unconstitutionally vague in violation of the First and Fourteenth Amendments;

**6.**     Declare ARM 44.10.321 unconstitutional and in violation of the First and Fourteenth Amendments;

**7.**     Declare Revised MCA Section 13-1-101(15) and 13-37-225(4) unconstitutionally vague in violation of the First and Fourteenth Amendments;

**8.**     Declare Revised MCA Section 13-1-101(15) unconstitutional and in violation of the First and Fourteenth Amendments;

**9.**     Declare Revised MCA Section 13-1-101(22) unconstitutional and in violation of the First and Fourteenth Amendments;

**10.**     Declare MCA Section 13-37-111 unconstitutional and in violation of the First and Fourteenth Amendments;

**11.**     Declare ARM 44.10.307(3) & (4) unconstitutional and in violation of the First and Fourteenth Amendments;

**12.**     Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA Section 13-1-101(22) and Revised MCA Section 13-1-101(30);

**13.**     Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.10.327;

**14.**     Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA Section 13-1-101(11)(a) and Revised MCA Section 13-1-101(17)(a);

**15.**     Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.10.323;

**16.**     Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA Section 13-1-101(7)(a)(i) and Revised MCA Section 13-1-101(9)(a)(i);

**17.**     Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.10.321;

**18.**     Enjoin Defendants, their agents, successors, and assigns, from enforcing Revised MCA Section 13-1-101(15);

**19.**      Enjoin Defendants, their agents, successors, and assigns, from enforcing Revised MCA Section 13-37-225(4);

**20.**    Enjoin Defendants, their agents, successors, and assigns, from enforcing Revised MCA Section 13-1-101(22);

**21.**    Enjoin the Commissioner, his agents, successors, and assigns, from acting pursuant to MCA Section 13-37-111;

**22.**    Enjoin the Commissioner, his agents, successors, and assigns, from acting pursuant to ARM 44.10.307(3) & (4);

**23.**    Grant Plaintiff its costs and attorneys fees under 42 U.S.C. Section 1988 and any other applicable authority; and

**24.**    Grant any and all other relief this Court deems just and equitable.

Dated: June 23, 2015

                                          Respectfully submitted,


                                          /s/ Anita Y. Milanovich
James Bopp, Jr.* (Ind. No. 2838-84)       Anita Y. Milanovich (Mt. No. 12176)
Justin McAdam* (Ind. No. 30016-49)        THE BOPP LAW FIRM, PC
THE JAMES MADISON CENTER FOR              1627 West Main Street, Suite 294
FREE SPEECH                               Bozeman, MT 59715
The National Building                     Phone: (406) 589-6856
1 South Sixth Street                      Cell: (406) 589-6856
Terre Haute, IN 47807                     Email: aymilanovich@bopplaw.com
Phone: (812) 232-2434                     *Attorney for Plaintiff*
Fax: (812) 235-3685
Email: jboppjr@aol.com
*Attorney for Plaintiff*

*Pro hac vice application granted
September 4, 2014.

**Plaintiff's First Amended
Verified Complaint**                  -61-

**Certificate of Service**

I hereby certify that on June 23, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Montana by using the Court's CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/ Anita Y. Milanovich

**Plaintiff's First Amended
Verified Complaint**                      -62-