Anita Y. Milanovich (Mt. No. 12176)
THE BOPP LAW FIRM, PC
1627 West Main Street, Suite 294
Bozeman, MT 59715
Phone: (406) 589-6856
Email: aymilanovich@bopplaw.com
*Attorney for Plaintiff*

James Bopp, Jr. (Ind. No. 2838-84)*
THE JAMES MADISON CENTER FOR
FREE SPEECH
The National Building
1 South Sixth Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com
*Attorney for Plaintiff*

*Pro hac vice application granted
September 4, 2015.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### HELENA DIVISION

| | |
|---|---|
| **Montanans for Community Development**,<br><br>*Plaintiff,*<br><br>v.<br><br>**Jonathan Motl**, in his official capacity as Commissioner of Political Practices, **Timothy Fox**, in his official capacity as Attorney General of the State of Montana, and **Leo Gallagher,** in his official capacity as Lewis and Clark County Attorney,<br><br>*Defendants.* | Case No. 6:14-cv-00055<br><br><br>**Second Amended Verified Complaint For Declaratory and Injunctive Relief** |

Plaintiff Montanans for Community Development ("MCD") amends its complaints against Defendants as follows[1]:

---

[1]This Court set December 31, 2015, as the deadline for filing a second amended complaint. (Doc. 99.)

## Introduction

1.     This is a civil action for declaratory and injunctive relief arising under the First and Fourteenth Amendments to the Constitution of the United States. It concerns the constitutionality and enforcement of Montana election statutes and administrative regulations that **1)** define political committees and their reporting, MCA §§ 13-1-101(22) and 13-1-101(30), ARM 44.11.103(15), 44.11.103(31), 44.11.105(1), 44.11.202, 44.11.203, 44.11.302(1), 44.11.402(5), 44.11.602 and 44.11.603; **2)** define expenditures, MCA § 13-1-101(17)(a), ARM 44.11.501 and 44.11504(1); **3)** define contributions, MCA § 13-1-101(9)(a), ARM 44.11.401; **4)** define electioneering communication and its reporting, MCA § 13-1-101(15) and MCA § 13-37-225(3), ARM 44.11.605; **5)** proscribe anonymous speech, MCA § 13-35-225 and ARM 44.11.601(2); **6)** establish investigatory procedures for the Commissioner of Political Practices, MCA § 13-37-111, ARM 44.11.106(6); and **7)** authorize publication of complaints filed with and sufficiency decisions prepared by the Commissioner of Political Practices, ARM 44.11.106(5) and 44.11.240(1)(g).

2.     Political committees are required to report certain contributions in excess of $35 (both received and made, along with contributor information) and certain expenditures they make. MCA §§ 13-37-225, 13-37-229, and 13-37-232. Political committees who fail to comply with these reporting requirements are

subject actions including but not limited to, investigation, MCA § 13-37-111(1) and (2), MCA §13-37-125; civil or criminal prosecution, MCA § 13-37-124, ARM 44.11.240(h); and, if convicted, are subject to potentially substantial fines, MCA §13-37-128; or removed from office, ARM 44.11.240(i). *See, e.g., American Tradition Partnership v. Motl,* No. BDV-2010-1120, slip op. (Mont. 1st Jud. Dist. 2013) (attached as Ex. 1) (fining a 501(c)(4) organization over $260,000 for failing to report expenditures).

3.     Plaintiff MCD, a 501(c)(4) organization, complains that these definitional, reporting, anonymity, investigatory and publication provisions unconstitutionally burden and chill its speech and association.  They are unconstitutional under the First and Fourteenth Amendments to the United States Constitution because **1)** they are unconstitutionally vague, **2)** they are unconstitutionally overbroad, **3)** they fail scrutiny review, or **4)** they are unequally enforced based on viewpoint discrimination.

### Jurisdiction and Venue

4.     Because this case arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). It also has jurisdiction pursuant to the Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper under 28 U.S.C. § 1391(b) because events giving rise to the claim occurred, and Defendants reside, in this Division.

## Parties

6. Montanans for Community Development ("MCD") is a non-profit corporation organized under Montana law that is exempt from federal income taxes under 26 U.S.C. 501(c)(4). MCD is located in Helena, Montana, which is in Lewis and Clark County.

7. As Commissioner of Political Practices, Defendant Jonathan Motl has the authority to investigate violations of, enforce the provisions of, and hire attorneys to prosecute violations of, Montana Code Chapters 35 and 37 and the regulations adopted to carry out these provisions. MCA §§ 13-37-111, 13-37-113, 13-37-114, and 13-37-124. The Commissioner acts under color of law and is sued in his official capacity.

8. As Montana Attorney General, Defendant Timothy Fox has the power to investigate and prosecute violations of Montana Code Chapters 35 and 37 by and through the county attorneys under his supervision. MCA §§ 2-15-501(5), 13-37-124, 13-37-125, and 13-37-128. The Attorney General acts under color of law and is sued in his official capacity.

9. As Lewis and Clark County Attorney, Defendant Leo Gallagher has the power to investigate and prosecute violations of Montana Code Chapters 35

and 37. *See* MCA §§ 7-4-2716, 13-37-124, 13-37-125, 13-37-128 (granting investigative and prosecutorial power to Montana's county attorneys). The county attorney acts under color of law and is sued in his official capacity.

**Facts**

10.     Chapters 35 and 37 of Title 13 the Montana Code impose campaign finance restrictions and bans on political speakers, including corporations and organizations, that fall within the scope of these chapters.

11.     MCA § 13-1-101(30) (hereinafter "the Political-Committee Statutory Definition") defines "political committee" to mean:

> (a) . . . a combination of two or more individuals or a person other than an individual who makes receives a contribution or makes an expenditure:
>    (i) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
>    (ii) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue;
>    (iii) to prepare or disseminate an election communication, an electioneering communication, or an independent expenditure.
> (b) Political committees include ballot issue committees, incidental committees, independent committees, and political party committees.
> (c) A candidate and the candidate's treasurer do not constitute a political committee.
> (d) A political committee is not formed when a combination of two or more individuals or a person other than an individual makes an election communication, an electioneering communication, or an independent expenditure of $250 or less.

*See* ARM 44.11.202(2) ("There are four types of political committees . . . ."). But:

> [a] political committee is not formed by the following:

. . .
(b) by a $250 or less expenditure as defined by "political committee" in
13-1-101, MCA;
(c) by a de minimis activity, as defined in these rules;
. . . .

ARM 44.11.202(3). "Person" is defined as "an individual, corporation, association,

firm, partnership, cooperative, committee, including a political committee, club,

union, or other organization or group of individuals or a candidate as defined in

subsection (8)." MCA § 13-1-101(28).

**12.** MCA § 13-1-101(15)(a) defines "Electioneering Communication" as:

a paid communication that is publicly distributed by radio, television,
cable, satellite, internet website, newspaper, periodical, billboard, mail,
or any other distribution of printed materials, that is made within 60
days of the initiation of voting in an election, that does not support or
oppose a candidate or ballot issue, that can be received by more than
100 recipients in the district voting on the candidate or ballot issue, and that:
(i) refers to one or more clearly identified candidates in that
election;
(ii) depicts the name, image, likeness, or voice of one or more
clearly identified candidates in that election; or
(iii) refers to a political party, ballot issue, or other question
submitted to the voters in that election.

"A person who makes an election communication, electioneering communication, or

independent expenditure is subject to reporting and disclosure requirements as

provided in chapters 35 and 37 of this title." MCA § 13-37-225(4).

**13.** "De minimis act" means "an action, contribution, or expenditure that

is so small that it does not trigger registration, reporting, disclaimer, or disclosure

obligations under Title 13, chapter 35 or 37, or warrant enforcement as a campaign practices violation under Title 13, chapter 37." MCA § 13-1-101(11). "The commissioner may consider" a list of "factors in determining whether specific acts, contributions, or expenditures are de minimis and therefore do not trigger registration, reporting, attribution, or disclosure requirements, or warrant enforcement as a campaign practices violation," along with "other factors and circumstances the commissioner determines are relevant." ARM 44.11.603(1). "These criteria will be considered and applied on a case-by-case basis." ARM 44.11.603(2). "Acts, contributions or expenditures "may, depending on the circumstances, be considered de minimis" for reasons "includ[ing], but [] not limited to" one of seven listed in the Rules. ARM 44.11.603(3).

14.     A "ballot issue committee" is defined as "a political committee specifically organized to support or oppose a ballot issue." MCA § 13-1-101(7); *see also* ARM 44.11.202(4).

15.     A "political party committee" is defined as "a political committee formed by a political party organization[2] and includes all county and city central committees." MCA § 13-1-101(31); *see also* ARM 44.11.202(5).

---

[2]"Political party organization" means "a political organization that: (a) was represented on the official ballot in either of the two most recent statewide general elections; or (b) has met the petition requirements, as provided in Title 13, chapter 10, part 5." MCA § 13-1-101(32). "Political organization" is undefined.

**16.** An "independent committee" is defined as "a political committee organized for the primary purpose of receiving contributions and making expenditures that is not controlled either directly or indirectly by a candidate and that does not coordinate with a candidate in conjunction with the making of expenditures except pursuant to the limits set forth in 13-37-216(1)." MCA § 13-1-101(23). In other words, "independent committee" is "a political committee that has the primary purpose of supporting or opposing candidates or ballot issues but is neither a ballot issue nor a political party political committee." ARM 44.11.202(7). "Independent committees reportable election activity may consist of: (a) making one or more expenditures; (b) accepting one or more contributions." *Id.*

**17.** An "incidental committee" is defined as "a political committee that is not specifically organized or operating for the primary purpose of supporting or opposing candidates or ballot issues but that may incidentally become a political committee by receiving a contribution or making an expenditure." MCA § 13-1-101(22). It is "a political committee that does not have the primary purpose of supporting or opposing candidates or issues." ARM 44.11.202(6).

**18.** "Primary purpose" means "the major, principal, or important goal, function, or reason for existence of a political committee." ARM 44.11.203(1).

> The commissioner may determine that the primary purpose of a political committee is to support or oppose candidates or ballot issues based upon any one or more of the following criteria:

(a) allocation and source of budget;
(b) allocation of staff or members' activity, both during an election and otherwise;
(c) the statement of purpose, articles of incorporation, bylaws, or goals.

ARM 44.11.203(2).

**19.** The Commissioner:

in determining the primary purpose of a political committee, may also consider any one or more of the following criteria:
(a) reportable election activity;
(b) the history of the political committee and the number of elections in which it has participated or registered;
(c) receipt of contributions in response to an appeal or that are designated for a specified candidate, ballot issue, petition, or reportable election activity;
(d) the number and cost of reportable election expenditures made;
(e) coordination with any candidates or other political committees;
(f) ordinary business actually conducted;
(g) if a corporation, whether it was created and maintained as provided by law; or
(h) the date of founding, incorporation, or organization.

ARM 44. 11.203(3). The Commissioner may classify what type of political committee must file as, ARM 44.11.203(4), based on a preponderance of the evidence. ARM 44.11.203(5). The Commissioner is not obligated to classify political committees "in the manner defined in these rules." ARM 44.11.202(10). A political committee can "submit additional information and request to be reclassified."ARM 44.11.203(6).

**20.**    "Incidental committee reportable election activity may consist of: (a) making one or more expenditures; (b) accepting one or more designated contributions; or (c) accepting one or more contributions in response to an appeal." *Id.*  Such reports must be filed electronically, ARM 44.11.302(1)(a), although "[t]he commissioner may provide a waiver. . . ." ARM 44.11.302(2).

**21.**    "Election activity" means "any activity that may constitute reportable election activity under Title 13, MCA." ARM 44.11.103(15).

**22.**    "'Reportable Election Activity' includes but is not limited to accepting a contribution, a contribution in response to an appeal, or a designated contribution, or making an expenditure, a contribution, a coordinated expenditure, an independent expenditure, or an in-kind contribution or expenditure, or making an election communication or electioneering communication." ARM 44.11.103(31).

**23.**    MCA § 13-37-226 provides reporting deadlines for political committees. A two-day reporting window is established for contributions and expenditures made within the final weeks before an election. *see* MCA § 13-37-226(1)(d) (statewide office and ballot issues); MCA § 13-37-226(2)(b)(district office and ballot issues); MCA § 13-37-226(3)(all other offices and issues); MCA § 13-37-226(4)(b) &(c)(creating a catch-all for remaining independent and political party committees); MCA § 13-37-226(5)(b) & (c)(creating a catch-all for

remaining incidental committees). Such contributions and expenditures are "reported again on the post-election report." ARM 44.11.402(5)(c).

**24.** "Coordinated" means "made in cooperation with, in consultation with, at the request of, or with the express prior consent of a candidate or political committee or an agent of a candidate or political committee." MCA § 13-1-101(10). A "coordinated expenditure" means "any election communication, electioneering communication, or reportable election activity that is made by a person in cooperation with, at the request or suggestion of, or with the express prior consent of a candidate or an agent of the candidate." ARM 44.11.602(1). To determine:

> whether a communication or reportable election activity is coordinated the following may be considered, whether:
> (a) it is based on information that is provided by the candidate or agent of the candidate directly or indirectly to the person funding or facilitating the communication or activity, or any person involved in creating, producing or disseminating it;
> (b) it was made by or through any candidate's agent in the course of the agent's involvement in the current campaign;
> (c) the person funding or facilitating the communication or reportable election activity retains the paid services of a person or individual who:
> > (i) currently, or during the six months immediately preceding the election in which the candidate's name will appear on the ballot, received compensation from the candidate or the candidate's agent; and
> > (ii) the person or individual is involved in creating, producing, or disseminating the communication or reportable election activity.
> (d) the communication or reportable election activity replicates, reproduces, republishes or disseminates, in whole or in substantial part, any material designed, produced and paid for, or distributed by the

candidate, except as set forth in (3)(e).

