IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| MONTANANS FOR COMMUNITY DEVELOPMENT,<br><br>            Plaintiff,<br><br>   vs.<br><br>JONATHAN MOTL, in his official capacity as Commissioner of Political Practices; TIMOTHY FOX, in his official capacity as Attorney General of the State of Montana, and LEO GALLAGHER, in his official capacity as Lewis and Clark County Attorney,<br><br>            Defendants. | CV 14–55–H–DLC<br><br><br>ORDER |

Before the Court are the parties' cross-motions for summary judgment. For the reasons explained below, the Court grants Defendants' motion and denies Plaintiff's motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.  Montanans for Community Development**

Plaintiff Montanans for Community Development ("MCD") is a self-identified tax exempt "social welfare organization" under 26 U.S.C. 501(c)(4).

This group asserts that it is a non-partisan organization that is not affiliated with any political candidate or political party. MCD's stated mission is "to promote and encourage policies that create jobs and grow local economies throughout Montana." (Doc. 100 at 17.) The organization seeks to accomplish this goal by "engag[ing] in grassroots advocacy and issues-oriented educational campaigns." (*Id.*)

MCD was organized at an initial meeting on October 2, 2013, and has only had one formal meeting since. MCD has no reported members, telephone number, email address, or website. Though MCD filed Articles of Incorporation with the Montana Secretary of State shortly after its initial meeting, its status as a Montana corporation was dissolved by the Secretary of State on December 1, 2015. MCD has neither applied for nor received recognition from the Internal Revenue Service regarding its purported tax exempt status.

MCD has stated an intention to engage in political speech through the circulation of issue advertisements, otherwise known as mailers. MCD asserts that it intended to circulate certain "issue advocacy" mailers as recently as September 2014, or roughly 60 days before the 2014 general election. (Doc. 100 at 17–18.) Although a template of these mailers was prepared by MCD, copies were not distributed out of concern that the organization would have been penalized by

Montana's Commissioner of Political Practices (the "Commissioner") for failing to comply with Montana's campaign disclosure and reporting laws.

The template was attached to MCD's complaint and consisted of two mailers.[1] The first mailer read: "Environmental extremists like the Sierra Club are working every day to kill high-paying jobs through frivolous lawsuits and burdensome regulations. It's time to understand how Montana's energy policy affects you. Check out www.energyxxi.org." (Doc. 100-7 at 2.) On the back, the mailer further explained:

> Billings is a prime location to feel the economic benefits of the
> Bakken oil boom and development of the Otter Creek coal deposits.

---

[1] In addition to the 2014 mailers, MCD also created four additional advertisements in 2013 that were provided to the Court, but never distributed. (*See* Doc. 100-6.) A review of the 2013 advertisements reveal that these mailers are similar to the 2014 mailers. However, three of the four 2013 mailers fail to name a candidate for office. Because these three mailers fail to name a candidate for office, the Court finds that they would not be an electioneering communication under the plain language of the statute and regulation. *See* Mont. Code Ann. § 13–1–101(15)(a); Admin. R. Mont. 44.11.605(1)(e) (requiring an electioneering communication to refer to a candidate or the candidate's "name, image, likeness, or voice"). Because these mailers are not electioneering communications under Montana law, any money spent in their production would not be an expenditure. *See* Mont. Code Ann. § 13–1–101(17)(a)(ii) (defining an "Expenditure" as "anything of value . . . used or intended for use . . . in producing electioneering communications"). Thus, because a political committee is only formed if it "makes an expenditure," the distribution of these three 2013 mailers would not require MCD to register as a political committee. *See* Mont. Code Ann. § 13–1–101(30)(a)(iii) (stating that a "Political committee" is a "a combination of two or more individuals . . . who . . . make[] an expenditure . . . to prepare or disseminate an . . . electioneering communication"). Thus, there is no basis for a constitutional challenge related to the 2013 mailers that did not name a candidate. Accordingly, the Court's analysis for the present motion will be limited to the 2014 advertisements and the lone 2013 mailer that did name a candidate. The Court notes that the lone 2013 mailer, which names John Quant, is almost identical to the mailer that names Joshua Sizemore. (*Compare* Doc. 100-6 at 3–4, *with* Doc. 100-7 at 2–3.)

-3-

Fortunately, local industry leaders like Joshua Sizemore are
promoting pro-growth policies that will develop resources and create
jobs right here in Billings.  Institute for 21st Century Energy's 5 Point
Plan:

> 1. Maximize America's own energy resources
> 2. Make new and clean energy technologies more affordable
> 3. Eliminate regulatory barriers derailing energy projects
> 4. Do not put America's existing energy sources out of
> business
> 5. Encourage free and fair trade of energy resources and
> technologies globally

But they can't do it alone.  Learn more at www.energyxxi.org and
join the fight.  Paid for by Montanans for Community Development

(Doc. 100-7 at 3 (omitted punctuation marks in original).)[2]

The second mailer, similar to the first, discussed how:

> Over the past decade, modern horizontal drilling technology has
> created an energy and jobs boom in Eastern Montana.  In 2013,
> Montana's oil and gas industry contributed to over 15,600 jobs,
> which pay over 2/3 more than the state average.[3]  Last year alone,
> Montana added an additional 4,900 jobs involved in selling goods
> and services to the oil and gas industry."

(Doc. 100-7 at 4.)  The back of the second mailer ominously continued:

> However, environmentalists like Mary McNally are fighting this
> progress at every turn. They're proposing:
> > - Putting a stop to the development of Montana's rich coal

---

[2] The text of the mailer was accompanied by pictures.  On the front, the face of a clock.
On the back, a dirt road leading to an oil and gas drilling rig and a photograph of a man,
presumably Joshua Sizemore.

[3] The mailer provided a footnote citation to: "'Articles & Reports - Montana Petroleum
Association.' Articles & Reports - Montana Petroleum Association. N.p., n.d. Web. 12 Aug.
2014.1."  (Doc. 100-7 at 4 (punctuation in original.)

reserves
- Shutting down modern natural resource development
practices that bring jobs to rural communities
- Locking up federal land in Eastern Montana so no resource
development can take place
- Blocked critical infrastructure projects that let Montana
export its coal, oil, and natural gas.
There is an alternative to this extremist rhetoric. Go to
www.energyxxi.org and support the Institute for 21st Century
Energy's Plan to maximize America's own energy resources.

(Doc. 100-7 at 5 (punctuation in original).)[4]

MCD asserts that it is an issue advocacy organization with a goal to educate

the public and does not support any political candidates or parties. Despite this

assertion, MCD sought to distribute these mailers during the sixty days preceding

the 2014 election, an election where both of the named individuals in the mailers

were running for office. Nonetheless, MCD steadfastly maintains that it will not

speak, i.e., distribute these mailers, if it has to comply with Montana's political

committee disclosure and reporting requirements. Accordingly, MCD contends

that its speech has been chilled and filed this lawsuit challenging the

constitutionality of Montana's political committee and disclosure laws.

---

[4] Like the first mailer, the second mailer also contains images in addition to text. On the
front of the second mailer is a picture of horizontal oil pumpjack next to a person wearing a
cowboy hat. On the back is another image of a horizontal oil pumpjack next to a photograph of a
woman, presumably Mary McNally.

**B. Montana's Committee and Disclosure Laws**

Under Montana law, a "Political committee" is defined as:

> a combination of two or more individuals or a person other than an
> individual who receives a contribution or makes an expenditure:
> (i) to support or oppose a candidate or a committee organized to
> support or oppose a candidate or a petition for nomination;
> (ii) to support or oppose a ballot issue or a committee organized to
> support or oppose a ballot issue; or
> (iii) to prepare or disseminate an election communication, an
> electioneering communication, or an independent expenditure.