(e) the candidate or the candidate's agent has made or participated in any discussion or in making any decision regarding the content, timing, location, media, intended audience, volume of distribution, or frequency of placement of the communication or activity.

(f) the person funding or facilitating the communication or reportable election activity has:

> (i) established a written firewall policy designed to prevent the flow of information about the candidate's campaign plans, projects, activities, or needs from the persons providing services to the candidate to persons involved in the creation, production, or dissemination of the communication or activity; and
>
> (ii) prior to the preparation or distribution of any communication or reportable election activity has distributed the firewall policy to all relevant employees, consultants, and clients affected by the policy; and
>
> (iii) filed the firewall policy with the COPP.

**25.** A "coordinated expenditure" is not:

(a) an uncoordinated expenditure or an independent reportable election activity funded or facilitated by a person;

(b) services, food, or lodging provided in a manner that they are not contributions by a person within the meaning of contribution as defined by 13-1-101, MCA, or these rules;

(c) the cost funded or facilitated by a person for any bona fide news story, commentary, blog, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical of general circulation;

(d) activity by an individual acting solely on his or her own behalf independently of any candidate or the candidate's agent; or

(e) the independent use of statements, images, or other information that is appropriated from a public source.

**26.** MCA § 13-1-101(17)(a) (hereinafter "the Expenditure Statutory Definition") states that an "expenditure" is:

a purchase, payment, distribution, loan, advance, promise, pledge, or gift

of money or anything of value:

(i) made by a candidate or political committee to support or oppose a candidate or a ballot issue; or

(ii) used or intended for use in making independent expenditures or in producing electioneering communications.

27.    "Support or oppose" means:

(a) using express words, including but not limited to "vote", "oppose", "support", "elect", "defeat", or "reject", that call for the nomination, election, or defeat of one or more clearly identified candidates, the election or defeat of one or more political parties, or the passage or defeat of one or more ballot issues submitted to voters in an election; or (b) otherwise referring to or depicting one or more clearly identified candidates, political parties, or ballot issues in a manner that is susceptible of no reasonable interpretation other than as a call for the nomination, election, or defeat of the candidate in an election, the election or defeat of the political party, or the passage or defeat of the ballot issue or other question submitted to the voters in an election.

MCA § 13-1-101(49).

28.    MCA § 13-1-101(9)(a)(i) (hereinafter "the Contribution Statutory Definition") states that a "contribution" means:

(i) the receipt by a candidate or a political committee of an advance, gift, loan, conveyance, deposit, payment, or distribution of money or anything of value to support or oppose a candidate or a ballot issue;

(ii) an expenditure, including an in-kind expenditure, that is made in coordination with a candidate or ballot issue committee and is reportable by the candidate or ballot issue committee as a contribution;

(iii) the receipt by a political committee of funds transferred from another political committee;

(iv) the payment by a person other than a candidate or political committee other than a candidate or political committee of compensation for the personal services of another person that are rendered to a candidate or political committee.

**29.** ARM 44.11.401 (hereinafter "the Contribution Regulatory Definition") states that "the term 'contribution' as defined in 13-1-101, MCA, includes, but is not limited to" a list of various purchases, payments, candidate self-funding, in-kind contributions, and coordinated expenditures.

**30.** Under ARM 44.11.504, if a political committee, or one of its members "advises, counsels, or otherwise knowingly encourages any person to make an expenditure for the purposes of avoiding direct contributions, or for any other reason, the expenditure shall be considered a contribution by that person to the candidate or political committee encouraging the expenditures" and is reportable as one.

**31.** MCA § 13-35-225(1) and ARM 44.11.601 (hereinafter the "Anonymous Speech Ban") states:

> All election communications, electioneering communications, and independent expenditures must clearly and conspicuously include the attribution "paid for by" followed by the name and address of the person who made or financed the expenditure for the communication. The attribution must contain:
> . . .
> (b) for election communications, electioneering communications, or independent expenditures financed by a political committee, the name of the committee, the name of the committee treasurer, and the address of the committee or the committee treasurer; and
> (c) for election communications, electioneering communications, or independent expenditures financed by a political committee that is a corporation or a union, the name of the corporation or union, its chief executive officer or equivalent, and the address of the principal place of business.

MCA § 13-35-225(1); *see also* ARM 44.11.601(2)(b) & (c).

32.    Those accused of violating or attempting to violate campaign finance

laws predicated on these definitions the ban are subject to investigation, MCA

§ 13-37-111(1), and potentially civil prosecution, MCA § 13-37-128.[3] Those who

fail to comply with reporting requirements are subject to (but not limited to)

arbitrary reclassification, ARM 44.11.240(c), findings of violation, ARM

44.11.240(g), and civil or criminal prosecution, ARM 44.11.240(h).

33.    MCA § 13-37-111 provides that "the commissioner is responsible for

investigating all of the alleged violations of the election laws," MCA § 13-37-

111(1), and authorizes the commissioner to:

> (a) investigate all statements filed pursuant to the provisions of chapter
> 35 of this title or this chapter and shall investigate alleged failures to file
> any statement or the alleged falsification of any statement filed pursuant
> to the provisions of chapter 35 of this title or this chapter. Upon the
> submission of a written complaint by any individual, the commissioner
> shall investigate any other alleged violation of the provisions of chapter

---

[3]MCA Section 13-37-128 provides that:

> (1) A person who intentionally or negligently violates any of the
> reporting provisions of this chapter, a provision of 13-35-225, or a
> provision of Title 13, chapter 35, part 4, is liable in a civil action
> brought by the commissioner or a county attorney pursuant to the
> provisions outlined in 13-37-124 and 13-37-125 for an amount up to
> $500 or three times the amount of the unlawful contributions or
> expenditures, whichever is greater.

MCA § 13-37-128(1).

35 of this title, this chapter, or any rule adopted pursuant to chapter 35 of this title or this chapter.

(b) inspect any records, accounts, or books that must be kept pursuant to the provisions of chapter 35 of this title or this chapter that are held by any political committee or candidate, as long as the inspection is made during reasonable office hours; and

(c) administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, bank account statements of a political committee or candidate, or other records that are relevant or material for the purpose of conducting any investigation pursuant to the provisions of chapter 35 of this title or this chapter.

34. Additionally, ARM 44.11.106(3) and (5) (the "Publication Provisions") state that "[t]he commissioner shall prepare a written summary of facts and statement of findings, upon completion of the investigation, which shall be sent to the complainant and the alleged violator," ARM 44.11.106(3), and that "a filed complaint and the summary of facts and statement of findings shall be public record," ARM 44.11.106(5). *See also* ARM 44.11.240(g) (stating that the Commissioner "may take actions, including but not limited to . . . issue a finding of sufficient evidence of violation of Montana's Campaign Practice and Finance laws. . . .").

35. Those convicted of violating or attempting to violate Montana's campaign finance laws through the procedures of the Investigatory Procedures Provision, the Publication Provisions, and subsequent civil action are subject to

fines. MCA § 13-37-128(1).[4]

36.     MCD, a non-profit corporation exempt from federal income taxation under I.R.C. 501(c)(4) (2006), is a non-sectarian and non-partisan organization. (*See MCD Bylaws,* attached as Ex. 3, at 1, § 2.) It is not connected with any political candidate or political party. Nor is it connected with any political committee.

37.     MCD's mission is "to promote and encourage policies that create jobs and grow local economies throughout Montana." (*Id.*) It "engages in grassroots advocacy and issues-oriented educational campaigns to further [its] goals." (*Id.*) In pursuit its mission, MCD engages in political speech.

38.     For example, in 2013, MCD prepared a variety of economic development ads, including one that mentioned grassroots activist John Quandt, an individual who also was at the time a Republican City Council candidate in Billings. (*See, e.g., 2013 Ads,* attached as Ex. 4.)  Such ads are issue advocacy. *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 470 (2007).

39.     Most recently, MCD intended to circulate issue ads that mention

---

[4]The Commissioner sought to increase penalties to also revoke corporate charters. *See Montana political practices commissioner seeks expansion of powers*, *available at* http://m.missoulian.com/news/state-and-regional/montana-political-practices-commissioner-seeks-expansion-of-powers/article_49303056-ede1-11e3-b564-0019bb2963f4.html?mobile_touch=true (June 6, 2014) (attached as Ex. 2).

individuals who also were candidates at the end of September 2014, which would

have been during the 2014 general election cycle. (*See 2014 Ads*, attached as Ex.

5.) One ad mentioned grassroots activist Joshua Sizemore, presently a candidate

for House District 47. (*Id.* at 2.) The other mentioned environmentalist and

legislative official Mary McNally, presently up for re-election to House District

49. (*Id.* at 4.) Both ads supported 21st Century Energy's plan to promote job

growth in the energy sector and provide recipients with contact information to

further educate themselves regarding that Plan. (*Id.*)

  **40.** MCD intends to spend more than $250 to publish substantially

similar ads that will likely reach more than 100 recipients in the district voting of

the candidate mentioned within 60 days of the initiation of voting in future

elections.

  **41.** MCD's organizational documents show that MCD does not have the

major purpose or a priority of nominating or electing any candidate(s). (*See MCD

Bylaws,* attached as Ex. 3, at 1, § 2.)

  **42.** MCD has not and does not plan to receive or spend either time or

money on, or coordinating spending on, speech advocating the election or defeat

of any candidate or the passage of ballot issues at the local, state, or federal level.

  **43.** MCD does not intend to follow Montana's political committee

requirements, including reporting to the Commissioner of Political Practices its

spending on its issue ads.

44.     In 2013, a Montana trial court imposed substantial fines against the

501(c)(4) organization American Tradition Partnership ("ATP") for failing to

report its spending on issue ads regardless of its major purpose and because its ads

met the appeal-to-vote test. *See Western Tradition Partnership v. Gallik,* No.

BDV-2010-1120, slip op. at 12, 16 (Mont. 1st Jud. Dist. 2011)(attached as Ex. 6)

(discussing how ATP's primary purpose is in factual dispute); *American Tradition

Partnership v. Motl,* No. BDV-2010-1120, slip op. at 2-3, 9 (attached as Ex. 1)

(imposing a $261,600 fine against ATP without any factual resolution regarding

ATP's major or primary purpose and adopting facts offered by the state that

misapplied the appeal-to-vote test).

45.     Because of that investigation, MCD sought an advisory opinion from

the Commissioner to secure a predetermination that its 2013 ads, which it intended

to circulate prior to the November 3, 2013, election, did not need to be reported.

*See Montanans for Community Development v. Motl,* No. 13-cv-70, 2014 WL

977999 at *1 (Mar. 12, 2014). It was not able to secure such an opinion prior to

the 2013 election,[5] so it did not engage in its desired speech.

---

[5]That advisory process has been closed. *See Notice of Refusal to Issue a
Declaratory Ruling, available at* http://www.politicalpractices.mt.gov/content/
5campaignfinance/MontananasforCommunityDevelopmentDeclaratoryRuling
(Mar. 7, 2014) (attached as Ex. 7).

46.     During the 2014 primary election cycle, the Commissioner targeted investigations and civil actions against candidates based on their political ideology and association with ATP, in part asserting that ATP's issue ads are an in-kind expenditure and therefore an illegal and unreported contribution to the candidates who "benefit" from the ads. *See Comm'n of Political Practices v. Miller*, Cause. No. CDV-2014-62 (1st Jud. Dist. 2014) (attached as Ex. 8) (pursuing civil action against candidate Miller in part because ATP's issue ad mentioning his opponent was allegedly an illegal and unreported in-kind contribution); *Comm'n of Political Practices v. Murray,* BDV-2014-170 (1st Jud. Dist. 2014) (attached as Ex. 9) (same); *Comm'n of Political Practices v. Bannan,* CDV-2014-178 (1st Jud. Dist. 2014) (attached as Ex. 10) (same); *Comm'n of Political Practices v. Wittich,* ADV-2014-251 (1st Jud. Dist. 2014) (attached as Ex. 11) (same). (*See also Commissioner Letter to Candidates,* attached as Ex. 12) (encouraging candidates to "protest" flyers and letters that have undisclosed and unreported costs).)

47.     The Commission also politically profiled organizations based on their political ideology by sending letters that advised only certain organizations that it expects timely and full reporting of any expenditures on "oppositional" flyers and candidate surveys they make. (*See Commission Letter to Organizations,* attached as Ex. 13; *Commission Letter to Survey Groups*, attached as Ex. 14.)  The letters make no mention of major or primary purpose.