Mont. Code Ann. § 13–1–101(30). This definition recognizes four types of

political committees: (1) ballot issue committees; (2) incidental committees; (3)

independent committees; and (4) and political party committees. *Id.* The statute

clarifies that "[a] political committee is not formed when a combination of two or

more individuals or a person other than an individual makes an election

communication, an electioneering communication, or an independent expenditure

of $250 or less." *Id*.

An "Incidental committee" is "a political committee that is not specifically

organized or operating for the primary purpose of supporting or opposing

candidates or ballot issues but that may incidentally become a political committee

by receiving a contribution or making an expenditure." Mont. Code Ann.

§ 13–1–101(22)(a). Factors to consider in determining an organization's primary

purpose are "allocation of budget, staff, or members' activity or the statement of purpose or goal of the person or individuals that form the committee." Mont. Code Ann. § 13–1–101(22)(b).

Incidental committees, like all political committees, must periodically submit reports concerning "contributions and expenditures made by or on the behalf of a candidate or political committee." Mont. Code Ann. § 13–37–225(1). Failure to do so may result in civil and criminal prosecution, and penalties "for an amount up to $500 or three times the amount of the unlawful contribution or expenditure, whichever is greater." Mont. Code Ann. § 13–37–228; Admin. R. Mont. 44.11.240. Defendants assert that MCD would most likely be classified as an incidental committee.

### C. Commissioner of Political Practices

Under Montana law, "the [C]ommissioner is responsible for investigating all of the alleged violations of the election laws . . . and in conjunction with the county attorneys is responsible for enforcing these election laws." Mont. Code. Ann. § 13–37–111(1). Montana's current Commissioner is Defendant Jonathan Motl ("Motl").

MCD vilifies Motl and accuses him of engaging in political profiling by investigating and seeking litigation against "certain groups and individuals whose

political ideology he disagrees with," specifically, "dark money"[5] groups and its supporters. (Doc. 100 at 22.) MCD provides that Motl unlawfully targets these individuals and groups, while simultaneously providing favorable treatment to groups and individuals whose political ideologies he supports.[6] Further, MCD states that the Commissioner's investigative practices expose individuals to false accusations and potential damage to reputation. Specifically, MCD states that it will not distribute its mailers out of fear that Motl will: (1) damage MCD's reputation; (2) issue substantial fines against MCD; (3) construe the mailers as coordinated, in-kind contributions and investigate and/or remove the individuals mentioned in the mailers from office; and (4) publish confidential information about MCD on the Commissioner's website. Accordingly, MCD challenges the Commissioner's investigatory powers as unconstitutional, contends that Motl engages in unlawful viewpoint discrimination, and accuses him of violating the

_____

[5] Motl defines "dark money" as "money spent in Montana elections that is not reported or disclosed by the candidate or by the third party entity spending the money." (Doc. 122 at 2.) This definition largely corresponds with other attempts to define this term. *See* Danny Emmer, *Shedding Light on "Dark Money": The Heightened Risk of Foreign Influence Post-Citizens United*, 20 Sw. J. Int'l L. 381, 394 (2014) (describing "dark money" as money provided by "people who want to influence elections without identifying themselves").

[6] Specifically, MCD accuses Motl of using his investigatory powers to support Democrats and so-called "Responsible Republicans," i.e., Republican politicians who support the regulation of dark money, while simultaneously abusing his powers to investigate and prosecute politicians and their supporters that do not.

Equal Protection Clause.

### D. Procedural History

MCD filed its initial complaint on September 3, 2014, seeking declaratory and injunctive relief. This complaint numbered 46 pages and alleged 14 counts. MCD also moved for a preliminary injunction seeking to enjoin the Commissioner, as well as Defendants Montana Attorney General Timothy Fox and Lewis and Clark County Attorney Leo Gallagher (collectively "Defendants"), from enforcing Montana's election and disclosure laws on the eve of the 2014 general election. On October 22, 2014, the Court denied the motion after finding that none of the factors discussed in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), supported an order preliminarily enjoining these laws. (Doc. 28.)

Following the denial, MCD filed an interlocutory appeal to the United States Court of Appeals for the Ninth Circuit and moved for an emergency injunction pending appeal. The Ninth Circuit denied the motion for an emergency injunction and MCD subsequently moved to voluntarily dismiss the appeal.

In June of 2015, MCD filed its first amended complaint. The amended complaint spanned 62 pages and alleged 15 counts. A few months later, Defendants moved the Court to compel MCD to respond to certain interrogatories

and requests for production put forth during discovery. The Court granted Defendants' motion in part and denied it in part after finding that some of the discovery requests were relevant and others were not. Ultimately, the Court found that the requests for information concerning MCD's communications with outside groups were relevant while internal communications within MCD were not. MCD then filed an interlocutory appeal with the Ninth Circuit requesting a writ of mandamus. The Ninth Circuit denied this request after concluding that MCD had not established grounds warranting the Ninth Circuit's intervention.

Following this appeal, the Court issued a new scheduling order setting a bench trial for early May 2016. Shortly thereafter, on December 31, 2015, MCD filed its second amended complaint. This document expanded to 93 pages and brought several new causes of action, resulting in a total of 23 counts. In addition to several new counts challenging recently adopted political committee and disclosure regulations, MCD added the above-described claims alleging viewpoint discrimination and equal protection violations against Motl.

The parties filed cross-motions for summary judgment and the Court conducted a hearing on the motions. Shortly before the hearing, MCD moved to vacate the scheduled bench trial stating that it "strongly believes that this matter can be resolved based on the pending summary judgment motions." (Doc. 161 at

2.)  Based upon this representation, and because Defendants did not oppose the motion, the Court vacated the bench trial.  (Doc. 162.)

As discussed, MCD asserts an unwavering unwillingness to comply with Montana's political committee reporting requirements and disclosure laws.  MCD provides that it desired to distribute mailers during the sixty days preceding the 2014 general election that would have informed the public about "policies that create jobs and grow local economies throughout Montana," but did not do so because it would have been required to register as political committee.  (Doc. 100 at 17–19.)  MCD asserts that though these mailers would have contained the names of individuals who were candidates in the 2014 election and provided information that was arguably critical or supportive of the candidates, the intention of these mailers would have been to educate the general public, not to advocate for the election or defeat of the candidates.

Because MCD will not distribute its mailers if it is subject to Montana's political committee and disclosure requirements, it contends that its First Amendment right of free speech has been unconstitutionally chilled.  As such, MCD challenges the constitutionality of Montana's political committee and

disclosure laws and and moves for summary judgment on its claims.[7]

## ANALYSIS

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## I. Preliminary Challenges to Standing

Defendants first dispute MCD's constitutional standing to challenge

---

[7] MCD has also provided notice of two cases recently decided in the District of Montana. (*See* Doc. 168.) Defendants move to strike this supplemental authority because it lodges new arguments and fails to follow this District Local Rules. *See* D. Mont. L.R. 7.4 (stating that a notice of supplemental authority "may not exceed two pages and must not present a new argument"). The Court will thus grant Defendants' motion because the notice of supplemental authority presents new arguments and exceeds the two-page limit. However, the Court will take judicial notice of these cases.

Montana's statutes and regulations.