**48.** MCD reasonably fears that if it engages in its desired issue advocacy, it, like ATP, will be presumed to be a political committee under Montana law and be subject to Montana's political committee burdens, which require: registration with the state, treasurer-designation, and bank account designation, MCA §§ 13-37-201, 13-37-205; record-keeping requirements, MCA § 13-37-208; periodic reporting requirements, MCA § 13-37-228; source bans on contributions received, MCA § 13-35-227; and disclosure of contribution sources, MCA § 13-37-225.

**49.** Also, under MCA § 13-1-101(15)(a), MCD's ads, if circulated as desired, would likely be electioneering communications that trigger political committee status and burdens, including unclear reporting requirements. *See* MCA § 13-1-101(30)(a)(iii).

**50.** Additionally, regardless of its political committee status, MCD reasonably fears that the Commissioner will politically profile and target it because of its views in its issue ads and will construe its spending not only as reportable spending, *see ATP*, No. BDV-2010-1120, slip op. at 5-7 (attached as Ex. 1), but also as a coordinated, in-kind contribution and therefore an illegal and unreported contribution to a candidate, exposing it and the "benefitting" candidate to fines and the candidates to possible removal from the ballot or office. *See, e.g., Miller,* Cause No. CDV-2014-62, at 16-17 (attached as Ex. 8) (seeking as a penalty for alleged violations Rep. Miller's removal from office pursuant to MCA

§ 13-35-106(3)); *Wittich,* ADV-2014-251, at 16-17 (attached as Ex. 10) (same).

    **51.**    Last, MCD reasonably fears that it, those candidates mentioned in its issue ads, or opponents to those mentioned will also be the target of investigation and litigation in the next four years because of their political ideology, *see* MCA § 13-37-130. The Commissioner exploits the press to characterize the lawful, unreported issue advocacy spending by certain groups and individuals whose political ideology he disagrees with as "dark money," inherently warranting scrutiny and investigation. (*See, e.g., Dark Money Article,* attached as Ex. 15; *see also Welch Complaint*, attached as Ex. 16 (pursuing investigation into ATP and individuals and organizations associated with it based on a two page complaint generally alleging reporting violations in 2012); *but see Pennington Complaint,* attached as Ex. 34 *and Pennington v. Bullock*, No. COPP 2013-CFP-012 (Sept. 23, 2015), *available at* http://www.politicalpractices.mt.gov/content/2recentdecisions/ PenningtonvBullockDecision, attached as Ex. 37 (dismissing 277-page complaint against Governor Bullock and "dark money" groups supporting him after no more than 2 months reviewing the matter and without even a phone call made to investigate). He has spent extensive energy and time since 2013 reopening, "expanding," and self-initiating complaints; refusing to settle with, watching, and even seeking to remove from office individuals associated with certain groups based on their political ideology; while summarily reviewing, dismissing, settling,

and delaying resolution of complaints against those with political ideologies he agrees. He issues advisory opinions based on incomplete facts and factual representations to some, (*see Welch Opinion*, attached as Ex. 41), while refusing to provide one to MCD.

52.     MCD fears that such profiling and targeted investigation could 1) destroy MCD's reputation, (*see, e.g., Dark Money Article,* attached as Ex. 15 (quoting the Commissioner as advising Montanans to treat 2014 ATP issue advocacy emails as suspect, asserting that ATP no longer has the public trust, and disparaging the group for being unable to properly defend and protect itself during investigation and civil prosecution even though ATP has only been adjudicated to have failed to report issue advocacy expenditures)); 2) subject MCD to substantial fines; and 3) cause the individuals it mentions or their opponents to be investigated and either removed from the ballot or from office, all because its ads were not reported and/or are construed as an illegal contribution made to a candidate.

53.     Should it be investigated because of its issue ads, MCD reasonably fears that confidential information and conclusions (whether correct or not) about its strategies and associations attached to a complaint filed with the Commission or secured during that investigation (whether by subpoena or voluntarily supplied) will be publicly disclosed. (*See, e.g., Bonogofsky v. Kennedy,* attached as Ex. 17,

at 24-28; *see also Names of Montana Growth Network Revealed*, The Independent Record (Dec. 21, 2015), attached as Ex. 43 (disclosing copies of checks and names of donors to group Commissioner asserted "insult[ed] reporting and disclosure in Montana" mere days after Commissioner decision finding violation was released before group had opportunity to consider legal options); *see MGN Decision*, attached as Ex. 42). Complaints and commissioner sufficiency decisions are sent to the complainant (who often is a political opponent) and are published on the Commissioner's website. *See Docket of Formal Complaints*, http://political practices.mt.gov/2recentdecisions/ docket.mcpx (last visited Dec. 30, 2015); *Campaign Finance and Practices Decision Page,* http://politicalpractices.mt.gov/ 2recentdecisions/campaignfinance. mcpx (last visited Dec. 30, 2015).

54.     Because it can be construed as a political committee with its ads treated as both expenditures and contributions, or treated as one because its ads can be construed as electioneering communications (subjecting it to onerous political committee burdens and unclear reporting requirements) and because its associations and strategies will likely be made public during an investigation before they are even adjudicated through due process as relevant or even true, MCD will not run its desired ads.

55.     Additionally, because its ads would be subject to the Anonymous Speech Ban, which requires both MCD and its President to be identified on its ads,

*see* MCA § 13-37-225(1)(c), MCD will not run its desired ads.

56.    MCD intended to circulate the ads attached as Exhibit 3 on October 3, 2014, and would run substantially similar ads in the future but for the statutes and regulations here challenged. MCD's speech is therefore chilled.

57.    MCD has no adequate remedy at law.

## Count I
## The Political-Committee Statutory Definition Is Facially Overbroad.

58.    Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

59.    The Political-Committee Statutory Definition defines "political committee" to mean:

> (a) . . .a combination of two or more individuals or a person other than an individual who receives a contribution or makes an expenditure:
>     (i) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
>     (ii) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue;
>     (iii) to prepare or disseminate an election communication, an electioneering communication, or an independent expenditure.

MCA § 13-1-101(30). It also establishes that "[a] political committee is not formed when a combination of two or more individuals or a person other than an individual makes an election communication, an electioneering communication, or an independent expenditure of $250 or less." MCA § 13-1-101(30)(d). "Person" is defined as "an individual, corporation, association, firm, partnership, cooperative,

committee, including a political committee, club, union, or other organization or group of individuals or a candidate as defined in subsection (8)." MCA § 13-1-101(28).

**60.** A law or regulation "is overbroad if it does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech." *Klein v. San Diego County*, 463 F.3d 1029, 1038 (9th Cir. 2006) (internal citations omitted).

**61.** To avoid overbreadth, the government may impose political-committee or political-committee-like burdens, *see Citizens United v. FEC,* 558 U.S. 310, 337-339 (2008), on an organization only if (1) it is "under the control of a candidate" or candidates, or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley v. FEC,* 424 U.S. 1, 79 (1976).

**62.** In reviewing *Buckley*'s overbreadth concerns, the Ninth Circuit has held that such overbreadth can also be avoided when the political committee definition only applies to groups that have "a 'primary' purpose of political activity," *Human Life of Washington v. Brumsickle*, 624 F.3d 990, 1011 (2010). This "limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only

incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally subject to political committee burdens. *Id.* at 1012;[6] *see also Yamada v.Snipes,* 786 F.3d 1182, 1198-99 (9th Cir. 2015) ("because Hawaii's definition extends only to organizations having "the purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making expenditures, for express advocacy or its functional equivalent.").

63. The Ninth Circuit has also held that overbreadth can be avoid when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[7] *Yamada,* 786 F.3d at 1200.

64. The Political-Committee Statutory Definition applies not only to express advocacy or its functional equivalent, but also to electioneering communications, which is more than these two types of speech. So it is not

_____

[6]The resulting "priority-incidentally" test is unconstitutionally vague for two reasons: It is based on "political advocacy[,]" 624 F.3d at 1011, so it is vague under *Buckley,* 424 U.S. at 42-43, and the boundary between "priority" and "incidentally" is unclear. But until it is so declared, it remains mandatory law for this Court.

[7]Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. But until it is so declared, it remains mandatory law for this Court.

tailored to any cognizable state interest, but is instead overbroad. *Yamada*, 786 F.3d at 1198; *see Wisconsin Right to Life v. Barland,* 751 F.3d 804, 840 (7th Cir. 2014) ("*WRTL-III*"). It nowhere limits its applicability to organizations having either the major purpose of nominating or electing candidates as required by *Buckley*, having a priority of engaging in political advocacy as required by *HLW*, or that are significant participants in the electoral process as required by *Yamada*. Nor has it been construed within these constitutional parameters. It is therefore facially overbroad in violation of the First and Fourteenth Amendments.

## Count II
### The Political-Committee Statutory Definition Is Unconstitutional As Applied To MCD.

65.     Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

66.     The Political-Committee Statutory Definition defines "political committee" to mean:

> (a) . . . a combination of two or more individuals or a person other than an individual who receives a contribution or makes an expenditure:
>     (i) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
>     (ii) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue;
>     (iii) to prepare or disseminate an election communication, an electioneering communication, or an independent expenditure.

MCA § 13-1-101(30). It also establishes that "[a] political committee is not

formed when a combination of two or more individuals or a person other than an individual makes an election communication, an electioneering communication, or an independent expenditure of $250 or less." MCA § 13-1-101(30)(d). "Person" is defined as "an individual, corporation, association, firm, partnership, cooperative, committee, including a political committee, club, union, or other organization or group of individuals or a candidate as defined in subsection (8)." MCA § 13-1-101(28).

67.     The government may impose political-committee or political-committee-like burdens, *see Citizens United,* 558 U.S. at 337-339, on an organization only if (1) it is "under the control of a candidate" or candidates or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley,* 424 U.S. at 79.

68.     In applying *Buckley*, the Ninth Circuit has held that overbreadth can also be avoided if the definition only applies to a group that has "a 'primary' purpose of political activity." *HLW*, 624 F.3d at 1011. This "limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally subject to political

committee burdens. *Id.* at 1012;[8] *see also Yamada*, 786 F.3d at 198-99 ("because Hawaii's definition extends only to organizations having "the purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making epxneidutres, for express advocacy or its functional equivalent.").

69.     The Ninth Circuit has also held that overbreadth can be avoid when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[9] *Yamada,* 786 F.3d at 1200.

70.     MCD's sole purpose is "to promote the social welfare" by "engag[ing] in grassroots advocacy and issues-oriented educational campaigns" that "promote and encourage policies that create jobs and grow local economies throughout Montana." (*MCD Bylaws*, attached as Ex. 3, at 1 § 2.) It has not and does not intend to engage in political activities such as contributions, coordinated expenditures, independent expenditures, express advocacy, or appeals to vote for the nomination or defeat of a candidate or passage of a ballot issue. Its desired

---

[8]The resulting "priority-incidentally" test is unconstitutionally vague. *See supra* n. 6.

[9]Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. *See supra* n. 7. But until it is so declared, it remains mandatory law for this Court.

speech is issue advocacy that, at most, is an electioneering communication. So under *Buckley, HLW,* and *Yamada*, the Political-Committee Statutory Definition is not tailored to any cognizable interest as applied to MCD. Any political speech MCD engages in cannot constitutionally be subject to political-committee or political-committee like burdens. *See Buckley,* 424 U.S. at 79; *HLW,* 624 F.3d at 1011; *Yamada*, 786 F.3d at 1200.[10]

71.    The Political-Committee Statutory Definition is unconstitutional as applied to MCD.

## Count III
### The Political-Committee Statutory Definition Is Unconstitutionally Vague.

72.    Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

73.    The Political-Committee Statutory Definition defines "political committee" to mean:

> (a) . . .a combination of two or more individuals or a person other than an individual who receives a contribution or makes an expenditure:
>     (i) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or
>     (ii) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue;
>     (iii) to prepare or disseminate an election communication, an

---

[10]Non-political committee, one-time, event-driven reporting can be constitutionally imposed. *See WRTL-III*, 751 F.3d at 841 (*citing Citizens United,* 558 U.S. at 366-69)*.* Montana has no such reporting requirements.

electioneering communication, or an independent expenditure.
MCA § 13-1-101(30). It also establishes that "[a] political committee is not
formed when a combination of two or more individuals or a person other than an
individual makes an election communication, an electioneering communication, or
an independent expenditure of $250 or less." MCA § 13-1-101(30)(d). "Person" is
defined as "an individual, corporation, association, firm, partnership, cooperative,
committee, including a political committee, club, union, or other organization or
group of individuals or a candidate as defined in subsection (8)." MCA § 13-1-
101(28).

74.    "A statute must be sufficiently clear so as to allow persons of
ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti v.
City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998); *WRTL-III,* 751 F.3d at 835.
"A statute is vague if men of common intelligence must necessarily guess at its
meaning and differ as to its application." *In re Doser*, 412 F.3d 1056, 1062 (9th
Cir. 2005). "Statutes that are insufficiently clear are void for three reasons: (1) to
avoid punishing people for behavior that they could not have known was illegal;
(2) to avoid subjective enforcement of the laws based on "arbitrary and
discriminatory enforcement" by government officers; and (3) to avoid any chilling
effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

75.    The Political-Committee Statutory Definition uses the terms "expen-

diture," "contribution," and "electioneering communication" to establish the scope

of its application. Because these terms are unconstitutionally vague, *see infra*

Counts XI-XII, XIV-XV, XVII, the Political-Committee Statutory Definition is

also unconstitutionally vague.