## A. Administrative Rules Effective January 9, 2016

As stated above, MCD's filed its second amended complaint on December 31, 2016. The second amended complaint raised several challenges to administrative regulations that did not become effective until January 9, 2016. MCD asserts that it has standing to challenge these regulations because although they were not effective until after the second amended complaint was filed, they were adopted November 24, 2015, more than a month before the filing. Further, MCD contends that Motl testified on November 17, 2015, before the State Administration and Veterans' Affairs Committee, that the adoption date for the regulations was the date the regulations became the policy of the Commissioner. As such, MCD contends that these adopted regulations, though not yet effective, had the force of law.[8] Because they have the force of law, MCD argues, it has standing to challenge the administrative regulations that became effective after it filed its second amended complaint.

Article III of the United States Constitution mandates that courts must only

---

[8] At the hearing on the cross-motions for summary judgment, counsel for MCD stated that many courts have looked to the date when the statutes or regulations were adopted for standing purposes, not the date when the law became effective. Counsel for MCD, however, fails to provide the Court with any case names or citations for this authority.

"adjudicate live cases or controversies" and should refrain from issuing advisory opinions. *Thomas v. Anchorage Equal Rights Commn*., 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (citing to U.S. Const. art. III). As such, courts have the responsibility to ensure that litigants have standing under Article III to bring their claims. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006). Further, a "plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought." *Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (citing *DaimlerChrysler Corp.*, 547 U.S. at 352). The existence of standing is determined by "the facts as they exist when the complaint is filed." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n. 4 (1992) (citation omitted).

In *Yamada v. Snipes*, the Ninth Circuit found that a corporation lacked standing to challenge a Hawaii statute because the statue was amended, i.e., it became effective, after the corporation filed its complaint. 786 F.3d 1182, 1204 (9th Cir. 2015) (*see also* Haw. Rev. Stat. Ann. § 11-341 (clarifying that the date the statute became effective was the same day the amendment occurred)). Here, the Court applies the same approach as the *Yamada* Court and finds that MCD lacks standing to challenge the regulations that came into effect after MCD filed its second amended complaint.

However, instead of dismissing these regulatory challenges outright, the Court could allow MCD leave to file another amended complaint. *See* Fed. R. Civ. P. 15(a)(2) (stating that a party may amend its complaint with leave of court, and leave of court should be freely given when justice requires); *see also Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1010 (9th Cir. 2008) ("We apply [Rule 15's] policy liberally."). However, the Court is loath to invite the filing of a third amended complaint. This case has stretched on for a considerable time and the Court does not want to further delay its resolution. Many of the challenged campaign committee disclosure and reporting statutes, which rely on the regulations to determine their meaning and application, are unaffected by Defendants' challenge to these same regulations. As discussed below, because the Court denies MCD's challenges to the statutory counterparts to these regulations, the Court will address the regulations on the merits.

## B. Investigatory Process

Defendants next assert that MCD lacks standing to challenge the Commissioner's investigative powers as described in Count 21 (misidentified as Count XX) of the second amended complaint. As stated above, the Commissioner is responsible for investigating alleged violations of Montana's election laws. Mont. Code. Ann. § 13-37-111(1). In the exercise of his duties, MCD states that

the Commissioner "routinely post complaints, notices of complaints (often with supporting documentation), as well as sufficiency findings disclosing associations and strategies on the Commission's website." (Doc. 100 at 78.)

MCD goes on to state that the Commissioner has, in the past, publically posted confidential materials accumulated through the complaint and investigatory process. MCD provides that it will refrain from distributing mailers because if they do, "any complaint filed against it will be publicly posted and could subject it to damaging publicity." (*Id.* at 81.) Further, "any confidential associations or strategies [MCD] provides or are discovered during an investigation can become public knowledge. " (*Id.*) As such, MCD argues that the Commissioner's investigation powers chill its speech in violation of the First and Fourteenth Amendments.

As mentioned above, a party must satisfy standing requirements for each claim alleged. *Washington Envtl. Council*, 732 F.3d at 1139. MCD, as the party bringing this suit, bears the initial burden of establishing standing by showing "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation and internal quote marks omitted). Importantly, to satisfy Article

III standing requirements, the injury in fact "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (citation and internal quote marks omitted).

In pre-enforcement cases, or cases where a party is arguably subject to threat of prosecution or other government action, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id.* at 2342 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Instead, an injury in fact can be established by "demonstrating a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). To demonstrate this danger, a party must allege: (1) an intention to engage in conduct arguably influenced by a constitutional interest, but prohibited by statute; and (2) a credible threat of prosecution. *Id.* Typically, plaintiffs can establish a credible threat by: (1) showing "a reasonable likelihood that the government will enforce the challenged law against them"; (2) "establish[ing], with some degree of concrete detail, that they intend to violate the challenged law"; and (3) showing that the law is applicable to plaintiffs. *Id.* at 786.

Here, the Court finds that MCD lacks standing under Count 21 for two independent reasons. First, MCD's intended course of conduct is not prohibited by the statute it challenges. Second, MCD fails to show that enforcement of the Commissioner's powers would cause actual and imminent injury.

Importantly, MCD states that it will not comply with Montana's political committee reporting and disclosure requirements. This conduct would violate Montana's statutes that require reporting and disclosure. In Count 21, MCD is challenging the Commissioner's investigation procedures, specifically the power to investigate under Montana Code Annotated ("MCA") § 13-37-111(1). Here, although the organization has "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest" by distributing its mailers, this conduct is not "arguably . . . proscribed by [the] statute" MCD challenges. *Babbitt*, 442 U.S. at 298. Put another way, distributing mailers does not violate MCA § 13-37-111(1).

However, even if MCD's intended speech would not have violated MCA § 13-37-111(1), the exercise of this statute could, arguably, "deter[] the exercise of [MCD's] constitutional rights." *Susan B. Anthony List*, 134 S. Ct. at 2342. Nonetheless, in order for MCD to satisfy its burden for standing, it must show that enforcement of this provision would lead to imminent injury. MCD fails to make

this showing.

For one, if MCD had distributed these mailers and declined to report it, a complaint would first have to be filed with the Commissioner. The Court, as discussed below, finds this scenario to be possible. However, a complaint being filed against MCD is not a cognizable injury. Indeed, the specific harm MCD alleges is harm to its reputation as a result of the complaint. The Court finds that possible damage to one's reputation is too speculative to support an injury in fact. *See Nampa Classical Acad. v. Goesling*, 2009 WL 2923069, at *3 (D. Idaho Sept. 10, 2009) (Plaintiffs' claim of damage to reputation did not constitute injury for standing purposes). Similarly, the possibility that the Commissioner would publish MCD's confidential "associations or strategies" (Doc. 100 at 81) is also too conjectural to support Article III standing. MCD therefore lacks standing to challenge the Commissioner's investigatory powers and summary judgment is granted to Defendants on Count 21 (mis-numbered as Count XX).

**C. Discrimination and Equal Protection Challenges**

As discussed, MCD also claims that Motl engages in viewpoint discrimination against dark money groups. As a result, MCD alleges, Motl treats similarly situated persons and groups differently based upon their perceived support or opposition to dark money. (Doc. 100 at 84–86 (citing various alleged

examples of Motl's unconstitutional viewpoint discrimination).) MCD thus

contends that Motl has violated the Equal Protection rights of these groups.

Notwithstanding these arguments, the Court declines to reach address these issues

as it finds that MCD lacks standing to bring Counts 22 and 23 (mis-identified as

Counts XXI and XXII).

Like MCD's previous counts, the organization must "satisfy standing

requirements for each claim alleged." *Washington Envtl. Council*, 732 F.3d at

1139. In terms of standing, it is well settled that a party "cannot rest [its] claim to

relief on the legal rights or interests of third parties." *Voigt v. Savell*, 70 F.3d

1552, 1564 (9th Cir. 1995). Indeed, the injury relied upon for standing purposes

must be "direct and personal to the particular plaintiff." *Catholic League for*

*Relig. and Civ. Rights v. City and County of San Francisco*, 624 F.3d 1043, 1066

(9th Cir. 2010); *see also Lujan*, 504 U.S. at 561 n. 1 ("[T]he injury must affect the

plaintiff in a personal and individual way.").