76.     Moreover, the term "political committee" uses "expenditure" and

"contribution" to define itself. MCA § 13-1-101(30). "Expenditure" and

"contribution" in turn use the term "political committee" to define themselves.

*See* MCA § 13-1-101(9)(a) (defining contribution as "the receipt by a candidate or

a political committee. . ."); *see id.* at 13-1-101(17)(a) (defining expenditure to

include spending "made by a candidate or a political committee . . ."). This makes

the three definitions circular and therefore the Political-Committee Statutory

Definition unconstitutionally vague.

77.     The Political-Committee Statutory Definition uses the phrase "to

support or oppose" to establish the scope of its application. "Support or oppose" is

in turn defined as express advocacy or the appeal to vote test. *See* MCA § 13-1-

101(49).  The appeal to vote test is unconstitutionally vague. *See FEC v.*

*Wisconsin Right to Life, Inc.,* 551 U.S. 449, 475 n.7 (2007) ("*WRTL-II*").

78.     The Political-Committee Statutory Definition is unconstitutionally

vague in violation of the First and Fourteenth Amendments.

## Count IV
## The Political-Committee Regulatory Definition is Facially Vague.

**79.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**80.** ARM 44.11.202(1) & (3) states that "[a] political committee exists under Title 13, chapters 35 and 37, MCA, and these rules by virtue of its receipt of one or more contributions or through making one or more expenditures," but that "[a] political committee is not formed . . . (c) by a de minimis activity, as defined in these rules; . . ."

**81.** "'De minimis act' means an action, contribution, or expenditure that is so small that it does not trigger registration, reporting, disclaimer, or disclosure obligations under Title 13, chapter 35 or 37, or warrant enforcement as a campaign practices violation under Title 13, chapter 37." MCA § 13-1-101(11).

**82.** "The commissioner may consider" a list of "factors in determining whether specific acts, contributions, or expenditures are de minimis and therefore do not trigger registration, reporting, attribution, or disclosure requirements, or warrant enforcement as a campaign practices violation," along with "other factors and circumstances the commissioner determines are relevant." ARM 44.11.603(1). "These criteria will be considered and applied on a case-by-case basis." ARM 44.11.603(2). "Acts, contributions or expenditures "may, depending on the

circumstances, be considered de minimis" for reasons "includ[ing], but [] not limited to" one of seven listed in the Rules. ARM 44.11.603(3).

83. "A statute must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998); *WRTL-III,* 751 F.3d at 835. "A statute is vague if men of common intelligence must necessarily guess at its meaning and differ as to its application." *In re Doser*, 412 F.3d 1056, 1062 (9th Cir. 2005). "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

84. ARM 44.11.202(3)(c) ("The Political-Committee Regulatory Definition") relies on terms that are defined to include amorphous factors with unknown "not limited to" scope that the Commissioner "may" consider on a case-by-case basis. Such imprecision and fluidity in determining the application of the Political-Committee Regulatory Definition "holds the potential for regulatory mischief, " *Wisconsin Right to Life v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) ("*WRTL-III*"), by permitting "subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers," *Foti,* 146

F.3d at 638.

**85.** The Political-Committee Regulatory Definition is unconstitutionally vague in violation of the First and Fourteenth Amendments.

### Count V
### The Political-Committee Regulatory Definition Is Unconstitutional.

**86.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**87.** The Political-Committee Regulatory Definition establishes criteria for when a political committee is or is not formed. ARM 44.11.202(3).

**88.** The Commissioner of Political Practices does not have the independent authority to make law but rather is authorized only to "adopt rules to carry out the provisions of chapter 35 of this title and this chapter in conformance with the Montana Administrative Procedure Act." MCA § 13-37-114.

**89.** Because the Political-Committee Regulatory Definition helps carry out and enforce the unconstitutional Political-Committee Statutory Definition, the Political-Committee Regulatory Definition should be struck down in its entirety as unconstitutional. *See Davis v. FEC,* 554 U.S. 724, 744 (2008) (striking down as unconstitutional disclosure requirements "designed to implement [] asymmetrical contribution limits" because the limits were unconstitutional).

**90.** Insofar as the Political-Committee Regulatory Definition applies to

MCD in a manner consistent with the Political-Committee Statutory Definition, it

should be struck down as unconstitutional as applied to MCD. *See id.*

## Count VI
## The Political-Committee Type Definition Is Facially Overbroad.

**91.** Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**92.** ARM 44.11.202(2) ("the Political-Committee Type Definition")

establishes four types of political committees.

**93.** A "ballot issue committee" is defined as "a political committee

specifically organized to support or oppose a ballot issue." MCA § 13-1-101(7);

ARM 44.11.202(4).

**94.** A "political party committee" is defined as "a political committee

formed by a political party organization[11] and includes all county and city central

committees." MCA § 13-1-101(31); *see also* ARM 44.11.202(5).

**95.** An "independent committee" is defined as "a political committee

organized for the primary purpose of receiving contributions and making

expenditures that is not controlled either directly or indirectly by a candidate and

_____

[11]"Political party organization" means "a political organization that:
(a) was represented on the official ballot in either of the two most recent statewide
general elections; or (b) has met the petition requirements, as provided in Title 13,
chapter 10, part 5." MCA § 13-1-101(32). "Political organization" is undefined.

that does not coordinate with a candidate in conjunction with the making of expenditures except pursuant to the limits set forth in 13-37-216(1)." MCA § 13-1-101(23). An "independent committee" is "a political committee that has the primary purpose of supporting or opposing candidates or ballot issues but is neither a ballot issue nor a political party political committee." ARM 44.11.202(7).

98. An "incidental committee" is defined as "a political committee that is not specifically organized or operating for the primary purpose of supporting or opposing candidates or ballot issues but that may incidentally become a political committee by receiving a contribution or making an expenditure." MCA § 13-1-101(22). It is "a political committee that does not have the primary purpose of supporting or opposing candidates or issues." ARM 44.11.202(6).

97. "Primary purpose" means "the major, principal, or important goal, function, or reason for existence of a political committee." ARM 44.11.203(1).

The commissioner may determine that the primary purpose of a political committee is to support or oppose candidates or ballot issues based upon any one or more of the following criteria:
(a) allocation and source of budget;
(b) allocation of staff or members' activity, both during an election and otherwise;
(c) the statement of purpose, articles of incorporation, bylaws, or goals.

ARM 44.11.203(2). The Commissioner:

in determining the primary purpose of a political committee, may also consider any one or more of the following criteria:

    (a) reportable election activity;

    (b) the history of the political committee and the number of elections in which it has participated or registered;

    (c) receipt of contributions in response to an appeal or that are designated for a specified candidate, ballot issue, petition, or reportable election activity;

    (d) the number and cost of reportable election expenditures made;

    (e) coordination with any candidates or other political committees;

    (f) ordinary business actually conducted;

    (g) if a corporation, whether it was created and maintained as provided by law; or

    (h) the date of founding, incorporation, or organization.

ARM 44. 11.203(3).

**98.** A law or regulation "is overbroad if it does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech." *Klein*, 463 F.3d at 1038 (internal citations omitted).

**99.** The government may impose political-committee or political-committee-like burdens, *see Citizens United,* 558 U.S. at 337-339, on an organization only if (1) it is "under the control of a candidate" or candidates or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley,* 424 U.S. at 79.

**100.** In applying *Buckley*, the Ninth Circuit has held that the relevant

inquiry is whether the political committee definition applies only to groups that have "a 'primary' purpose of political activity." *HLW*, 624 F.3d at 1011. This "limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally subject to political committee burdens. *Id.* at 1012;[12] *see also Yamada*, 687 F.3d at 1098-99 ("because Hawaii's definition extends only to organizations having "the purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making epxneidutres, for express advocacy or its functional equivalent.").

**101.** The Ninth Circuit has also held that overbreadth can be avoided when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[13] *Yamada,* 687 F.3d at 1200.

**102.** The Political-Committee Type Definition is not closely drawn to a

---

[12]The resulting "priority-incidentally" test is unconstitutionally vague. *See supra* n. 6.

[13]Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. *Supra* n. 7. But until it is so declared, it remains mandatory law for this Court.

cognizable state interest. *WRTL-III*, 751 F.3d at 841. It nowhere limits its applicability to organizations having the major purpose of nominating or electing candidates under *Buckley,* or organizations that are a significant participant under *Yamada*, and only has one type of committee—the independent committee—that requires a "primary purpose" or priority of engaging in political advocacy under *HLW*. And it goes beyond nominating or electing candidates under *Buckley* or engaging in political advocacy under *HLW* to include supporting or opposing issues. Moreover, it expressly includes those organizations that do not have a major purpose or priority of nominating or electing candidates but who incidentally do so as "incidental committees," contrary to *HLW*. ARM 44.10.327(2)(c).

**103.** The definition of primary purpose, on which the independent committee and incidental committee definitions rely, is also not tailored to a cognizable state interest and so is overbroad. *Klein*, 463 F.3d at 1038.

**104.** The Political-Committee Type Definition is facially overbroad, in violation of the First and Fourteenth Amendments.

**Count VII**
**The Political-Committee Type Definition**
**Is Unconstitutional As Applied to MCD.**

**105.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**106.** ARM 44.11.202(2) ("the Political-Committee Type Definition") establishes four types of political committees.

**107.** A "ballot issue committee" is defined as "a political committee specifically organized to support or oppose a ballot issue." MCA § 13-1-101(7); ARM 44.11.202(4).

**108.** A "political party committee" is defined as "a political committee formed by a political party organization[14] and includes all county and city central committees." MCA § 13-1-101(31); *see also* ARM 44.11.202(5).

**109.** An "independent committee" is defined as "a political committee organized for the primary purpose of receiving contributions and making expenditures that is not controlled either directly or indirectly by a candidate and that does not coordinate with a candidate in conjunction with the making of expenditures except pursuant to the limits set forth in 13-37-216(1)." MCA § 13-1-101(23). An "independent committee" is "a political committee that has the primary purpose of supporting or opposing candidates or ballot issues but is neither a ballot issue nor a political party political committee." ARM 44.11.202(7).

---

[14]"Political party organization" means "a political organization that: (a) was represented on the official ballot in either of the two most recent statewide general elections; or (b) has met the petition requirements, as provided in Title 13, chapter 10, part 5." MCA § 13-1-101(32). "Political organization" is undefined.

**110.** An "incidental committee" is defined as "a political committee that is not specifically organized or operating for the primary purpose of supporting or opposing candidates or ballot issues but that may incidentally become a political committee by receiving a contribution or making an expenditure." MCA § 13-1-101(22). It is "a political committee that does not have the primary purpose of supporting or opposing candidates or issues." ARM 44.11.202(6).

**111.** "Primary purpose" means "the major, principal, or important goal, function, or reason for existence of a political committee." ARM 44.11.203(1).

> The commissioner may determine that the primary purpose of a political committee is to support or oppose candidates or ballot issues based upon any one or more of the following criteria:
> (a) allocation and source of budget;
> (b) allocation of staff or members' activity, both during an election and otherwise;
> (c) the statement of purpose, articles of incorporation, bylaws, or goals.

ARM 44.11.203(2). The Commissioner:

> in determining the primary purpose of a political committee, may also consider any one or more of the following criteria:
> (a) reportable election activity;
> (b) the history of the political committee and the number of elections in which it has participated or registered;
> (c) receipt of contributions in response to an appeal or that are designated for a specified candidate, ballot issue, petition, or reportable election activity;
> (d) the number and cost of reportable election expenditures made;
> (e) coordination with any candidates or other political committees;

(f) ordinary business actually conducted;
(g) if a corporation, whether it was created and maintained as provided by law; or
(h) the date of founding, incorporation, or organization.

ARM 44. 11.203(3).

**112.** The government may impose political-committee or political-committee-like burdens, *see Citizens United,* 558 U.S. at 337-339, on an organization only if (1) it is "under the control of a candidate" or candidates or (2) "the major purpose" of the organization is "the nomination or election of a candidate" or candidates in the jurisdiction. *Buckley,* 424 U.S. at 79.

**113.** In applying *Buckley*, the Ninth Circuit has held that political committee definitions can avoid overbreadth by applying only to groups that have "a 'primary' purpose of political activity."*HLW*, 624 F.3d at 1011. This "limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* If the group had a primary purpose of engaging in political activity rather than an incidental one, it is constitutionally subject to political committee burdens. *Id.* at 1012;[15] *see also Yamada*, 687 F.3d at 1098-99 ("because Hawaii's definition extends only to organizations having "the

---

[15]The resulting "priority-incidentally" test is unconstitutionally vague. *See supra* n. 7.

purpose of political advocacy, it avoids reaching organizations engaged in only incidental advocacy . . . . noncandidate committee status applies to organizations that have the purpose of making or receiving contributions, or making epxneidutres, for express advocacy or its functional equivalent.").

**114.** The Ninth Circuit has also held that overbreadth can be avoid when the political committee definition only applies to groups that are "significant participant[s] in [the state's] electoral process."[16] *Yamada,* 687 F.3d at 1200.