Here, however, the discriminatory harms allegedly perpetrated by Motl,

Plaintiff concedes (*see* Doc. 100 at 83–86), have been against groups other than

MCD.[9] MCD fails to allege any personal and direct injury to the organization

---

[9] The Court notes that MCD does claim that Motl refused to issue advisory opinions requested by the organization while issuing opinions for groups he supports (Doc. 100 at 83 (citing Docs. 100-21, 100-22, 100-23, 100-24).) The Court has reviewed these documents and

caused by Motl's past actions.  If Motl has indeed discriminated against these groups, let them come forward.  MCD simply is not the proper plaintiff to allege these claims.  The Court grants summary judgment to Defendants on Counts 22 and 23.[10]

## D.  Count XVII

Defendants next contest MCD's standing to bring Count XVII.  This Count challenges Administrative Rule of Montana ("ARM") 44.11.504.[11]  Defendants contend that MCD has not alleged facts which would result in a violation of this regulation.  In its response brief to Defendants' motion for summary judgment,

---

finds MCD's claim that they are evidence of Motl's discrimination completely without merit.

[10] Arguably, however, Counts 22 and 23 of MCD's second amended complaint could be read to support an argument that Motl's alleged discriminatory actions also chilled MCD's speech because it did not distribute its mailers out of fear that Motl would punish the group for its views on dark money.  However, the Court finds this possible injury to be too speculative to support a claim for standing. For one, if Motl did pursue complaints against dark money groups, MCD could not prove that this pursuance was due to an improper motive. *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) (to establish a viewpoint discrimination claim, plaintiff must show that the government official's alleged discriminatory action was "because of not merely in spite of" plaintiff's message).  Second, according to MCD, its message is directed towards "promot[ing] and encourag[ing] policies that create jobs and grow local economies throughout Montana." (Doc. 100 at 17.) MCD's stated viewpoint thus has nothing to do with promoting dark money.

[11] This regulation provides that "[i]f a candidate or political committee, or member thereof, advises, counsels, or otherwise knowingly encourages any person to make an expenditure for the purpose of avoiding direct contributions, or for any other reason, the expenditure shall be considered a contribution by that person to the candidate or political committee encouraging the expenditure."  Admin. R. Mont. 44.11.504.

MCD concedes that it "did not allege facts in its complaint establishing a harm arising from that regulation" and "withdraws its challenge to ARM 44.11. 504." (Doc. 157 at 12.) The Court thus grants summary judgment to Defendants on Count XVII.

## II. Challenges to Political Committee and Disclosure Laws

Before the Court addresses MCD's challenges to Montana's political committee and reporting laws, the Court must first address MCD's standing to bring these claims.

### A. Standing

As previously mentioned, standing for pre-enforcement litigants can be established by alleging an injury in fact. *Lopez*, 630 F.3d at 785. MCD can establish an injury in fact by "demonstrating a realistic danger of sustaining a direct injury as a result of the [challenged] statute's operation or enforcement." *Id.* To demonstrate a realistic danger, MCD must allege an intention to engage in conduct arguably impacted by a constitutional interest, but prohibited by statute, and a credible threat of prosecution. *Id.*

Here, MCD has alleged an intention to engage in First Amendment related conduct. In its second amended complaint, the organization states an intention to engage in speech through the distribution of issue advocacy mailers. MCD has

provided copies of these mailers and the Court readily concludes that these mailers

constitute protected speech under the First Amendment.

Next, to establish standing, MCD must show that its intended speech is

prohibited under Montana law and the organization faces a credible threat of

prosecution as a result of its speech. *Id.* As described above, in order to satisfy its

burden, MCD must show: (1) a reasonable likelihood that the challenged laws will

be enforced against it; and (2) allegations "with some degree of concrete detail,

that [it] intend[s] to violate the challenged law." *Id.* at 786.

In analyzing the first factor, courts must determine if there is a credible

threat of enforcement. *Id.* This can include specific warnings or threats to initiate

proceedings under the challenged regulations, or a history of past enforcement

under the challenged regulations against similarly situated parties. *Id.* Applying

the second factor, MCD's intent to violate the law must be demonstrated by a

concrete plan detailing its future speech. *Id.* Demonstrated plans to distribute

flyers regarding a specific ballot initiative or mail postcards criticizing a

candidate's position on an issue have been sufficient to satisfy the intent to violate

factor. *Am. Civ. Liberties Union of Nev. v. Heller*, 378 F3d 979, 984 (9th Cir.

2004).

Here, the Court finds that MCD has satisfied both prongs and has standing

to challenge Montana's campaign committee reporting and disclosure laws. First, it is well documented that the Commissioner has enforced Montana's disclosure and reporting requirements against similarly situated parties in the past. (Doc. 28 at 8 (describing the fines imposed by the Commissioner against the political committee American Tradition Partnership for failing to report expenses).) MCD satisfies the first prong.

Next, to qualify as an incidental political committee, an organization need only spend $250 on electioneering communications distributed 60 days before an election. Mont. Code Ann. §§ 13–1–101(15)(a), 17(a)(ii), 22(a), (30)(a)(iii). As mentioned above, failure to adhere to Montana's committee reporting requirements subjects an organization to civil and criminal prosecution,[12] including monetary fines. Mont. Code Ann. § 13–37–228.

In this case, MCD has established that it intended to spend over $250 on mailers in September of 2014. MCD also states that it would like to send similar mailers in the future. At the hearing on the underlying motions and in its briefing, Defendants asserted that MCD would most likely be classified as an incidental committee. Finally, the parties agree that the individuals named in the September

_____

[12] The Court highly doubts that failure to report an electioneering communication would have subjected MCD to criminal prosecution. Indeed, at most, MCD would have been issued a civil fine.

2014 mailers were candidates in the upcoming November election.[13]

Under these facts, the Court concludes that MCD's 2014 mailers, at a minimum, would have been considered electioneering communications if distributed before the 2014 election. This distribution would have required MCD to register as a political committee. Failure to do so would most likely have subjected MCD to civil penalties. As discussed, the Commissioner has a history of past enforcement of these laws. Accordingly, the Court concludes that MCD has standing to bring its vagueness challenges to Montana's political committee and disclosures laws.

**B. Vagueness Challenges on the Merits**

MCD first challenges several of Montana's disclosure and reporting laws as facially unconstitutional. A facial challenge, in contrast to an as-applied challenge, argues a law is unconstitutional on its face. A law "may be facially unconstitutional in one of two ways: either it is unconstitutional in every conceivable application, or it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad."[14] *Foti v. City of Menlo Park*, 146

---

[13] The Court presumes that any future mailers would also contain images and names of current political candidates.

[14] MCD's overbreadth arguments are addressed *supra.*

F.3d 629, 635 (9th Cir. 1998) (punctuation marks omitted) (quoting *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984)).  Under a vagueness challenge, the first type of facial challenge, "the plaintiff argues that the ordinance could never be applied in a valid manner because it is unconstitutionally vague or it impermissibly restricts a protected activity." *Foti*,146 F.3d at 635 (citing *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir. 1984).

"A law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004) (citations omitted).  However, "perfect clarity is not required even when a law regulates protected speech." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").  Consequently, "even when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness." *California Teachers Ass'n*, 271 F.3d at 1151.