**115.** MCD's exclusive purpose is "to promote the social welfare" by "engag[ing] in grassroots advocacy and issues-oriented educational campaigns" that "promote and encourage policies that create jobs and grow local economies throughout Montana." (*MCD Bylaws*, attached as Ex. 3, at 1 § 2.) MCD has not and does not intend to engage in electoral activity, by making contributions, expenditures, independent expenditures, or engaging in express advocacy or appeals to vote for the nomination or election of a candidate, or for the passage of a ballot initiative. So under *Buckley, HLW*, and *Yamada*, any political speech MCD engages in cannot constitutionally be subject to political-committee or political-committee like burdens. *See Buckley,* 424 U.S. at 79; *HLW,* 624 F.3d at

---

[16] Just like the priority-incidentally test, the "significant participant" test is unconstitutionally vague, as the scope of "significant" is undefined. *Supra* n. 8. But until it is so declared, it remains mandatory law for this Court.

1011; *Yamada*, 687 F.3d at 1200. Yet the Political-Committee Type Definition can apply to MCD because it expressly includes as political committees those organizations that are not significant participants who engage in express advocacy or its functional equivalent under *Yamada*, who do not have a major purpose of nominating or electing candidates but who incidentally do so as "incidental committees," ARM 44.10.327(2)(c), in direct contravention of *HLW*.

116. The Political-Committee Type Definition is unconstitutional as applied to MCD.

## Count VIII
## The Political-Committee Type Definition Is Unconstitutionally Vague.

117. Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

118. The Political-Committee Type Definition establishes four types of political committees. ARM 44.11.202(2).

119. A "ballot issue committee" is defined as "a political committee specifically organized to support or oppose a ballot issue." MCA § 13-1-101(7); ARM 44.11.202(4).

120. A "political party committee" is defined as "a political committee

formed by a political party organization[17] and includes all county and city central committees." MCA § 13-1-101(31); *see also* ARM 44.11.202(5).

**121.** An "independent committee" is defined as "a political committee organized for the primary purpose of receiving contributions and making expenditures that is not controlled either directly or indirectly by a candidate and that does not coordinate with a candidate in conjunction with the making of expenditures except pursuant to the limits set forth in 13-37-216(1)." MCA § 13-1-101(23). An "independent committee" is "a political committee that has the primary purpose of supporting or opposing candidates or ballot issues but is neither a ballot issue nor a political party political committee." ARM 44.11.202(7).

**122.** An "incidental committee" is defined as "a political committee that is not specifically organized or operating for the primary purpose of supporting or opposing candidates or ballot issues but that may incidentally become a political committee by receiving a contribution or making an expenditure." MCA § 13-1-101(22). It is "a political committee that does not have the primary purpose of supporting or opposing candidates or issues." ARM 44.11.202(6).

---

[17]"Political party organization" means "a political organization that: (a) was represented on the official ballot in either of the two most recent statewide general elections; or (b) has met the petition requirements, as provided in Title 13, chapter 10, part 5." MCA § 13-1-101(32). "Political organization" is undefined.

**123.** "Primary purpose" means "the major, principal, or important goal, function, or reason for existence of a political committee." ARM 44.11.203(1).

> The commissioner may determine that the primary purpose of a political committee is to support or oppose candidates or ballot issues based upon any one or more of the following criteria:
> (a) allocation and source of budget;
> (b) allocation of staff or members' activity, both during an election and otherwise;
> (c) the statement of purpose, articles of incorporation, bylaws, or goals.

ARM 44.11.203(2). The Commissioner:

> in determining the primary purpose of a political committee, may also consider any one or more of the following criteria:
> (a) reportable election activity;
> (b) the history of the political committee and the number of elections in which it has participated or registered;
> (c) receipt of contributions in response to an appeal or that are designated for a specified candidate, ballot issue, petition, or reportable election activity;
> (d) the number and cost of reportable election expenditures made;
> (e) coordination with any candidates or other political committees;
> (f) ordinary business actually conducted;
> (g) if a corporation, whether it was created and maintained as provided by law; or
> (h) the date of founding, incorporation, or organization.

ARM 44. 11.203(3).

**124.** The Commissioner may classify what type of political committee must file as, ARM 44.11.203(4), based on a preponderance of the evidence. ARM 44.11.203(5). The Commissioner is not obligated to classify political committees

"in the manner defined in these rules." ARM 44.11.202(10). A political committee

can "submit additional information and request to be reclassified."ARM

44.11.203(6).

**125.** "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*,

146 F.3d at 638. "A statute is vague if men of common intelligence must

necessarily guess at its meaning and differ as to its application." *In re Doser*, 412

F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1)

to avoid punishing people for behavior that they could not have known was

illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and

discriminatory enforcement" by government officers; and (3) to avoid any chilling

effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**126.** The Political-Committee type Definition uses the terms "expenditure"

and "contribution" to establish the scope of its application. Because these terms

are unconstitutionally vague, *see infra* Counts XI-XII, XIV-XV, the Political-

Committee Type Definition is also unconstitutionally vague.

**127.** Moreover, the terms "expenditure" and "contribution" use the term

"political committee" to define themselves. *See* MCA § 13-1-101(9)(a)(i)

(defining contribution as "the receipt by a candidate or a political committee. . .");

*see id.* at 13-1-101(17)(a)(i)(defining expenditure to include spending "made by a

candidate or a political committee . . ."). This makes the three definitions circular and therefore the Political-Committee Type Definition unconstitutionally vague.

128. The Political-Committee Type Definition uses the phrase "to support or oppose" to establish the scope of its application. "Support or oppose" is in turn defined as express advocacy or the appeal to vote test. MCA § 13-1-101(49). The appeal to vote test is unconstitutionally vague. *WRTL-II*, 551 U.S. at 475 n.7.

129. The Political-Committee Type Definition is unconstitutionally vague in violation of the First and Fourteenth Amendments.

## Count IX
## The Political-Committee Reporting Requirements Are Unconstitutionally Vague.

130. Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

131. The Political-Committee Type Definition establishes four types of political committees: the ballot issue committee, the political party committee, the independent committee, and the incidental committee. ARM 44.11.202.

132. "Independent committees reportable election activity may consist of: (a) making one or more expenditures; (b) accepting one or more contributions." ARM 44.11.202(7).

133. "Incidental committee reportable election activity may consist of: (a) making one or more expenditures; (b) accepting one or more designated

contributions; or (c) accepting one or more contributions in response to an appeal." ARM 44.11.202(6). Such reports must be filed electronically, ARM 44.11.302(1)(a), although "[t]he commissioner may provide a waiver. . . ." ARM 44.11.302(2).

134.    "Election activity" means "any activity that may constitute reportable election activity under Title 13, MCA." ARM 44.11.103(15).

135.    "'Reportable Election Activity' includes but is not limited to accepting a contribution, a contribution in response to an appeal, or a designated contribution, or making an expenditure, a contribution, a coordinated expenditure, an independent expenditure, or an in-kind contribution or expenditure, or making an election communication or electioneering communication." ARM 44.11.103(31).

136.    "A statute must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*, 146 F.3d at 638; *WRTL-III,* 751 F.3d at 835. "A statute is vague if men of common intelligence must necessarily guess at its meaning and differ as to its application." *In re Doser*, 412 F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to

avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**137.** ARM 44.11.202(6), ARM 44.11.202(7), and ARM 44.11.302 ("the Political-Committee Reporting Requirements") contain and rely on terms that are defined to contain "may" and "not limited to" words and phrases. The term "appeal" is also undefined. Such words and phrases "hold[] the potential for regulatory mischief, " *Wisconsin Right to Life v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) ("*WRTL-III*"), by permitting "subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers," *Foti,* 146 F.3d at 638.

**138.** The Political-Committee Reporting Requirements are unconstitutionally vague in violation of the First and Fourteenth Amendments.

## Count X
### The Political-Committee Filing Requirements Fail Scrutiny Review.

**139.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**140.** MCA § 13-37-226 provides reporting deadlines for political committees. A two-day reporting window is established for contributions and expenditures made within the final weeks before an election. *see* MCA § 13-37-226(1)(d)(statewide office and ballot issues); MCA § 13-37-226(2)(b)(district

office and ballot issues); MCA § 13-37-226(3)(all other offices and issues); MCA § 13-37-226(4)(b) &(c)(catch-all for remaining independent and political party committees); MCA § 13-37-226(5)(b) & (c)(catch-all for remaining incidental committees. Such contributions and expenditures are "reported again on the post-election report." ARM 44.11.402(5)(c).

141.    Such reports must be filed electronically, ARM 44.11.302(1)(a), although "[t]he commissioner may provide a waiver. . . ." ARM 44.11.302(2).

142.    Disclosure requirements are subject to exacting scrutiny, that is, they "must bear a substantial relationship to a sufficiently important governmental interest." *Yamada,* 786 F.3d at 1194 (*citing Doe v. Reed,* 561 U.S. 186, 196(2010) *and Human Life,* 624 F.3d at 1008). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.*

143.    ARM 44.11.402(5) and ARM 44.11.302 ("the Political-Committee Filing Requirements") impose substantial burdens on political committees, requiring with only subjective exception electronic filing despite the rural nature of Montana and requiring repetitive reporting of information to the Commissioner. No government interest justifies such requirements. *Yamada,* 786 F.3d at 1194.

144.    The Political-Committee Filing Requirements are unconstitutional under the First and Fourteenth Amendments.

# Count XI
## The Expenditure Statutory Definition Is Facially Vague.

**145.**  Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**146.**  MCA § 13-1-101(17)(a) ("the Expenditure Statutory Definition")

defines "Expenditure" as:

> a purchase, payment, distribution, loan, advance, promise, pledge, or gift
> of money or anything of value:
>> (i) made by a candidate or political committee to support or
> oppose a candidate or a ballot issue; or
>> (ii) used or intended for use in making independent expenditures
> or in producing electioneering communications.

**147.**  "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*,

146 F.3d at 638. "A statute is vague if men of common intelligence must

necessarily guess at its meaning and differ as to its application." *In re Doser*, 412

F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1)

to avoid punishing people for behavior that they could not have known was

illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and

discriminatory enforcement" by government officers; and (3) to avoid any chilling

effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**148.**  The term "expenditure" uses "political committee" to define itself.

MCA § 13-1-101(17)(a). "Political committee" in turn use the term "expenditure"

to define itself.  *See* MCA § 13-1-101(30). This makes the two definitions circular and therefore the Expenditure Statutory Definition unconstitutionally vague.

**149.**  "Support or oppose" is defined as express advocacy or an appeal to vote. MCA § 13-1-101(49).

**150.**  The Expenditure Statutory Definition's inclusion of the appeal-to-vote test renders it vague because the test:

> ultimately depend[s] . . . upon a judicial judgment (or is it—worse still—a jury judgment?) concerning "reasonable" or "plausible" import that is far from certain, that rests upon consideration of innumerable surrounding circumstances which the speaker may not even be aware of, and that lends itself to distortion by reason of the decisionmaker's subjective evaluation of the importance or unimportance of the challenged speech. In this critical area of political discourse, the speaker[s] cannot be compelled to risk felony [or other] prosecution with no more assurance of impunity than [their] prediction that what [t]he[y] say[] will be found susceptible of some "reasonable interpretation other than [to promote or oppose] a specific candidate." Under these circumstances, "many persons, rather than undertake the considerable burden (and sometimes risk) vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

*FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 493-94 (2007) ("*WRTL-II*") (Scalia, J., concurring in part and concurring in the judgment) (brackets in original omitted); *but see Yamada*, 687 F.3d at 1090-91.  *See, e.g., WTP,* No. BDV-2010-1120, slip op. at 19-20 (attached as Ex. 6) (applying the appeal-to-vote test to conclude that "it could be . . . reasonable to interpret" the issue ad before it as an

"appeal to vote" and as "advocat[ing] for the defeat" of that candidate, *id.* at 19;

*Magill v. Reintsma,* No. COPP 2014-CFP-037 at 8-10 (May 12, 2015) (attached as

Ex. 18) (reasoning that a state court complaint seeking to remove an elected

official from office filed during an election cycle amounted to both express

advocacy and satisfied the appeal-to-vote test).

**151.**   The Expenditure Statutory Definition is facially vague in violation of

the First and Fourteenth Amendments.

**Count XII**
**The Expenditure Regulatory Definition is Facially Vague.**

**152.**    Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**153.**   ARM 44.11.501(1) (hereinafter "the Expenditure Regulatory

Definition") states that:

> the term 'expenditure' as defined in 13-1-101, MCA, includes, but is not
> limited to:
> . . . .
> (b) expenses incurred by a candidate or political committee with respect
> to polls, surveys, and the solicitation of funds for reportable election
> activity.
> . . . .

**154.**   "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*,

146 F.3d at 638; *WRTL-III,* 751 F.3d at 835. "A statute is vague if men of common

intelligence must necessarily guess at its meaning and differ as to its application."
*In re Doser*, 412 F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**155.** The Expenditure Regulatory Definition contains the phrase "not limited to." Such phrases "hold[] the potential for regulatory mischief," *WRTL-III*, 751 F.3d at 833, by permitting "subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers," *Foti,* 146 F.3d at 638.

**156.** The Expenditure Regulatory Definition also is circularly vague because it defines itself in connection with "political committee."  And it is vague because it relies on the phrase "reportable election activity." *See* Count IX.

**157.** The Expenditure Regulatory Definition is  unconstitutionally vague in violation of the First and Fourteenth Amendments.