Additionally, a law is impermissibly vague if its "deterrent effect on legitimate expression is . . . both real and substantial." *Young v. American Mini*

*Theatres, Inc.*, 427 U.S. 50, 60 (1976) (quotation marks omitted) "Whether a statute's chilling effect on legitimate speech is substantial should be judged in relation to what the statute clearly proscribes." *California Teachers Ass'n,* 271 F.3d at 1151. However, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quotation marks omitted)). Further, the Court "must accept a narrowing construction to uphold the constitutionality of an ordinance if its language is 'readily susceptible' to it." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 942 (9th Cir. 1997) (quoting *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988)).

Lastly, when construing state statutes and regulations, this Court must follow Montana's rules of statutory interpretation. *Assn. des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 945 (9th Cir. 2013) ("In interpreting a state statute, we apply the state's rules of statutory construction."). In Montana, "the rules of statutory construction require the language of a statute to be construed according to its plain meaning." *Clarke v. Massey*, 897 P.2d 1085, 1088 (Mont. 1995).

### 1. Challenges to Statutory Definitions

MCD initially argues that the statutory definitions of contribution, expenditure, and political committee are unconstitutionally vague. MCD relies on two arguments for this contention. First, MCD asserts that the definitions of these terms are vague because they rely on one another for their meaning. Because their definitions are circular, MCD reasons, the Court must strike them down as vague. Second, MCD contends that the above terms are vague because they rely on the phrase "support or oppose." (Doc. 129 at 12.) This phrase, MCD suggests, has been interpreted by courts to be the functional equivalent of the "appeal-to-vote test," which, according to MCD, the United States Supreme Court views unfavorably. (*Id.* (citing *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007).) The Court will address each of these argument in turn.

### i. Circular Definitions

As discussed, MCD suggests that the statutory definitions of contribution, expenditure, and political committee are unconstitutionally vague because they are based on circular definitions. Under Montana law, a "Contribution" is defined as:

> (i) the receipt by a candidate or a political committee of an advance, gift, loan, conveyance, deposit, payment, or distribution of money or anything of value to support or oppose a candidate or a ballot issue;
> (ii) an expenditure, including an in-kind expenditure, that is made in coordination with a candidate or ballot issue committee and is

reportable by the candidate or ballot issue committee as a
contribution;
(iii) the receipt by a political committee of funds transferred from
another political committee; or
(iv) the payment by a person other than a candidate or political
committee of compensation for the personal services of another
person that are rendered to a candidate or political committee.

Mont. Code. Ann. § 13–1–101(9)(a). Further, an "Expenditure" is defined as:

a purchase, payment, distribution, loan, advance, promise, pledge, or
gift of money or anything of value:
(i) made by a candidate or political committee to support or oppose a
candidate or a ballot issue; or
(ii) used or intended for use in making independent expenditures or in
producing electioneering communications.[15]

Mont. Code Ann. § 13–1–101(17)(b). Lastly, as discussed above, a "Political

committee" is:

a combination of two or more individuals or a person other than an
individual who receives a contribution or makes an expenditure:
(i) to support or oppose a candidate or a committee organized to
support or oppose a candidate or a petition for nomination;
(ii) to support or oppose a ballot issue or a committee organized to
support or oppose a ballot issue; or
(iii) to prepare or disseminate an election communication, an
electioneering communication, or an independent expenditure.

---

[15] This statute further claries that an "'Expenditure' does not mean: (i) services, food, or
lodging provided in a manner that they are not contributions under subsection (9); (ii) payments
by a candidate for a filing fee or for personal travel expenses, food, clothing, lodging, or personal
necessities for the candidate and the candidate's family; (iii) the cost of any bona fide news story,
commentary, blog, or editorial distributed through the facilities of any broadcasting station,
newspaper, magazine, or other periodical publication of general circulation; or (iv) the cost of
any communication by any membership organization or corporation to its members or
stockholders or employees." Mont. Code Ann. § 13–1–101(17)(b).

Mont. Code Ann. § 13–1–101(30)(a).

MCD suggests that because the scope of contribution and expenditure are defined by political committee, and political committee relies on contribution and expenditure for its definition, these terms are circular and must be facially struck down. The Court disagrees.

Reading these terms in their context, the Court finds that their reliance on one another does not make them vague. Instead, this reliance facilitates clarity as to which groups are covered by Montana's campaign finance laws, i.e., candidates and political committees. Applying these terms as a whole, it is clear that a political committee is a "combination of two or more individuals or a person other than an individual," that either (1) receives "an advance, gift, loan, conveyance, deposit, payment, or distribution of money or anything of value to support or oppose a candidate or a ballot issue" (i.e., a "contribution"); or (2) makes a "purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value" (i.e, an "expenditure") to support or oppose a candidate or ballot issue. *See* Mont. Code Ann. §§ 13–1–101(3), (9), (17). Thus, the Court finds that these terms are not so vague that they fail "to provide a reasonable opportunity to know what conduct is prohibited." *Tucson Woman's Clinic*, 379

F.3d at 555.  The Court thus rejects MCD's first vagueness argument.

## ii.  Appeal to Vote Language

Next, MCD contends that because the statutory definitions of contribution, expenditure, political committee, and electioneering communication contain the terms "support or oppose," they are unconstitutionally vague.  MCD maintains that these terms are express advocacy or its functional equivalent—the appeal to vote test.  According to MCD, the appeal to vote test is vague under *Federal Election Commission  v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL II*"). Again, the Court disagrees and finds that these terms are not vague.

In *Yamada v. Snipes*, a Ninth Circuit decision cited above, the Court examined a vagueness challenge to the term "influencing" under Hawaii's campaign finance laws and rejected the challenge.  *Yamada*, 786 F.3d at 1188–1191.  There, the Court found that the term was not vague because it was significantly narrowed by the state's interpretation of the statute.  *Id.* at 1188–1189 (stating that the state's interpretation of "influence" did not create vagueness problems because the interpretation of the term "refers only to communications or activities that constitute express advocacy or its functional equivalent").  Further, the Ninth Circuit rejected the argument, similar to MCD's, that terms that regulate express advocacy or appeal to vote language are per se vague.  *See Id.* at 1191

("We therefore join the First, Fourth and Tenth Circuits in holding that the 'appeal to vote' language is not unconstitutionally vague.").

Here, like the law at issue in *Yamada*, the definition of "support or oppose" has been given a significantly narrowed definition which disarms, it not negates, any vagueness arguments applied to it. Indeed, the terms "support or oppose," are defined under Montana law to mean:

> (a) using express words, including but not limited to "vote", "oppose", "support", "elect", "defeat", or "reject", that call for the nomination, election, or defeat of one or more clearly identified candidates, the election or defeat of one or more political parties, or the passage or defeat of one or more ballot issues submitted to voters in an election; or
> (b) otherwise referring to or depicting one or more clearly identified candidates, political parties, or ballot issues in a manner that is susceptible of no reasonable interpretation other than as a call for the nomination, election, or defeat of the candidate in an election, the election or defeat of the political party, or the passage or defeat of the ballot issue or other question submitted to the voters in an election.

Mont. Code Ann. § 13–1–101(49). The Court finds that this narrowing definition, and in particular subsection (b), eliminates any vagueness arguments put forward by MCD because it seeks only to regulate express advocacy. *See WRTL II*, 551 U.S. 449, 469–470 (2007) ("[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.").