**Count XIII**
**The Expenditure Regulatory Definition Is Unconstitutional.**

**158.** Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**159.** The Expenditure Regulatory Definition interprets the Expenditure Statutory Definition, stating that "the term 'expenditure' as defined in 13-1-101, MCA, includes, but is not limited to" a list of various expenses, payments, and types of expenditures. ARM 44.11.501(1).

**160.** The Commissioner of Political Practices does not have the independent authority to make law but rather is authorized only to "adopt rules to carry out the provisions of chapter 35 of this title and this chapter in conformance with the Montana Administrative Procedure Act." MCA § 13-37-114.

**161.** Because the Expenditure Regulatory Definition is designed to help carry out and enforce the facially vague Expenditure Statutory Definition, the Expenditure Regulatory Definition should be struck down in its entirety as unconstitutional. *See Davis v. FEC,* 554 U.S. 724, 744 (2008) (striking down as unconstitutional disclosure requirements "designed to implement [] asymmetrical contribution limits" because the limits were unconstitutional).

**162.** Insofar as the Expenditure Regulatory Definition applies to issue ads consistent with the Expenditure Statutory Definition, it should be struck down as unconstitutional as applied to issue ads. *See id.*

## Count XIV
## The Contribution Statutory Definition Is Facially Vague.

**163.** Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**164.** MCA § 13-1-101(9)(a) ("the Contribution Statutory Definition")

defines "contribution" as:

> (i) the receipt by a candidate or a political committee of an advance, gift,
> loan, conveyance, deposit, payment, or distribution of money or
> anything of value to support or oppose a candidate or a ballot issue;
> (ii) an expenditure, including an in-kind expenditure, that is made in
> coordination with a candidate or ballot issue committee and is reportable
> by the candidate or ballot issue committee as a contribution;
> (iii) the receipt by a political committee of funds transferred from
> another political committee;
> (iv) the payment by a person other than a candidate or political
> committee other than a candidate or political committee of compensation
> for the personal services of another person that are rendered to a
> candidate or political committee.

**165.** "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*,

146 F.3d at 638; *WRTL-III*, 751 F.3d at 835. "A statute is vague if men of common

intelligence must necessarily guess at its meaning and differ as to its application."

*In re Doser*, 412 F.3d at 1062. "Statutes that are insufficiently clear are void for

three reasons: (1) to avoid punishing people for behavior that they could not have

known was illegal; (2) to avoid subjective enforcement of the laws based on

"arbitrary and discriminatory enforcement" by government officers; and (3) to

avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**166.** The term "contribution" uses "political committee" to define itself. MCA § 13-1-101(9)(a). "Political committee" in turn use the term "contribution" to define itself. *See* MCA § 13-1-101(30). This makes the two definitions circular and therefore the Contribution Statutory Definition unconstitutionally vague.

**167.** The Contribution Statutory Definition turns on "support or oppose" language, which is defined as express advocacy or an appeal to vote under MCA § 13-1-101(49). *See* MCA § 13-1-101(9)(a). As with the Expenditure Regulatory Definition, the Contribution Statutory Definition is vague because:

> [it] ultimately depend[s] . . . upon a judicial judgment (or is it—worse still—a jury judgment?) concerning "reasonable" or "plausible" import that is far from certain, that rests upon consideration of innumerable surrounding circumstances which the speaker may not even be aware of, and that lends itself to distortion by reason of the decisionmaker's subjective evaluation of the importance or unimportance of the challenged speech. In this critical area of political discourse, the speaker[s] cannot be compelled to risk felony [or other] prosecution with no more assurance of impunity than [their] prediction that what [t]he[y] say[] will be found susceptible of some "reasonable interpretation other than [to promote or oppose] a specific candidate." Under these circumstances, "many persons, rather than undertake the considerable burden (and sometimes risk) vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

*WRTL-II*, 551 U.S. at 493-94 (Scalia, J., concurring in part and concurring in the

judgment) (brackets in original omitted); *but see Yamada*, 687 F.3d at 1090-91.

*See, e.g., WTP,* No. BDV-2010-1120, slip op. at 19-20 (attached as Ex. 6)

(applying the appeal-to-vote test to conclude that "it could be . . . reasonable to

interpret" the issue ad before it as an "appeal to vote" and as "advocat[ing] for the

defeat" of that candidate); *Magill,* No. COPP 2014-CFP-037 at 8-10 (attached as

Ex. 18) (reasoning that a state court complaint seeking to remove an elected

official from office filed during an election cycle somehow amounted to express

advocacy *and* satisfied the appeal-to-vote test).

**168.** The Contribution Statutory Definition is facially vague in violation of

the First and Fourteenth Amendments.

## Count XV
### The Contribution Regulatory Definition Is Facially Vague.

**169.** Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**170.** ARM 44.11.401 (hereinafter "the Contribution Regulatory

Definition") states that "the term 'contribution' as defined in 13-1-101, MCA,

includes, but is not limited to" a list of various purchases, payments, candidate

self-funding, in-kind contributions, and coordinated expenditures.

**171.** "Coordinated" means "means made in cooperation with, in

consultation with, at the request of, or with the express prior consent of a

candidate or political committee or an agent of a candidate or political committee."

MCA § 13-1-101(10).

**172.** A "coordinated expenditure" means "any election communication,

electioneering communication, or reportable election activity that is made by a

person in cooperation with, at the request or suggestion of, or with the express

prior consent of a candidate or an agent of the candidate." ARM 44.11.602(1).

**173.** To determine:

whether a communication or reportable election activity is coordinated
the following may be considered, whether:
(a) it is based on information that is provided by the candidate or agent
of the candidate directly or indirectly to the person funding or
facilitating the communication or activity, or any person involved in
creating, producing or disseminating it;
(b) it was made by or through any candidate's agent in the course of the
agent's involvement in the current campaign;
(c) the person funding or facilitating the communication or reportable
election activity retains the paid services of a person or individual who:
(i) currently, or during the six months immediately preceding the
election in which the candidate's name will appear on the ballot,
received compensation from the candidate or the candidate's
agent; and
(ii) the person or individual is involved in creating, producing, or
disseminating the communication or reportable election activity.
(d) the communication or reportable election activity replicates,
reproduces, republishes or disseminates, in whole or in substantial part,
any material designed, produced and paid for, or distributed by the
candidate, except as set forth in (3)(e).
(e) the candidate or the candidate's agent has made or participated in
any discussion or in making any decision regarding the content, timing,
location, media, intended audience, volume of distribution, or frequency
of placement of the communication or activity.

(f) the person funding or facilitating the communication or reportable election activity has:

> (i) established a written firewall policy designed to prevent the flow of information about the candidate's campaign plans, projects, activities, or needs from the persons providing services to the candidate to persons involved in the creation, production, or dissemination of the communication or activity; and
>
> (ii) prior to the preparation or distribution of any communication or reportable election activity has distributed the firewall policy to all relevant employees, consultants, and clients affected by the policy; and
>
> (iii) filed the firewall policy with the COPP.

ARM 44.11.602(2).

**174.** A "coordinated expenditure" is not:

(a) an uncoordinated expenditure or an independent reportable election activity funded or facilitated by a person;

(b) services, food, or lodging provided in a manner that they are not contributions by a person within the meaning of contribution as defined by 13-1-101, MCA, or these rules;

(c) the cost funded or facilitated by a person for any bona fide news story, commentary, blog, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical of general circulation;

(d) activity by an individual acting solely on his or her own behalf independently of any candidate or the candidate's agent; or

(e) the independent use of statements, images, or other information that is appropriated from a public source.

ARM 44.11.602(3).

**175.** "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*,

146 F.3d at 638; *WRTL-III,* 751 F.3d at 835. "A statute is vague if men of common

intelligence must necessarily guess at its meaning and differ as to its application."

*In re Doser*, 412 F.3d at 1062. "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

**176.** The Contribution Regulatory Definition contains the phrase "not limited to" and relies on terms that turn on what "may" be considered. Such phrases "hold[] the potential for regulatory mischief, " *Wisconsin Right to Life v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) ("*WRTL-III*"), by permitting "subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers," *Foti*, 146 F.3d at 638.

**177.** The Contribution Regulatory Definition is unconstitutionally vague in violation of the First and Fourteenth Amendments.

### Count XVI
### The Contribution Regulatory Definition Is Unconstitutional.

**178.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**179.** The Contribution Regulatory Definition interprets the Contribution Statutory Definition, stating that "the term 'contribution' as defined in MCA § 13-

1-101, includes, but is not limited to" a list of various purchases, payments, candidate self-funding, and in-kind contributions. ARM 44.11.401(1).

180.    The Commissioner of Political Practices does not have the independent authority to make law but rather is authorized only to "adopt rules to carry out the provisions of chapter 35 of this title and this chapter in conformance with the Montana Administrative Procedure Act." MCA § 13-37-114.

181.    Because the Contribution Regulatory Definition is designed to help carry out and enforce the facially vague Contribution Statutory Definition, the Contribution Regulatory Definition should be struck down in its entirety as unconstitutional. *See Davis,* 554 U.S. at 744 (striking down as unconstitutional disclosure requirements "designed to implement [] asymmetrical contribution limits" because the limits were unconstitutional).

182.    Insofar as the Contribution Regulatory Definition applies to issue ads consistent with the Contribution Statutory Definition, it should be struck down as unconstitutional as applied to issue ads. *See id.*

### Count XVII
### The Contribution Conversion Provision Is Overbroad.

183.    Under ARM 44.11.504 (the "Contribution Conversion Provision"), if a political committee, or one of its members "advises, counsels, or otherwise knowingly encourages any person to make an expenditure for the purposes of

avoiding direct contributions, or for any other reason, the expenditure shall be considered a contribution by that person to the candidate or political committee encouraging the expenditures and is reportable as one."

184.    A law or regulation "is overbroad if it does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech." *Klein*, 463 F.3d at 1038 (internal citations omitted).

185.    The Contribution Conversion Provision applies to members of political committee, whether acting on behalf of the political committee or not, who encourage anyone else to make an expenditure for any reason. Such encouragement is attributed as a contribution to a candidate or political committee and reportable *by them* (subject to penalties such as fines and removal from office) regardless of the political committee's knowledge or authorization of such encouragement.

186.    The Contribution Conversion Provision is not narrowly tailored to a compelling state interest, but is instead unconstitutionally overbroad under the First and Fourteenth Amendments to the United States Constitution.

## Count XVII
### The Electioneering Communication Definition And Reporting Requirement Are Facially Vague.

187.    Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

**188.** MCA § 13-1-101(15) and ARM 44.11.605 (the "Electioneering

Communication Definition") states:

(a) "Electioneering communication" means a paid communication that is publicly distributed by radio, television, cable, satellite, internet website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:
    (i) refers to one or more clearly identified candidates in that election;
    (ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or
    (iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.
(b) The term does not mean:
    (i) a bona fide news story, commentary, blog, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, internet website, or other periodical publication of general circulation unless the facilities are owned or controlled by a candidate or political committee;
    (ii) a communication by any membership organization or corporation to its members, stockholders, or employees;
(iii) a commercial communication that depicts a candidate's name, image, likeness, or voice only in the candidate's capacity as owner, operator, or employee of a business that existed prior to the candidacy;
    (iv) a communication that constitutes a candidate debate or forum or that solely promotes a candidate debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or
    (v) a communication that the commissioner determines by rule is not an electioneering communication.

MCA § 13-1-101(15). And:

(1) An electioneering communication is a paid communication that:

(a) is publicly distributed by one or more of the modes of communication listed in the statute;

(b) is made within 60 days of the initiation of voting in an election;

(c) does not support or oppose a candidate or ballot issue, as "support or oppose" is defined in 13-1-101, MCA;

(d) can be received by more than 100 recipients in the district voting on the candidate or ballot issue;

(e) meets one or more of the following criteria:

> (i) refers to one or more clearly identified candidates in the election;
>
> (ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in the election; or
>
> (iii) refers to a political party, ballot issue, or other question submitted to the voters in the election; and

(f) may also be an independent expenditure.

(2) In (1)(b) the phrase "made within 60 days of the initiation of voting in an election" shall mean the following:

(a) in the case of mail ballot elections, the initiation of voting occurs when official ballot packets are mailed to qualified electors pursuant to 13-19-206, MCA;

(b) in other elections the initiation of voting occurs when absentee ballot packets are mailed to or otherwise delivered to qualified electors pursuant to 13-13-214, MCA.

(3) An electioneering communication does not mean any communication that is excluded from the definition of the term in 13-1-101, MCA. In addition, an electioneering communication does not mean:

(a) a communication that refers to or depicts the name, image, likeness, or voice of one or more clearly identified candidates, but that is susceptible to no reasonable interpretation other than as unrelated to the candidacy or the election;

(b) a communication that refers to a political party, ballot issue, or other question submitted to the voters at an election, but that is susceptible to no reasonable interpretation other than as unrelated to the issue or the election;

(c) the voter information pamphlet prepared and distributed
by the Secretary of State; or

(d) any other regular or normal communication by a local government or a state agency that include information about a candidate, ballot issue, or election. A communication concerning a bond issue by local government or a state agency is not regular and normal communication and is subject to reporting and disclosure as an electioneering communication. For purposes of this rule the terms local government and state agency shall have the same meaning as the definitions of the terms in 2-2-102, MCA.