Because limited regulation of materials that constitute express advocacy is permissible under the Constitution, *see id.* at 465, the Court finds that MCD's second statutory vagueness argument is without merit.[16]

## 2. Challenges to Regulatory Definitions

MCD next challenges the regulatory definitions of contribution, expenditure, reportable election activity, and coordinated expenditure. The Court first notes that many of MCD's arguments rely on terms that were included in the draft versions of these rules, but not included in the rules that became effective on January 9, 2016. *See* Admin. R. Mont. 44.11.401(1), 44.11.501(1) (lacking the phrase "not limited to" in the definitions of "expenditure" and "contribution"); 44.11.603 (lacking the phrase "on a case-by-case basis" and "other factors and circumstances the commissioner determines are relevant" in the definition "de minimis act" which serves to define "political committee"). To the extent that MCD's arguments rely on these non-adopted terms, the Court rejects these arguments as moot.

---

[16] The Court notes that MCD cites previous applications of these statutes by Motl in various Commissioner cases as evidence that they are vague. Contrary to MCD's argument, under a vagueness challenge a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others." *Hunt v. City of Los Angeles*, 638 F.3d 703, 709–710 (9th Cir. 2011) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010). Thus, a vagueness challenge which asks the Court to consider application of the law to others is not appropriate.

### i. Political Committee Reporting Requirements

MCD first challenges the regulations constituting Montana's political committee reporting requirements under ARM 44.11.202(6) and 44.11.202(7), and the rule governing the filing of statements and reports under ARM 44.11.302. MCD contends that these statutes are vague because they contain or rely on terms that are defined by the words "may," "appeal," and "not limited to" in the definition of "reportable election activity." These terms, MCD stresses, invite mischief by the Commissioner in that they allow for arbitrary and discriminatory enforcement.

Examining these terms as a whole, the Court finds that MCD's arguments attempt to read vagueness into the rules where none existed before. First, the regulations define an incidental committee as:

> a political committee that does not have the *primary purpose* of supporting or opposing candidates or ballot issues. Incidental committee *reportable election activity*[17] *may* consist of:
> (a) making one or more expenditures;
> (b) accepting one or more designated contributions; or
> (c) accepting one or more contributions in response to an *appeal.*

---

[17] The rules define "Reportable Election Activity" as "includ[ing,] but is *not limited to* accepting a contribution, a contribution in response to an appeal, or a designated contribution, or making an expenditure, a contribution, a coordinated expenditure, an independent expenditure, or an in-kind contribution or expenditure, or making an election communication or electioneering communication." Admin. R. Mont. 44.11.103(31) (emphasis added).

Admin. R. Mont. 44.11.202(6) (emphasis added).  Similarly, an independent

committee is defined as:

> a political committee that has the *primary purpose* of supporting or
> opposing candidates or ballot issues but is neither a ballot issue nor a
> political party political committee.  Independent committee
> *reportable election activity may* consist of:
> (a) making one or more expenditures;
> (b) accepting one or more contributions.

Admin. R. Mont. 44.11.202(7) (emphasis added).  Lastly, the rules stipulate that

reports concerning election activities must be filed electronically, however, "the

commissioner *may* provide a waiver."  Admin. R. Mont. 44.11.302.

Here, the use of the word *may* does not permit the possible mischief alleged

by MCD.  Instead, it is clear that the use of *may* tells the Commissioner that any

activities following the term would constitute a reportable election activity.  *See*

Admin. R. Mont. 44.11.202(6) ("Incidental committee reportable election activity

*may* consist of"); Admin. R. Mont. 44.11.202(7) ("Independent committee

reportable election activity *may* consist of").  The Court finds that use of this term

is not vague under the plain language of the regulation.  Instead, the term is clearly

limited by the factors following it.[18]

---

[18] For this reason, MCD's argument that the phrase "primary purpose" is vague must also
fail.  MCD argues that this phrase gives the Commissioner too much discretion and allows for
arbitrary enforcement.  The Court disagrees and finds that the factors following this phrase limit
the Commissioner's discretion. *See* Admin. R. Mont. 44.11.202(6), (7); *see also* 44.11.203

Likewise, *may* under ARM 44.11.302 is permissible because it gives the Commissioner discretion to allow candidates and committees to opt-out of electronic reporting. This provision is clearly intended to allow an alternative for mandatory electronic election reporting due to the possibility that the reporter may not have access to the internet. The Court finds this discretion appropriate and not likely to lead to abuse.

Next, the use of the word *appeal* in ARM 44.11.202(6) does not make the regulation vague. Defendants provide a limiting interpretation of appeal to mean "request." (Doc. 120 at 29 (citing *The American Heritage Dictionary* 85 (5th ed., Houghton Mifflin Harcourt 2011) (defining appeal as "[a]n earnest or urgent request").) This limiting interpretation provides clarity to the rule and does not lead to impermissible vagueness.

Lastly, the Court agrees with Defendants that MCD is in no danger of arbitrary or discriminatory enforcement due to the phrase *not limited to* in the definition of "reportable election activity." Admin. R. Mont. 44.11.103(31). As discussed, Defendants state that MCD's 2014 mailers would most likely qualify as "electioneering communications," which is a reportable election activity. Regardless, even if this was not the case, "uncertainty at a statute's margins will

(defining *primary purpose* and limiting the definition based on identified factors).

not warrant facial invalidation if it is clear what the statute proscribes in the vast majority of its intended applications." *California Teachers Ass'n*, 271 F.3d at 1151 (quotation marks omitted). Here, the regulation describes numerous examples of activities that constitute reportable election activities following the phrase *not limited to*. *See* Admin. R. Mont. 44.11.103(31). Applicability of the law is thus clear in the majority of situations.

### ii. Derivative Challenges

Similar to its challenges aimed at the statutory definitions of "political committee," "expenditure," and "contribution," MCD also challenges the regulatory definition of "political committee," which relies on the statutory definitions of these terms for its meaning. *See* Admin. R. Mont. 44.11.202(1), (3); 44.11.401(1); 44.11.501(1) (citing to Mont. Code Ann. § 13–1–101). MCD contends that because these regulatory definitions cite to statutory definitions that are vague, the regulations are also vague. The Court disagrees and finds that these regulatory definitions are not vague for the reasons decided in section II.B.1 of this Order.

### 3. Vagueness Challenge to "Electioneering Communication"

MCD's final vagueness challenge is aimed at the statutory and regulatory definitions of "electioneering communication." This term is defined to mean:

a paid communication that is publicly distributed by radio, television, cable, satellite, internet website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:

(i) refers to one or more clearly identified candidates in that election;
(ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or
(iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.

Mont. Code Ann. § 13–1–101(15)(a). The regulatory definition is almost identical to the statutory definition. *See* Admin. R. Mont. 44.11.605.

MCD makes at least two arguments in support of its contention that this definition is vague. First, MCD contends that the definition is vague because the question of whether an electioneering communication "can be received by more than 100 recipients" is an indeterminable standard. The Court disagrees and finds that in the vast majority of cases it would not be challenging to determine if 100 people could receive a communication.

Here, for example, MCD states that it desired to distribute the aforementioned mailers in fall of 2014. It would thus be simple for MCD to determine if its mailers could be received by 100 people because the organization itself would know how many mailers, i.e., electioneering communications, were

sent.  Further, issues of newspaper or televison communications would also be easily ascertainable.  The sender would merely inquire with the distributor concerning the number of people in the publication or viewing audience.  MCD also argues that internet distribution is particularly problematic because it would be much harder to determine if 100 individuals received the communication. The Court agrees that there may be instances where it is not initially clear whether 100 people in a particular voting district would receive a communication if it was distributed over the internet.  However, this does not render the statute facially vague. *California Teachers Ass'n*, 271 F.3d at 1151 (stating that "constitution must tolerate a certain amount of vagueness").