(4) The determination whether a particular communication is an electioneering communication or is excluded from the definition of the term will be based on the purpose, timing, and distribution of the communication.

(5) Upon request, the commissioner may issue a letter to a group or person reporting the cost of electioneering communications under these rules. The letter may state that the reporting and disclosure required for an electioneering communication does not mean or imply that an express advocacy determination was made as to the communication that is covered by the cost reported.

(6) A person who makes an electioneering communication is subject to the reporting and disclosure requirements of Title 13, chapters 35 and 37, MCA, and these rules.

(7) The COPP shall maintain a form which will allow a political committee to report an electioneering communication without designating the expenditure as in support of or in opposition to candidate(s) or issue(s).

ARM 44.11.605.

**189.** MCA § 13-37-225(3)(the "Electioneering Reporting Requirement")

states that "A person who makes an election communication, electioneering

communication, or independent expenditure is subject to reporting and disclosure

requirements as provided in chapters 35 and 37 of this title."

**190.** "A statute must be sufficiently clear so as to allow persons of

ordinary intelligence a reasonable opportunity to know what is prohibited." *Foti*,

146 F.3d at 638; *WRTL-III*, 751 F.3d at 835. "A statute is vague if men of common intelligence must necessarily guess at its meaning and differ as to its application." *In re Doser*, 412 F.3d 1056, 1062 (9th Cir. 2005). "Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at 638.

191.    Whether the communications regulated, particularly internet websites, billboards, or any other distribution of printed materials, "can be received by more than 100 recipients in the district voting on the candidate or ballot issue" is not ascertainable. *Cf. The Electioneering Communication Database*, FCC Media Bureau, http://apps.fcc.gov/ecd/ (last visited June 23, 2015) (creating a searchable database showing what radio and broadcast stations will satisfy FECA's EC recipient requirement).

192.    Additionally, those that engage in electioneering communications, whether as a political committee or otherwise, must guess as to what reporting requirement they are subject to. *See* MCA § 13-37-226(1) (establishing times for reporting for those supporting or opposing a statewide candidate or ballot); *id.* § 13-37-226(2) (establishing times for reporting for those supporting or opposing a

district candidate or ballot); *id.* § 13-37-226(3) (establishing times for reporting

for those supporting or opposing local issues); *id.* § 13-37-226(4) (establishing

time for independent and political party committees to report); *id.* § 13-37-225(5)

(establishing times for incidental committees to report); MCA § 13-37-229

(establishing disclosure content for ballot issue committees, political party

committees, and independent committees); MCA § 13-37-232 (establishing

disclosure content for incidental committees).

**193.** ARM 44.11.605(1)(c) indicates that an electioneering communication

is one that "does not support or oppose a candidate or ballot issue." Yet ARM

44.11.605(1)(f) indicates that the communication "may also be an independent

expenditure." MCA § 13-1-101(24) defines an "independent expenditure" as "an

expenditure for an election communication to support or oppose a candidate or

ballot issue made at any time that is not coordinated with a candidate or ballot

issue committee." An election communication and an electioneering

communication are mutually exclusive definitions, as the former is speech that

supports or opposes a candidate, MCA § 13-1-101(14)(a), and the later is speech

that does not support or oppose a candidate, MCA § 13-1-101(15)(a). What the

Electioneering Communication Definition is trying to regulate is unclear, and can

lead to arbitrary enforcement against those unaware they were regulated and the

unconstitutional chill of free speech. *Foti*, 146 F.3d at 638.

**194.** The Electioneering Definition also employs a reverse form of the appeal-to-vote test, stating that electioneering communications does not mean communications "susceptible to no reasonable interpretation other than as unrelated to the candidate or the election," ARM 44.11.605(3)(a), or "to the issue," ARM 44.11.605(3)(b). The appeal-to-vote test is unconstitutionally vague, *see WRTL-II*, 551 U.S. at 474 n.7; *id.* at 493-94 (Scalia, J., concurring). And the phrase "unrelated to" is unconstitutionally vague, *Buckley v. Valeo,* 424 U.S. 1, 41-42 (1976).

**195.** The Electioneering Definition turns on "the purpose . . . of the communication." ARM 44.11.605(4). Such "an intent-based test would chill core political speech, *WRTL-II*, 551 U.S. at 468-69, and is unconstitutionally vague, *id.*

**196.** The Electioneering Communication Definition and Reporting Requirement are unconstitutionally vague in violation of the First and Fourteenth Amendments.

**Count XVIII**
**The Electioneering Communication Definition Fails Scrutiny Review**.

**197.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**198.** The Electioneering Communication Definition states:

(a) "Electioneering communication" means a paid communication that is publicly distributed by radio, television, cable, satellite, internet

website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:

(i) refers to one or more clearly identified candidates in that election;

(ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or

(iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.

(b) The term does not mean:

(i) a bona fide news story, commentary, blog, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, internet website, or other periodical publication of general circulation unless the facilities are owned or controlled by a candidate or political committee;

(ii) a communication by any membership organization or corporation to its members, stockholders, or employees;

(iii) a commercial communication that depicts a candidate's name, image, likeness, or voice only in the candidate's capacity as owner, operator, or employee of a business that existed prior to the candidacy;

(iv) a communication that constitutes a candidate debate or forum or that solely promotes a candidate debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or

(v) a communication that the commissioner determines by rule is not an electioneering communication.

MCA § 13-1-101(15). And:

(1) An electioneering communication is a paid communication that:
   (a) is publicly distributed by one or more of the modes of communication listed in the statute;
   (b) is made within 60 days of the initiation of voting in an election;
   (c) does not support or oppose a candidate or ballot issue, as "support or oppose" is defined in 13-1-101, MCA;
   (d) can be received by more than 100 recipients in the district voting on the candidate or ballot issue;

(e)  meets one or more of the following criteria:
> (i)  refers to one or more clearly identified candidates in the election;
> (ii)  depicts the name, image, likeness, or voice of one or more clearly identified candidates in the election; or
> (iii)  refers to a political party, ballot issue, or other question submitted to the voters in the election; and

(f)  may also be an independent expenditure.

(2)  In (1)(b) the phrase "made within 60 days of the initiation of voting in an election" shall mean the following:
> (a)  in the case of mail ballot elections, the initiation of voting occurs when official ballot packets are mailed to qualified electors pursuant to 13-19-206, MCA;
> (b)  in other elections the initiation of voting occurs when absentee ballot packets are mailed to or otherwise delivered to qualified electors pursuant to 13-13-214, MCA.

(3) An electioneering communication does not mean any communication that is excluded from the definition of the term in 13-1-101, MCA.  In addition, an electioneering communication does not mean:
> (a)  a communication that refers to or depicts the name, image, likeness, or voice of one or more clearly identified candidates, but that is susceptible to no reasonable interpretation other than as unrelated to the candidacy or the election;
> (b)  a communication that refers to a political party, ballot issue, or other question submitted to the voters at an election, but that is susceptible to no reasonable interpretation other than as unrelated to the issue or the election;
> (c) the voter information pamphlet prepared and distributed by the Secretary of State; or

(d) any other regular or normal communication by a local government or a state agency that include information about a candidate, ballot issue, or election. A communication concerning a bond issue by local government or a state agency is not regular and normal communication and is subject to reporting and disclosure as an electioneering communication.  For purposes of this rule the terms local government and state agency shall have the same meaning as the definitions of the terms in 2-2-

102, MCA.

> (4) The determination whether a particular communication is an electioneering communication or is excluded from the definition of the term will be based on the purpose, timing, and distribution of the communication.
>
> (5) Upon request, the commissioner may issue a letter to a group or person reporting the cost of electioneering communications under these rules. The letter may state that the reporting and disclosure required for an electioneering communication does not mean or imply that an express advocacy determination was made as to the communication that is covered by the cost reported.
>
> (6) A person who makes an electioneering communication is subject to the reporting and disclosure requirements of Title 13, chapters 35 and 37, MCA, and these rules.
>
> (7) The COPP shall maintain a form which will allow a political committee to report an electioneering communication without designating the expenditure as in support of or in opposition to candidate(s) or issue(s).

ARM 44.11.605.

**199.** Defendants cannot show that the Electioneering Communication Definition satisfies scrutiny. *Center for Ind. Freedom, Inc. v. Tennant*, 706 F.3d 270, 283-84 (4th Cir. 2013). The Electioneering Communication Definition is unconstitutional.

## Count XIX
### The Anonymous Speech Ban Is Unconstitutional.

**200.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**201.** MCA § 13-35-225 states, in relevant part:

**Election materials not to be anonymous—statement of accuracy— notice—penalty.** (1) All election communications, electioneering communications, and independent expenditures must clearly and conspicuously include the attribution "paid for by" followed by the name and address of the person who made or financed the expenditure for the communication. The attribution must contain:

. . .

(b) for election material communications, electioneering communications, or independent expenditures financed by a political committee, the name of the committee, the name of the committee treasurer, and the address of the committee or the committee treasurer; and

(c) for election communications, electioneering communications, or independent expenditures financed by a political committee that is a corporation or a union, the name of the corporation or union, its chief executive officer or equivalent, and the address of the principal place of business.

*See also* ARM 44.11.601(2)(b)(requiring disclosure of the name of the committee, its treasurer, and its address); *id.* 44.11.601(2)(c)(requiring disclosure of the name of the corporation or union, its CEO, and its address).

202. MCA § 13-35-225 and ARM 44.11.601 ("The Anonymous Speech Ban") are "a content-based limitation on core political speech . . . [that] must receive the most "exacting scrutiny" under the First Amendment," that is, the government must prove that it is narrowly tailored and the least restrictive alternative to serve an overriding state interest. *Am. Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 992-93 (9th Cir. 2004) (*citing McIntyre,* 514 U.S.

at 346, 115 S.Ct. 1511); *see also Reed v. Town of Gilbert,* No. 13-502, slip. op. at

6 (June 19, 2015) ("Content-based laws—those that target speech based on its

communicative content—are presumptively unconstitutional and may be justified

only if the government proves that they are narrowly tailored to serve compelling

state interests.").

    **203.**   The Anonymous Speech Ban is not narrowly tailored to a compelling

state interest, *Heller,* 378 F.3d 992-93, so it is unconstitutional under the First and

Fourteenth Amendments.

## Count XX

**The Investigatory Procedures Provision and the Publication Provisions
Unconstitutionally Burden And Chill Protected Speech and Association.**

    **204.**   Plaintiff MCD realleges and incorporates by reference all of the

allegations contained in all of the preceding paragraphs.

    **205.**   Montana law states that "the commissioner is responsible for

investigating all of the alleged violations of the election laws," MCA § 13-37-

111(1), and authorizes the commissioner, during an investigation, to:

> (a) investigate all statements filed pursuant to the provisions of chapter
> 35 of this title or this chapter and shall investigate alleged failures to file
> any statement or the alleged falsification of any statement filed pursuant
> to the provisions of chapter 35 of this title or this chapter. Upon the
> submission of a written complaint by any individual, the commissioner
> shall investigate any other alleged violation of the provisions of chapter

35 of this title, this chapter, or any rule adopted pursuant to chapter 35 of this title or this chapter.

(b) inspect any records, accounts, or books that must be kept pursuant to the provisions of chapter 35 of this title or this chapter that are held by any political committee or candidate, as long as the inspection is made during reasonable office hours; and

(c) administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, bank account statements of a political committee or candidate, or other records that are relevant or material for the purpose of conducting any investigation pursuant to the provisions of chapter 35 of this title or this chapter.

MCA § 13-37-111(2) (collectively "the Investigatory Procedures Provision").

Then, "[t]he commissioner shall prepare a written summary of facts and statement of findings, upon completion of the investigation, which shall be sent to the complainant and the alleged violator," ARM 44.11.106(3), and, since "[a]ll documents provided to and all communications with the COPP are public records," ARM 44.11.106(6), make "[a] filed complaint and the summary of facts and statement of findings . . . public record," unless " the commissioner determines [it] is subject to protection from disclosure based on constitutional or statutory law," ARM 44.11.106(5) (collectively "the Publication Provisions").

206.     Commissioners routinely post complaints, notices of complaints (often with supporting documentation), as well as sufficiency findings disclosing associations and strategies on the Commission's website. *See Docket of Formal Complaints*, http://political practices.mt.gov/2recentdecisions/docket.mcpx (last

visited December 30, 2015); *Campaign Finance and Practices Decision Page,* http://politicalpractices.mt.gov/2recentdecisions/campaignfinance.mcpx (last visited December 30, 2015).

207. The Commissioner has disclosed donors to the public sua sponte immediately after finding a violation but before the alleged violator has had any due process opportunity to defend themselves. *See Names of Montana Growth Network Revealed*, The Independent Record (Dec. 21, 2015), attached as Ex. 43 (disclosing copies of checks and names of donors to group Commissioner asserted "insult[ed] reporting and disclosure in Montana" mere days after Commissioner decision finding violation was released and before group had opportunity to consider legal options); *see MGN Decision*, attached as Ex. 42.