Second, MCD argues that ARM 44.11.605(1)(c) is vague because it leaves people guessing as to their reporting requirements. Again, MCD reads vagueness into the statute.  The Court agrees with Defendants that the reporting required of an entity depends on its committee classification.  Here, MCD desires to distribute mailers that Defendants identify as electioneering communications.  Admin. R. Mont. 44.11.605(1)(c); Mont. Code Ann. § 13–1–101(15)(a).  This type of communication is an expenditure.  Mont. Code Ann. § 13–1–101(17)(a)(ii). Entities that make an expenditure, but do not support or oppose a candidate, must register and report as an incidental committee.  Mont. Code Ann.

§ 13–1–101(22)(a).  Therefore, application of this regulation to MCD is not vague and Defendants' motion for summary judgment on Count 18 (misidentified as Count XVII) is granted.

Thus, ultimately, because MCD's vagueness arguments fail, the Court grants summary judgment to Defendants on Counts III, IV, V, VIII, IX, XI, XII, XIII, XIV, XV, and XVI of MCD's second amended complaint.

## C.  Exacting Scrutiny

Next, MCD challenges Montana's political committee definitions and disclosure requirements as failing scrutiny review.  MCD also challenges these statutes and regulations as facially overbroad.

"[A] campaign finance disclosure requirement is constitutional if it survives exacting scrutiny, meaning that it is substantially related to a sufficiently important governmental interest."  *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010).  Disclosure requirements are constitutional because though they "may burden the ability to speak . . . [they] do not prevent anyone from speaking."  *Citizens United v. Fed. Election Commn.*, 558 U.S. 310, 366 (2010) (citations omitted).

### 1.  Governmental Interest

First, the Court is satisfied that Montana's disclosure laws serve "a

sufficiently important governmental interest." *Brumsickle*, 624 F.3d at 1005. As

discussed in this Court's opinion in *National Association for Gun Rights, Inc., v.*

*Murry*, "disclosure provides the electorate with information as to where political

campaign money comes from and how it is spent by the candidate in order to aid

the voters in evaluating those who seek . . . office." 969 F. Supp. 2d 1262, 1267

(D. Mont. 2013) (quoting *Buckley v. Valeo*, 424 U.S. 1, 66–67 (1976); *see also*

*Brumsickle*, 624 F.3d at 1005 ("[D]isclosure laws help ensure that voters have the

facts they need to evaluate the various messages competing for their attention.").

Further, "[p]roviding information to the electorate is vital to the efficient

functioning of the marketplace of ideas, and thus to advancing the democratic

objectives underlying the First Amendment." *Brumsickle*, 624 F.3d at 1005. Also,

in addition to providing voters with information, disclosure laws also serve to

deter actual corruption and avoid the appearance thereof, and aid in "gathering the

data necessary to enforce more substantive electioneering restrictions." *Alaska*

*Right To Life Comm. v. Miles*, 441 F.3d 773, 793 (9th Cir. 2006) (citation

omitted).

As discussed, the Court finds that Montana's disclosure laws serve a

important, if not compelling, government interest. Due the dramatic rise in

election spending in the last few decades, Montana's voters are inundated with

political televison advertisements and mailers. These communication seek to inform (or misinform) the voters and sway their opinions. Providing Montana voters with information about individuals and groups competing for their attention serve important government interests.

### 2. Substantial Relationship

As discussed, in order to satisfy exacting scrutiny, a disclosure law must be "substantially related" to the government interest. *Brumsickle*, 624 F.3d at 1005. MCD contends that multiple committee definitions and disclosure requirements are not substantially related and thus fail to meet exacting scrutiny. The Court will address each argument in turn.

MCD initially argues that Montana's reporting requirements are so burdensome, that no government interest could satisfy their requirements. The Court disagrees. As stated, if MCD would have distributed its mailers, the organization would have been required to register as a political committee. This would have required MCD to complete a form called the Statement of Organization (Form C-2). (Doc. 122-1.) Motl states that the C-2 form would take about 10 minutes to complete and would require the committee to list a "treasurer/contact for the group, a brief description of the committee type and purpose, a list of the names of candidates identified by expenditure and the name

and address of the bank used by the political committee." (Doc. 122 at 3.)

If the group qualified as an incidental committee, it would then be required to complete a C-4 form (Doc. 122-2) within five days of making an expenditure. This is a three page form that can be completed at the same time as the filing of the C-2 form. The C-4 form requires some basic information about the committee and a brief description of the expenditure. Committees that continue to make expenditures would need to file additional C-4 forms for each expenditure. The Court has reviewed these forms and deems them less complicated than federal or state personal income tax forms.

However, MCD alleges that ARM 44.11.402(5) and 44.11.302 impose substantial burdens on political committees. These regulations require that a contribution, as described in MCA § 13–1–101(9)(a), be reported within two days of its receipt. Admin. R. Mont. 44.11.402(5). Additionally, this report must be filed electronically with the Commissioner. Admin. R. Mont. 44.11.302. MCD charges that, first, these requirements require undue excessive reporting, and second, electronic reporting is burdensome due to Montana's rural nature. The Court disagrees.

First, repeated reporting reflects the reality of election expenditures and contributions. Political committees are constantly making new expenditures and

receiving contributions. It is common sense that in order to inform the electorate about a committee's spending or receipt of funds before an election, these events must be reported on a continual and timely basis. Second, the Court strenuously disagrees with MCD that electronic reporting is burdensome. Electronic reporting allows for timely reporting and furthers the State's interest in transparency. Further, the United States Supreme Court has recognized the benefits of electronic reporting. *See Citizens United*, 558 U.S. at 370 (discussing how "modern technology makes disclosures rapid and informative"). Finally, as discussed above, ARM 44.11.302 allows committees to opt-out of electronic reporting. Thus, the above-discussed regulations satisfy exacting scrutiny.

Next, MCD alleges that Montana's requirement that election communications, electioneering communications, and independent expenditures include a "paid for by" attribution does not meet exacting scrutiny. Mont. Code. Ann. § 13–35–225; Admin. R. Mont. 44.11.601. MCD contends that these are content based restrictions that are "not narrowly tailored to serve an overriding state interest[,] they compel information already disclosed to the Commissioner[,] and are underinclusive because they require insufficient information." (Doc. 129 at 31 (citing *Am. Civ. Liberties Union of Nev.*, 378 F3d at 998).) MCD is incorrect.

First, the Court disagrees with MCD's characterization of these provisions as not narrowly tailored. In *American Civil Liberties Union of Nevada v. Heller*, the Ninth Circuit held unconstitutional a state statute that required disclosure of the names and addresses of the persons who either paid for or were "responsible for paying for the publication of any material or information relating to an election, candidate or any question on a ballot to identify their names and addresses on any published printed or written matter or any photograph." 378 F.3d at 981, 1002 (quotation and punctuation marks omitted). There, the Court found the statute impermissibly overbroad because it was not narrowly tailored to serve an overriding state interest. *Id.* at 993–1001. This conclusion was based in large part by the wide-ranging application of the statue which applied to "any material or information relating to an election." *Id.* at 986.

However, after finding that the statute was not narrowly tailored, the Court clarified that its holding in no way proscribed another more finely tuned statute which required disclosure on the publication. *See id.* at 1000 ("Our conclusion that the Nevada statute at issue here is not narrowly tailored to assist the state in enforcing other campaign finance laws should not in any way suggest that an on-publication identification requirement could never be narrowly tailored to achieve this goal.").