208. The Commissioner authorized in this very lawsuit during discovery MCD's counsel to review all staff notebooks and investigatory reports since 2011 without first reviewing them for the privacy interests of third parties discussed therein or securing a protective order or any agreement in writing from MCD's counsel as to the confidentiality of those documents. (*See Motl Discovery Responses*, attached as Ex. 44; *Counsel Email*, attached as Ex. 45.)

209. The First Amendment protects the right to associate with others. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("*NAACP*"). This right is "fundamental." *San Francisco County Democratic Cent. Comm. v. Eu*, 826

F.2d 814, 827 (9th Cir. 1987). Once disclosure occurs, it cannot be undone. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1158 (9th Cir. 2010). Consequently, disclosure of an association's private, internal data, political affiliations, or activities imposes a substantial burden on First Amendment rights, *Buckley v. Valeo*, 424 U.S. 1, 64-68 (1976); *NAACP*, 357 U.S. at 462-63 (1958); *Perry*, 591 F.3d at 1159-60 (9th Cir. 2010).

210. The "public disclosure of an association's confidential internal materials . . . intrudes on the 'privacy of association and belief guaranteed by the First Amendment,' *Buckley,* 424 U.S. at 64, 96 S.Ct. at 656, as well as seriously interferes with internal group operations and effectiveness." *AFL-CIO v. FEC*, 333 F.3d 168, 177-78 (D.C. Cir. 2003). "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy v. New Hampshire*, 354 U.S. 234, 250-51 (1957). "Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference in these matters." *Id.* at 250.

211. Those haled before investigative bodies have a "strong confidentiality interest" analogous to those haled before a grand jury in a criminal proceeding. *In re Sealed Case*, 237 F.3d 657, 667 (D.C. Cir. 2001). Compelled disclosure is

especially inappropriate in such contexts because "secrecy is needed to protect an innocent accused from damaging publicity." *Id*. at 177.

212.  The Investigatory Procedures Provision and the Publication Provisions  provide inadequate safeguards preventing the public disclosure of **1)** confidential materials in and attached to complaints filed with the commissioner and the commissioner's complaint notices, or **2)** confidential materials discovered during an investigation discussed in the commissioner's sufficiency findings or publically disclosed by the commissioner, whether acquired by subpoena or voluntarily furnished by the alleged violator or political opponents. The Investigatory Procedures Provision and the Publication Provisions thus fail to ensure "secrecy . . . to protect an innocent from damaging publicity." *Id.* at 177.

213.  Because of the Investigatory Procedures Provision and the Publication Provisions, MCD's speech is chilled. MCD will refrain from running its issue ads because any complaint filed against it will be publicly posted and could subject it to damaging publicity. And any confidential associations or strategies it provides or are discovered during an investigation can become public knowledge. *See, e.g., Bognogofsky v. Kennedy,* slip op. at 24-27 (attached as Ex. 17) (discussing in a publicly-posted, unadjudicated document **1)** ATP's alleged strategies derived from materials furnished by political opponents and **2)** alleged associations between ATP and other individuals and organizations). *Names of*

*Montana Growth Network Revealed*, The Independent Record (Dec. 21, 2015), attached as Ex. 43 (disclosing copies of checks and names of donors to group Commissioner asserted "insult[ed] reporting and disclosure in Montana" mere days after Commissioner decision finding violation was released before group had opportunity to consider legal options); *see MGN Decision*, attached as Ex. 42.

**214.** MCD also bears the substantial burden of defending its constitutional rights throughout any investigation and risks liability if it is unable to adequately defend those rights.

**215.** The Investigatory Procedures Provision and the Publication Provisions are not narrowly tailored to served a compelling state interest. *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 99 (1982); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

**216.** The Investigatory Procedures Provision and the Publication Provisions are unconstitutional under the First and Fourteenth Amendment.

## Count XXI
### The Commissioner Has Engaged in Unconstitutional Viewpoint Discrimination.

**217.** Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**218.** As stated in *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995):

It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96 (1972). Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over another. *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984). Discrimination against speech because of its message is presumed to be unconstitutional. *See Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–643 (1994) . . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. *See R.A.V. v. St. Paul,* 505 U.S. 377, 391 (1992). Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *See Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46 (1983).

*See also Giebel v. Sylvester*, 244 F.3d 1182, 1188-89 (9th Cir. 2001) ("'Content discrimination' occurs when the government 'choos[es] the subjects' that may be discussed, while 'viewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject. . . . viewpoint-based suppression of speech is impermissible.").

**219.** Since taking office in 2013, the Commissioner has addressed complaints based on the political viewpoint of the alleged violators. For example, he has issued advisory opinions on insufficient facts or factual representations for those he supports while refusing to issue one for MCD because of insufficient facts and factual representations not proven to be true. (*Compare Welch Opinion*, attached as Ex. 41, with MCD Advisory Opinion Documents, attached as Ex. 25-

28.) He has reopened, "expanded," initiated, accepted, refused to settle and even sought to remove from office through (in some cases generic) complaints that involving certain groups and individuals he has deemed nefarious and "dark money"-related (*see, e.g.,* Ex. 8-11, 15); has sent threatening enforcement letters and created "watch files" for such groups and individuals, (*see, e.g.,* Letters, attached as Ex. 12-14); and publically disclosed donors of such groups before they had an opportunity to resolve the alleged violations with the COPP or in court (*see MGN Decision,* attached as Ex. 42; *Names of Montana Growth Network Revealed*, The Independent Record (Dec. 21, 2015), attached as Ex. 43). Then, he has superficially investigated, dismissed, settled, and delayed resolution of complaints against those he likes and supports, including a 277-page "dark money" complaint against the Governor who appointed him and third party organizations. (*See, e.g., Pennington Complaint*, attached as Ex. 34; *Bullock Decision*, attached as Ex. 37.)

220.    The Commissioner has engaged in unconstitutional viewpoint discrimination.

## Count XXII
### The Commissioner's Enforcement of Montana Campaign Finance Law Violates the Equal Protection Clause.

221.    Plaintiff MCD realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

**222.** An equal protection violation occurs when a party can "demonstrate that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Cooper v. Clark Cnty., Nevada*, 519 F. App'x 479, 481 (9th Cir. 2013) (internal citations omitted). However, where a fundamental right is implicated, strict scrutiny applies. *Tuscson Woman's Clinic v. Eden,* 379 F.3d 531, 543 (9th Cir. 2004). "The First Amendment right to free speech is such a fundamental right." *Denney v. Drug Enforcement Admin.*, 508 F. Supp. 2d 815, 835-36 (E.D. Cal. 2007) (*citing Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 101 & n. 8 (1972)). The *Mosley* Court held that "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Mosley,* 408 U.S. at 101. In reviewing an ordinance prohibiting picketing on all but one subject, the court stated that "[i]n a variety of contexts we have said that 'even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' This standard, of course, has been carefully applied when First Amendment interests are involved." *Id.* at 101 n. 8 (citations omitted).

**223.** Since taking office in 2013, the Commissioner has treated similarly situated individuals and groups differently while regulating the political free

speech rights of Montanans. For example, he has issued advisory opinions on insufficient facts for some while refusing to issue one for MCD because of insufficient facts. (*Compare Welch Opinion*, attached as Ex. 41, with MCD Advisory Opinion Documents, attached as Ex. 25-28.) He has reopened, "expanded," initiated, accepted, refused to settle and even sought to remove from office through (in some cases generic) complaints that involving certain groups and individuals he has deemed nefarious and "dark money"-related (*see, e.g.,* Ex. 8-11, 15); has sent threatening enforcement letters and created "watch files" for such groups and individuals, (*see, e.g.,* Letters, attached as Ex. 12-14); and publically disclosed donors of such groups before they had an opportunity to resolve the alleged violations with the COPP or in court (*see MGN Decision*, attached as Ex. 42; *Names of Montana Growth Network Revealed*, The Independent Record (Dec. 21, 2015), attached as Ex. 43). Conversely, he has superficially investigated, dismissed, settled, and delayed resolution of complaints against those he likes and supports, including a 277-page "dark money" complaint against the Governor who appointed him and third party organizations. (*See, e.g., Pennington Complaint*, attached as Ex. 34; *Bullock Decision*, attached as Ex. 37.)

224.  The Commissioner has enforced campaign finance law in violation of the Equal Protection Clause.

# Prayer for Relief

Wherefore, Plaintiff requests the following relief:

**1.** Declare MCA § 13-1-101(30) unconstitutionally overbroad on its face, overbroad as applied to MCD, and vague in violation of the First and Fourteenth Amendments;

**2.** Declare ARM 44.11.202(3)(c), and MCA § 13-1-101(11) and ARM 44.11.603 on which it relies, unconstitutionally vague and otherwise unconstitutional in violation of the First and Fourteenth Amendments;

**3.** Declare ARM 44.11.202(2), and ARM 44.11.203 on which it relies, unconstitutionally overbroad on its face, overbroad as applied to MCD, and vague in violation of the First and Fourteenth Amendments;

**4.** Declare ARM 44.11.202(6), ARM 44.11.202(7), and ARM 44.11.302 unconstitutionally vague in violation of the First and Fourteenth Amendments;

**5.** Declare ARM 44.11.402(5) and ARM 44.11.302 fail scrutiny review and violate the First and Fourteenth Amendments;

**6.** Declare MCA § 13-1-101(9)(a), and MCA § 13-1-101(49) on which it relies, unconstitutionally vague in violation of the First and Fourteenth Amendments;

**7.** Declare ARM 44.11.401, and ARM 44.11.602(2) & (3) on which it relies, unconstitutionally vague and otherwise unconstitutional in violation of the First and Fourteenth Amendments;

**8.** Declare MCA § 13-1-101(17)(a), and MCA § 13-1-101(49) on which it relies, unconstitutionally vague in violation of the First and Fourteenth Amendments;

**9.** Declare ARM 44.11.501(1) unconstitutionally vague and otherwise unconstitutional in violation of the First and Fourteenth Amendments;

**10.** Declare ARM 44.11.504 unconstitutionally overbroad in violation of the First and Fourteenth Amendments;

**11.** Declare MCA § 13-1-101(15) and ARM 44.11.605 unconstitutionally vague and fails scrutiny review in violation of the First and Fourteenth Amendments;

**12.** Declare MCA § 13-37-225(3) unconstitutionally vague in violation of the First and Fourteenth Amendments;

**13.** Declare MCA § 13-35-225 and ARM 44.11.601 fail scrutiny review in violation of the First and Fourteenth Amendments;

**14.** Declare MCA Section 13-37-111 unconstitutional and in violation of the First and Fourteenth Amendments;

**15.** Declare ARM 44.11.106 unconstitutional and in violation of the First and Fourteenth Amendments;

**16.** Declare that the Commissioner has engaged in unconstitutional viewpoint discrimination in enforcing Montana's campaign finance laws;

**17.** Declare that the Commissioner has violated the Equal Protection Clause in enforcing Montana's campaign finance laws;

**18.** Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA § 13-1-101(30);

**19.** Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.11.202(3)(c), and MCA § 13-1-101(11) and ARM 44.11.603;

**20.** Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.11.202(2), and ARM 44.11.203;

**21.** Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.11.202(6), ARM 44.11.202(7), and ARM 44.11.302;

**22.** Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.11.402(5) and ARM 44.11.302;

**23.** Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA § 13-1-101(9)(a) and MCA § 13-1-101(49) on which it relies;

**24.** Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.11.401 and ARM 44.11.602(2) & (3) on which it relies;

**25.** Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA § 13-1-101(17)(a) and MCA § 13-1-101(49) on which it relies;

**26.** Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.11.501(1);

**27.** Enjoin Defendants, their agents, successors, and assigns, from enforcing ARM 44.11.504;

**28.** Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA § 13-1-101(15) and ARM 44.11.605;

**29.** Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA § 13-37-225(3);

**30.** Enjoin Defendants, their agents, successors, and assigns, from enforcing MCA § 13-35-225 and ARM 44.11.601;

**31.** Enjoin Defendants, their agents, successors, and assigns, from acting pursuant to MCA Section 13-37-111 until adequate confidentiality policies are put into place;

**32.** Enjoin Defendants, their agents, successors, and assigns, from acting pursuant to ARM 44.11.106 until adequate confidentiality policies are put into place;

**33.** Enjoin the Commissioner from engaging in unconstitutional viewpoint discrimination in enforcing Montana's campaign finance laws;

**34.** Enjoin the Commissioner from violating the Equal Protection Clause in enforcing Montana's campaign finance laws.

**35.** Grant Plaintiff its costs and attorneys fees under 42 U.S.C. Section 1988 and any other applicable authority; and

**36.** Grant any and all other relief this Court deems just and equitable.

Dated: December 31, 2015

Respectfully submitted,

/s/ Anita Y. Milanovich

James Bopp, Jr.* (Ind. No. 2838-84)
THE JAMES MADISON CENTER FOR
FREE SPEECH
The National Building
1 South Sixth Street
Terre Haute, IN 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com
*Attorney for Plaintiff*

Anita Y. Milanovich (Mt. No. 12176)
THE BOPP LAW FIRM, PC
1627 West Main Street, Suite 294
Bozeman, MT 59715
Phone: (406) 589-6856
Cell: (406) 589-6856
Email: aymilanovich@bopplaw.com
*Attorney for Plaintiff*

*Pro hac vice application granted
September 4, 2014.

**Certificate of Service**

I hereby certify that on December 31, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Montana by using the Court's CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Anita Y. Milanovich