Indeed, in *Yamada*, the Ninth Circuit upheld a statute that required on-publication disclosure due, in large part, because the burdens imposed were minimal. *Yamada*, 786 F.3d at 1202 (describing the statute as imposing "only a modest burden on First Amendment rights"). Here, like the statute at issue in *Yamada*, the disclosure required under Montana's so-called "anonymous speech ban" only requires the "name and address of the person who made or financed the expenditure for the communication." Mont. Code. Ann. § 13–35–225. Thus, to be in compliance with this statute, the vast majority of communications would only be required to add a sentence or two at most. Also, unlike the statute in *Heller*, which applied to "any material or information relating to an election," Montana's statute only applies to a handful of specifically designated communications. *See* Mont. Code. Ann. § 13–35–225(1). Montana's statute is thus easily distinguishable from the one at issue in *Heller*. The Court finds that the First Amendment burdens imposed by this statute are outweighed by the benefits of disclosure to the electorate.

Additionally, the Court notes that MCD's mailers would qualify as an electioneering communication. The disclosure requirement for this communication only goes into effect if it is made sixty days before an election. *See* Mont. Code. Ann. § 13–1–101(15)(a). Here, the Court finds that Montana's

requirement that electioneering communications include a "paid for by" attribution is narrowly tailored because the disclosure requirements only go into effect within the two months leading up to an election. *Yamada*, 786 F.3d at 1203 n.14 ("*Citizens United*'s post-*McIntyre*, post-*Heller* discussion makes clear that disclaimer laws . . . may be imposed on political advertisements that discuss a candidate shortly before an election.").

Accordingly, the Court concludes that Montana's political committee disclosure requirements and definitions are "substantially related to a sufficiently important governmental interest," and satisfy scrutiny review because the disclosure required under them "increases as a political committee more actively engages in campaign spending and as an election nears." *Brumsickle*, 624 F.3d 990 at 1013.[19] The Court grants summary judgment to Defendants on Counts X, 19 (misidentified as XVIII) and 20 (misidentified as XIX).

### D. Overbreadth Challenges

Closely related to MCD's challenges under exacting scrutiny, the organization also challenges Montana's political committee statutory and

---

[19] MCD also argues that the Commissioner's investigatory powers are also unconstitutional under scrutiny review. *See* Mont. Code. Ann. § 13–37–111; Admin. R. Mont. 44.11.106. However, as discussed in section I.B. of this Order, MCD fails to allege a viable injury in fact due to the enforcement of these powers. Thus, MCD lacks standing to challenge these provisions under scrutiny review.

regulatory definitions as unconstitutionally overbroad. Specifically, MCD contends that Montana's law and regulations pertaining to political committees are overboard. However, because the Court has determined that Montana's political committee laws satisfy exacting scrutiny, the Court need not address MCD's overbreadth arguments because MCD is incapable of showing that the alleged overbreadth of these provisions "is both real and substantial." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Thus, the Court rejects MCD's overbreadth arguments as they pertain to MCA § 13–1–101(30) ("Political committee" statutory definition) and ARM 44.11.202(2) ("Political committee" regulatory definition). However, in the interest of thoroughness, the Court will briefly address a few of MCD's arguments pertaining to overbreadth.

MCD argues that Montana's political committee definitions are overly broad because they are not limited to groups with the "major purpose" of nominating or electing candidates. However, as discussed in the Court's Order denying the motion for preliminary injunction, the Ninth Circuit has rejected any bright-line "major purpose test." *See Yamada*, 786 F.3d at 1200–1201 ("[Plaintiff's] argument that regulations should reach only organizations with a primary purpose of political advocacy also ignores the 'fundamental organizational reality that most organizations do not have just one major

purpose.'") (quoting *Brumsickle*, 624 F.3d at 1011.  MCD's "major purpose"

argument is thus without support.

Next, similar to its vagueness arguments, MCD also apparently challenges

MCA § 13–1–101(15) and ARM 44.11.605 as overbroad, which discuss the

definition of electioneering communications.  In its brief in support of summary

judgment, MCD states that the  "vast sweep [of these regulations] (which could

include filings in this lawsuit) bears no substantial relation to Montana's

information interest."  (Doc. 129 at 30.)  The Court disagrees and rejects MCD's

argument for the reasons discussed in section II.C.2.  The Court grants summary

judgment to Defendants on Counts I and VI.

### E. As-Applied Challenge

Finally, MCD contends that Montana's political committee definitions,

specifically MCA § 13–1–101(30) and ARM 44.11.202(2), are unconstitutional

as-applied to the organization.  MCD states that it has no interest in engaging in

political activities and merely seeks to "promote the social welfare" by "engaging

in grassroots advocacy and issues-oriented educational campaigns."  (Doc. 126 at

21.)  MCD asserts that it only intends to engage in issue advocacy and thus

Montana's political committee and disclosure laws are not tailored to any

cognizable interest as applied to the organization.  Again, the Court disagrees.

"An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (citations omitted). Further, "[a] successful as-applied challenge does not render the law itself invalid but only the particular application of the law." *Id.*

As discussed, the State of Montana has an important, if not compelling, interest in the regulation of political speech during the time immediately preceding an election. *Alaska Right To Life Comm.*, 441 F.3d at 793 ("[T]here is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way."). Here, MCD desired to send "issue advocacy" mailers in the sixty days preceding the 2014 election. Further, these mailers would cost in excess of $250 and name candidates for political office, in addition to including their images. MCD states that it desires to engage in political speech, though it argues that it does not support or oppose a particular political candidate.[20] (Doc. 126 at 21.) Despite this assertion, these mailers would qualify as electioneering communications and would require MCD to register as a

---

[20] This assertion is apparently contradicted by the testimony of Bill Coate, the President of MCD, who stated that the organization's message is "irrelevant unless people are educated on how they go into the voting booth." (Doc. 123-1 at 14.)

incidental committee and report its expenditures. As described, the burdens associated with incidental committee reporting are minimal and narrowly tailored to the State's interest in disclosure. Further, as discussed, MCD's incidental committee reporting requirements satisfy exacting scrutiny.

Despite this finding, MCD argues that Montana cannot regulate its speech because it does not have a "major purpose, a primary purpose, or even a priority of the nomination or election of a candidate or candidates in Montana." (Doc. 129 at 28 (internal quotation marks omitted).) These arguments have been rejected by the Ninth Circuit. *Yamada*, 786 F.3d at 1200; *Brumsickle*, 624 F.3d at 1011; *see also Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 489 (7th Cir. 2012) ("[L]imiting disclosure requirements to groups with the major purpose of influencing elections would allow even those very groups to circumvent the law with ease."). Also, even if the Court takes MCD at its word that it intends to pursue only issue advocacy, regulation of issue advocacy is permitted if justified by a compelling state interest. *Alaska Right To Life Comm.*, 441 F.3d at 793.

Here, regulation of MCD's electioneering communications, which seek to "educate" the electorate about candidates for office in the time preceding an election, is warranted because it provides "the voting public with the information with which to assess the various messages vying for their attention in the

marketplace of ideas." *Brumsickle*, 624 F.3d at 1008. Further, and most importantly, MCD provides no explanation why the organization is incapable of complying with Montana's disclosure requirements. *Id.* at 1022 (rejecting an as-applied challenge brought by an organization because it was unable to show why it could not comply with the state's disclosure laws). Consequently, requiring MCD to disclose that it is distributing these mailers is constitutionally sound. The Court thus finds that these regulations are constitutional as-applied to MCD. The Court grants summary judgment to Defendants on Counts II and VII.

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc 119) is GRANTED.

IT IS FURTHERED ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 125) is DENIED.

IT IS FURTHERED ORDERED that Defendants' Motion to Strike (Doc. 169) is GRANTED.

The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiff.

This case is CLOSED.

DATED this 31st day of October, 2016.

Dana L. Christensen, Chief District Judge
United States District Court